No. 21-10486

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

DARCY CORBITT, et al.,
Plaintiffs-Appellees.

v.

HON. HAL TAYLOR, in his official capacity as
Secretary of the Alabama Law Enforcement Agency, et al.,
Defendants-Appellants,

_____

On Appeal from the United States
District Court for the Middle District of Alabama
Case No. 2:18-cv-00091-MHT-SMD

_____

BRIEF OF PLAINTIFFS-APPELLEES
_____

Rose Saxe
James D. Esseks
Leslie J. Cooper
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2605

Gabriel Arkles
David Brown
TRANSGENDER LEGAL DEFENSE AND
EDUCATION FUND
520 Eighth Avenue, Ste. 2204
New York, NY 10018
(646) 993-1688

LaTisha Gotell Faulks
Kaitlin Welborn
ACLU FOUNDATION OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 420-1741

*Attorneys for Plaintiffs-Appellees*

## AMENDED CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit

Rule 26.1-1(a)(3) and 26.1-2(b), the undersigned counsel certifies that the following

listed persons and parties may have an interest in the outcome of this case:

1.  Alabama Attorney General's Office;
2.  Alabama Center for Law and Liberty;
3.  Alabama Law Enforcement Agency;
4.  Alabama Policy Institute;
5.  American Civil Liberties Union Foundation;
6.  American Civil Liberties Union Foundation of Alabama;
7.  American Civil Liberties Union of Alabama;
8.  Archer, Jon;
9.  Arkles, Gabriel;
10. Barnes, Meridith H.;
11. Barnes, Noel S.;
12. Boone, Brock;
13. Borden, Hon. Gray M.;
14. Brown, David;
15. Chynoweth, Brad A.;
16. Clark, Destiny;
17. Clark, Matthew J.;
18. Cooper, Leslie J.;
19. Corbitt, Darcy;
20. Davis, James W.;
21. Doe, Jane (see doc. 41);
22. Doe, John (see doc. 10);
23. Doyle, Hon. Stephen M.;
24. Eastman, Jeannie;
25. Esseks, James D.;
26. Faulks, LaTisha Gotell;
27. LaCour Jr., Edmund G.;
28. Marshall, Randall C.;
29. Marshall, Hon. Steve;
30. Messick, Misty S. Fairbanks;

31.    Pregno, Deena;
32.    Robinson, Michael W.;
33.    Saxe, Rose;
34.    Sinclair, Winfield J.;
35.    Taylor, Hon. Hal;
36.    Thompson, Hon. Myron H.;
37.    Transgender Legal Defense and Education Fund;
38.    Ward, Charles;
39.    Welborn, Kaitlin; and,
40.    Wilson, Thomas A.

Counsel for the Appellees further certify that no additional publicly traded company or corporation has an interest in the outcome of this case or appeal.

Respectfully submitted this 26th day of July 2021.


/s Kaitlin Welborn
Kaitlin Welborn
*Attorney for Plaintiffs-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellees believe that oral argument would assist the Court in addressing the important questions of constitutional law raised in this case.

# TABLE OF CONTENTS

Amended Certificate of Interested Persons ..........................................................C-1

Statement Regarding Oral Argument ....................................................... i

Table of Contents ........................................................................ ii

Table of Authorities ..................................................................... iv

Statement of the Issues.....................................................................1

Statement of the Case.......................................................................2

     I.     Policy Order 63 ...........................................................3

     II.    The Policy's Harmful Effect on Plaintiffs ...........................6

          A.   Darcy Corbitt ....................................................8

          B.   Destiny Clark ....................................................9

          C.   Jane Doe........................................................11

     III.   Course of Proceedings...................................................12

Summary of the Argument....................................................................14

Argument  .....................................................................................16

     I.     The Policy Violates the Equal Protection Clause ..................16

          A.   The Policy Enacts a Sex-Based Classification ..............25

          B.   The Policy's Sex-Based Classification Is Subject to Heightened Scrutiny……………………………………………………………..20

          C.   The Policy Fails Any Level of Review..........................24

              i.     The Policy serves no important purpose and fails heightened scrutiny......................................................24

a.    The Policy is arbitrary. ........................................................25

b.    Consistency with Alabama's birth certificate policy is not an important government interest for purposes of heightened scrutiny. ............................................................27

c.    The State's *post-hoc* justifications cannot satisfy heightened scrutiny. ............................................................31

(1)    The Policy undermines accurate identification. .............31

(2)    The Policy is not closely or substantially related to any other important law enforcement or correctional interests. ............................................................36

ii)    The Policy would not withstand even rational basis review .....39

II.    The Policy Unconstitutionally Deprives Plaintiffs of Due Process and Compels Speech. ..................................................................40

A.    The Policy Violates Plaintiffs' Right to Informational Privacy. ....40

B.    The Policy Violates Plaintiffs' Right to Refuse Medical Care. .......44

C.    The Policy Violates Plaintiffs' Free Speech Rights. .....................46

III.    The Plaintiffs Sued Within the Statute of Limitations. ........................49

Conclusion ..........................................................................................51

Certificate of Compliance .......................................................................53

Certificate of Service ............................................................................54

iii

# TABLE OF AUTHORITIES

## Cases

*Adams v. Sch. Bd. of St. Johns Cty., Fla.*, __ F.4th __, No. 18-13592,
   2021 WL 2944396 (11th Cir. July 14, 2021) ..............................................passim

*Anderson v. City of Bessemer, N.C.*,
   470 U.S. 564 (1985) ...........................................................................................29

*Arroyo Gonzalez v. Rossello Nevares*,
   305 F. Supp. 3d 327 (D.P.R. 2018) .............................................................33, 39

*Bailey v. Alabama*,
   219 U.S. 219 (1911) ...........................................................................................45

*Beavers v. Am. Cast Iron Pipe Co.*,
   975 F.2d 792 (11th Cir. 1992)............................................................................49

*Bonner v. City of Prichard, Ala.*,
   661 F.2d 1206 (11th Cir. 1981)..........................................................................41

*Bostock v. Clayton County, Ga.*,
   140 S. Ct. 1731 (2020) ...........................................................................12, 17, 18

*Brown v. Board of Education*,
   347 U.S. 483 (1954) ...........................................................................................50

*City of L.A., Cal. v. Patel*,
   576 U.S. 409 (2015) ...........................................................................................36

*City of Richmond v. J.A. Croson Co.*,
   488 U.S. 469 (1989) ...........................................................................................23

*Collier v. Dickinson*,
   477 F.3d 1306 (11th Cir. 2007).....................................................................42, 43

*Cooper v. Harris*,
   137 S. Ct. 1455 (2017) .......................................................................................15

*Craig v. Boren,*
    429 U.S. 190 (1976) ........................................................................25

*Cruzan v. Dir., Mo. Dep't of Health,*
    497 U.S. 261 (1990). ......................................................................44

*Darnell v. Lloyd,*
    395 F. Supp. 1210 (D. Conn. 1975) ...............................................21

*De Veloz v. Miami-Dade Cty.,*
    756 F. App'x 869 (11th Cir. 2018).................................................38

*Diamond v. Owens,* 5:20-cv-00453-MTT,
    Doc. No. 64 (M.D. Ga. Apr. 22, 2021) ..........................................38

*Doe v. Frank,*
    951 F.2d 320 (11th Cir. 1992)........................................................44

*Farmer v. Brennan,*
    511 U.S. 825 (1994) .......................................................................38

*Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.,*
    830 F.3d 1242 (11th Cir. 2016)......................................................29

*Frontiero v. Richardson,*
    411 U.S. 677 (1973) .......................................................................37

*\*F.V. v. Barron,*
    286 F. Supp. 3d 1131 (D. Idaho 2018)......................................*passim*

*Glenn v. Brumby,*
    663 F.3d 1312 (11th Cir. 2011)................................................18, 31

*Hecox v. Little,*
    479 F. Supp. 3d 930 (D. Idaho 2020).............................................20

*Hunter v. Underwood,*
    471 U.S. 222 (1985) .......................................................................20

*In re Childers-Gray*,
    487 P.3d 96 (Utah 2021) ........................................................................33

*In re Feldhaus*,
    796 S.E.2d 316 (Ga. Ct. App. 2017) ....................................................33

*In re Golden*,
    56 A.D.3d 1109 (N.Y. App. Div. 2008) ...............................................33

*James v. City of Douglas, Ga.*,
    941 F.2d 1539 (11th Cir. 1991) ............................................................41

*Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*,
    438 F.3d 195 (2d Cir. 2006) .................................................................23

*J.E.B. v. Ala. ex rel. T.B.*,
    511 U.S. 127 (1994) ...............................................................................22

*K.L. v. State, Dep't of Admin., Div. of Motor Vehicles*, No. 3AN-11-05431-CI,
    2012 WL 2685183 (Alaska Super. Ct. Mar. 12, 2012). ............................. 32, 34

*Lebron v. Sec'y, Fla. Dep't of Child. & Fam.*,
    710 F.3d 1202 (11th Cir. 2013) ...........................................................45

*\*Love v. Johnson*,
    146 F. Supp. 3d 848 (E.D. Mich. 2015) ...................................... passim

*Loving v. Virginia*,
    388 U.S. 1 (1967) ............................................................... 17, 22, 23

*McLaughlin v. State of Fla.*,
    379 U.S. 184 (1964) ...............................................................................31

*Missouri v. Jenkins*,
    515 U.S. 70 (1995) .................................................................................22

*N.A.A.C.P. v. Hunt*,
    891 F.2d 1555 (11th Cir. 1990) ............................................................46

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   138 S. Ct. 2361 (2018)........................................................................47

*Obergefell v. Hodges*,
   576 U.S. 644 (2015)...........................................................................36

*Peightal v. Metro. Dade Cty.*,
   26 F.3d 1545 (11th Cir. 1994). ..........................................................23

*Perry v. Sindermann*,
   408 U.S. 593 (1972)...........................................................................45

*Pers. Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979)...........................................................................25

*Planned Parenthood of Se. Pa. v. Casey*,
   505 U.S. 833 (1992) ..................................................................... 44, 45

*Plante v. Gonzalez*,
   575 F.2d 1119 (5th Cir. 1978) ...........................................................41

*Powell v. Schriver*,
   175 F.3d 107 (2d Cir. 1999) ..............................................................41

*Pryor v. Reno*,
   171 F.3d 1281 (11th Cr. 1999) ..................................................... 42, 43

*Ray v. Himes*, No. 2:18-CV-272,
   2019 WL 11791719 (S.D. Ohio Sept. 12, 2019) ......................... 42, 43

*Ray v. McCloud*,
   507 F. Supp. 3d 925 (S.D. Ohio 2020) ........................................ 19, 33

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
   487 U.S. 781 (1988)...........................................................................46

*Rozar v. Mullis*,
   85 F.3d 556 (11th Cir. 1996) .............................................................50

*Shelley v. Kraemer*,
  334 U.S. 1 (1948) ............................................................................28

*Skinner v. Oklahoma*,
  316 U.S. 535 (1942) ........................................................................44

*Sly v. State*,
  387 So. 2d 913 (Ala. Crim. App. 1980) ..........................................44

*Summit Med. Assocs., P.C. v. Pryor*,
  180 F.3d 1326 (11th Cir. 1999) ......................................................49

*U.S. Dep't of Agric. v. Moreno*,
  413 U.S. 528 (1973) ........................................................................40

*United States v. Virginia*,
  518 U.S. 515 (1996) ..................................................................22, 25

*Va. Hosp. Ass'n v. Baliles*,
  868 F.2d 653 (4th Cir. 1989) ..........................................................49

*Washington v. Glucksberg*,
  521 U.S. 702 (1997). .......................................................................45

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
  135 S. Ct. 2239 (2015) ..............................................................47, 48

*Whalen v. Roe*,
  429 U.S. 589 (1977). .......................................................................41

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
  858 F.3d 1034 (7th Cir. 2017) ........................................................17

*Wooley v. Maynard*,
  430 U.S. 705 (1977) ..................................................................46, 47

*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ..................................................................47, 48

**Acts and Statutes**

Ala. Code § 6-2-38(*l*)................................................................49

Ala. Code § 8-17-222 ..............................................................44

Ala. Code § 9-11-44 ................................................................44

Ala. Code § 16-27-4 ................................................................44

Ala. Code § 16-64-3 ................................................................44

Ala. Code § 17-9-30 ................................................................44

Ala. Code § 22-9A-19................................................................3

Ala. Code § 32-6-1 ..................................................................44

Ala. Code § 32-6-9 ..................................................................44

Ala. Code § 32-6-18 ................................................................55

Ala. Code § 32-10-2 ................................................................44

REAL ID Act of 2005, Pub. L. No. 109-13, § 202(b)(3), 119 Stat. 231, 312.........48

**Other Authorities**

Andrew Flores et al., Williams Inst., *How Many Adults Identify as Transgender In The United States?* 3 (2016), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Adults-US-Aug-2016.pdf. .................................1

*Equality Maps: Identity Document Laws and Policies*, Movement Advancement Project, https://www.lgbtmap.org/equality-maps/identity_document_laws (last visited July 26, 2021).................................................26

*How Trans Friendly Is The Driver's License Gender Marker Change Policy In Your State?*, Nat'l Ctr. for Transgender Equal. (July 2021), https://transequality.org/sites/default/files/Drivers%20License%20Grades %20July%202021a_0.pdf.................................................5

## Other Authorities

Andrew Flores et al., Williams Inst., *How Many Adults Identify as Transgender In The United States?* 3 (2016), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Adults-US-Aug-2016.pdf. ................................................. 1

*Equality Maps: Identity Document Laws and Policies*, Movement Advancement Project, https://www.lgbtmap.org/equality-maps/identity_document_laws (last visited July 26, 2021) ................................................................... 26

*How Trans Friendly Is The Driver's License Gender Marker Change Policy In Your State?*, Nat'l Ctr. for Transgender Equal. (July 2021), https://transequality.org/sites/default/files/Drivers%20License%20Grades%20July%202021a_0.pdf ........................................................................... 5

*Selecting Your Gender Marker*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/passports/need-passport/selecting-your-gender-marker.html ........................................................................................... 5

## Regulations and Rules

Ala. Admin. Code r. 262-X-4.02(13)(b)(1) .............................................. 44

Ala. Admin. Code r. 540-X-7App.B .................................................. 44

Ala. Admin. Code r. 660-5-29.02 ...................................................... 44

Ala. Admin. Code r. 790-X-2.01 ...................................................... 44

6 C.F.R. § 37.17 ....................................................................... 36

28 C.F.R. § 115.42(c), (e) .............................................................. 38

Fed. R. Civ. P. 30(b)(6) ............................................................... 30

## STATEMENT OF THE ISSUES

The Alabama Law Enforcement Agency's ("ALEA") Policy Order 63 ("the Policy"),[1] prevents transgender[2] Alabamians from changing the sex designation on their driver's licenses unless they have had "complete" "gender reassignment surgery," including genital surgery. The issues on appeal are: whether the district court correctly held that the Policy violates the Equal Protection Clause by classifying Plaintiffs based on sex for no genuine, important reason, *see generally* Doc. 101[3]; whether the Policy violates Plaintiffs' Fourteenth Amendment right to informational privacy, their Fourteenth Amendment right to refuse medical treatment, and their First Amendment right to refrain from associating with and disseminating the message that their sex is male; and whether the district court

---

[1] The Policy has evolved somewhat over time, and at one point may have been unwritten. But it has apparently always required surgery, amendment of one's birth certificate (which requires surgery if one was born in Alabama or certain other states, as were the Plaintiffs), or both. Because these requirements are the object of the Plaintiffs' challenge, Plaintiffs use "the Policy" to refer to both the current and previous iterations of this policy, unless otherwise indicated.

[2] Transgender people are those whose gender identity—their deeply-held understanding of who they are—differs from the sex they were assigned at birth. As of 2016, there were an estimated 22,500 transgender adults living in Alabama. *See* Andrew Flores et al., Williams Inst., *How Many Adults Identify as Transgender In The United States?* 3 (2016), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Adults-US-Aug-2016.pdf.

[3] "Doc. __" refers to docket entries in the district court. The pin-cited page numbers correspond to CM/ECF pagination.

correctly held that Plaintiffs Darcy Corbitt and Destiny Clark filed suit within the statute of limitations.

## STATEMENT OF THE CASE

This case is about whether Alabama may force transgender people to undergo surgery as a condition of receiving a driver's license that accurately designates their sex. In denying Plaintiffs' applications to correct their sex designations, the State[4] discriminated against them based on sex; compelled them to disclose their transgender status every time they displayed their license; conditioned their receipt of a license they could safely use on submitting to permanently sterilizing surgery; and forced them to display and associate themselves with a message contrary to their most fundamental beliefs. As a result of the Policy, among other harms, Ms. Clark has feared for her life when casting a ballot; Ms. Doe has been turned away for services at a credit union; and Ms. Corbitt had to miss a family member's funeral.

Alabama is one of only a handful of states with such a policy, and thus far every federal court to consider a comparable policy has ruled it unconstitutional. The Policy puts transgender people's lives at risk and has no scientific basis. The State has offered no justification for its policy beyond a desire for consistency with a state law regarding birth certificates, and speculative, *post-hoc* rationales regarding

---

[4] "The State" refers to the Appellees, collectively.

identification and the implementation of sex-based law enforcement and correctional policies.

The district court held that the Policy violated Plaintiffs' rights under the Equal Protection clause. That decision should be affirmed.

## I.    POLICY ORDER 63.

Plaintiffs seek an Alabama driver's license with a sex designation that matches the sex they know themselves to be, and which they can use without risk of harm, regardless of their surgical history. If they lived in any of at least forty other U.S. jurisdictions, they could do so. But Alabama is their home. And Alabama denied each of them a license with the correct the sex designation because they have not had a sterilizing surgery that Ms. Doe cannot afford, Ms. Clark does not want or need, Ms. Corbitt does not believe is consistent with God's plan for her. Doc. 52-28 at 4; Doc. 52-36 at 32; Doc. 52-42 at 7 (sealed); Doc. 101 at 7.

ALEA's Policy Order 63 allows transgender people to correct the sex designation on a driver's license only after "gender reassignment surgery," and requires applicants to submit "[a]n amended state certified birth certificate and/or a letter from the physician that performed the reassignment procedure." Doc. 52-1 at 2. The State created the Policy for one purpose: to achieve consistency with a state statute that requires a court order based on proof of "surgical procedure" to amend the sex designation on a birth certificate, Ala. Code § 22-9A-19. *See* Doc. 101 at 17.

The State admitted that it did not create or revise the Policy for any other purpose. *See* Doc. 101 at 35–36; *see also* Doc. 52-3 at 14, 16.

The State has additionally enforced an unwritten interpretation of its Policy on many, but not all, applicants, requiring the surgery to be "complete." Doc. 101 at 5, 28–31. While the State imposes this requirement in an effort to ensure transgender people have undergone at least genital surgery and possibly also chest surgery, in practice it often approves sex designation changes where a physician's letter describes a surgery as "completed," without specifying what the procedure was. *Id.* at 28–31. Thus, the district court found, "there is no rhyme or reason at all" to the State's application of its unwritten completeness rule: "[W]hether [the State] will approve a change of sex designation appears to turn on the particular phrasing of the doctor's letter provided, or even an ALEA staff member's impressionistic sense of the letter's sufficiency." *Id.* at 28.[5]

The Policy also does not apply to transgender people who acquire an Alabama driver's license for the first time after they have already updated the gender marker on their passport, out-of-state license, or out-of-state birth certificate. *See id.* at 6;

---

[5] The State granted some applications based on physician letters that failed to specify whether the applicant had genital surgery. *See* Doc. 52-6 (sealed); Doc. 52-7 (sealed); Doc. 52-8 (sealed); Doc. 52-9 (sealed); Doc. 52-10 (sealed); *see also* Doc. 52-2 at 28–30. Yet it rejected other applications with similar letters for failure to specify genital surgery. *See* Doc. 52-11 (sealed); Doc. 52-12 (sealed).

Doc. 52-2 at 30; Doc. 52-24 at 9–11.[6] Thus, the Policy applies only to those transgender Alabamians who were not fortunate enough to update the sex marker on their identification before they required an Alabama license.

In requiring any form of surgery at all, Alabama is an outlier. Most other U.S. jurisdictions do not require documentation of any specific form of medical or surgical treatment, and many do not require any medical evidence at all.[7] Nor does the federal government.[8]

In litigation the State asserted various interests it claims the Policy serves, beyond the only genuine, contemporaneous reason it offered. These interests include identifying people and applying sex-based correctional and law enforcement policies. Doc. 101 at 16–17. But it produced no evidence that the Policy serves these interests. Rather, the State's witnesses testified that under most situations where law enforcement officers seek to identify whether the person presenting a driver's license

---

[6] The State did not present any evidence of harms to its interests from awarding those transgender people licenses with a correct sex marker, despite not having shown proof of surgery, whether or not the surgery was "complete."

[7] *See How Trans Friendly Is The Driver's License Gender Marker Change Policy In Your State?*, Nat'l Ctr. for Transgender Equal. (July 2021), https://transequality.org/sites/default/files/Drivers%20License%20Grades%20July%202020 21a_0.pdf (38 states, D.C., and Puerto Rico).

[8] *See Selecting Your Gender Marker*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/passports/need-passport/selecting-your-gender-marker.html (last visited July 26, 2021); Doc. 52-15 at 15–16; Doc. 52-16 at 4; Doc. 52-17 at 2–3; *see generally* Doc. 52-18.

truly is its holder, the person's surgical history, genitalia, and reproductive organs are irrelevant, and that a policy reflecting a person's gender identity would satisfy the same law enforcement and correctional interests that the Policy does. *See* Doc. 52-3 at 23–25; *see also* Doc. 48-9 at 10, 27, 30 (recommending that transgender people not be classified based on genital status in law enforcement and correctional settings).

## II.    THE POLICY'S HARMFUL EFFECT ON PLAINTIFFS.

Many transgender people experience a medical condition called gender dysphoria, in which they experience distress due to an inconsistency between their gender identity and their assigned sex at birth. *See* Doc. 52-45 at 5. Treatment for this condition is individualized, and the goal of treatment is to alleviate the distress. *Id.* at 9–12. At minimum, treatment requires the person to live in the gender which they know themselves to be. *Id.* at 6. Although some transgender people additionally need one or more form of surgery, for others, surgery is unnecessary to treat their symptoms, or contraindicated because of risk of complications. *Id.* at 9–11. Genital surgery for transgender women and most transgender men results in sterilization. *Id.* at 12. Also, unfortunately, many transgender people cannot access all the healthcare they might need. *Id.* at 9.

Changing the sex designation on a license in and of itself is a form of treatment for gender dysphoria, and often a lifesaving one. *Id.* at 6–7. Permitting 100

transgender people to change an identity document prevents nine cases of suicidal ideation and two suicide attempts. *Id.* "The magnitude of this improvement is greater than treating depressed suicidal patients with common antidepressants." *Id.* at 7.

Additionally, transgender people "face starkly increased rates of interpersonal violence." *Id.* at 8. Identification that reveals people to be transgender increases those risks, placing transgender people in "grave physical danger." *Id.* One in fifty transgender people are physically attacked after showing identification that does not match their gender. Doc. 101 at 9; Doc. 52-47 at 8. one in six transgender people are denied services when their identifying information did not match their gender. Doc. 101 at 9; Doc. 52-47 at 8. And over *half* of transgender people were assaulted or harassed by a law enforcement officer who learned of their transgender status. Doc. 101 at 9; Doc. 52-47 at 6.

It is no wonder, then, that transgender people who lack appropriate identification therefore "may avoid travelling by plane, applying for employment, applying for public benefits, filling prescriptions, purchasing alcohol, applying to and attending college, checking into a hotel, renting a car, voting, opening and using a checking account, using a credit or bank card, travelling internationally, and numerous other things." Doc. 52-45 at 7.

### A.    Darcy Corbitt.

Plaintiff Darcy Corbitt is a transgender Alabama resident, graduate student, and ordained minister. Doc. 52-28 at 2; Doc. 52-29 at 9. Ms. Corbitt is a woman. Doc. 52-28 at 2; Doc. 52-29 at 14. She was assigned male at birth. Doc. 52-29 at 6. When she was sixteen years old, she received an Alabama driver's license with a male sex designation. *Id.* at 11. Ms. Corbitt moved to North Dakota in 2015. *Id.* at 7–8. While living in North Dakota, Ms. Corbitt successfully corrected her North Dakota driver's license to reflect her sex as female. *Id.* at 12, 34; Doc. 52-32.

In August 2017, having returned to Alabama, Ms. Corbitt visited an ALEA office to obtain an Alabama license to replace her North Dakota license. Doc. 52-29 at 22. After allowing Ms. Corbitt to update her weight and address, the clerk asked Ms. Corbitt to review the papers and sign to verify that the information was accurate. *Id.* at 23–24. Ms. Corbitt saw that the clerk had listed her sex as male on the papers and explained that she could not verify them, because the sex information was not accurate. *Id.* at 24. After loud conversations referring to Ms. Corbitt as an "it" and "he," the clerk said that Ms. Corbitt would need to get an amended birth certificate or a doctor's note saying that she had had surgery before the license could be

updated. *Id.* at 25–27. Ms. Corbitt fled to her car, afraid that someone who overheard the misgendering would attack her.[9] *Id.* at 27.

Ms. Corbitt could only have gotten an Alabama driver's license if she had violated her religious beliefs and lied about who she was. *Id.* at 28; Doc. 52-28 at 4. For her, that was not an option. Ms. Corbitt believes that rejecting her identity as a transgender woman would be tantamount to rejecting God; it is her "closely held religious belief that God has created [her] as a transgender woman." Doc. 52-28 at 4; *see also* Doc. 101 at 7–8. Surgery is also not an option—she does not believe it is currently in God's plan for her. Doc. 52-28 at 4–5.

Ms. Corbitt also fears violence and discrimination if her license were to reveal her to be transgender. Ms. Corbitt has received death threats for speaking out on transgender issues in the past. *Id.* at 3–4. She has also been stalked. *Id.* at 3; Doc. 52-29 at 33.

### B.   Destiny Clark.

Plaintiff Destiny Clark is a transgender woman. Doc. 52-36 6, 11–12; Doc. 52-37 at 2. She tried change the gender listed on her Alabama license three times. Doc. 52-36 at 29.

---

[9] Misgendering "is when transgender people are addressed either accidentally or intentionally with the wrong pronoun or with the patient's prior name" and "has profound and sometimes life-threatening negative mental health consequences for transgender people." Doc. 52-45 at 5–6.

First, in 2015, Ms. Clark went to a local driver's license office where a clerk told her that they could not help her. *Id.* Second, Ms. Clark contacted Jeannie Eastman at the Medical Unit of ALEA. Ms. Eastman advised her that changing her sex designation would be a "simple process;" Ms. Eastman only needed to "backspace the M and put an F and the next day you're ready to get your driver's license changed." *Id.* All Ms. Clark needed to do was to send in her medical documentation. *Id.* Ms. Clark sent a letter from her doctor noting that she had transitioned medically. Doc. 48-1 at 12. Ms. Eastman declined to change the sex designation on Ms. Clark's license because Ms. Clark had not had surgery. *Id.* Although Ms. Clark was frustrated, she intended to undergo gender-affirming surgery. *Id.*

Third, in February 2017, the State denied Ms. Clark's application yet again "notwithstanding her doctor's letter indicating that she had received 'gender transformation surgery'—namely, surgery to modify her chest." Doc. 101 at 27; *see* Doc. 48-1 at 13; Doc. 52-39 (sealed). Ms. Eastman informed Ms. Clark that she needed to have "full surgery" for the State to approve her application. Doc. 52-36 at 31–32. However, Ms. Clark does not want or need any additional surgery. *See id.* at 32.

Ms. Clark is afraid to publicly produce a driver's license with a male designation. Doc. 52-37 at 2–3. When she shows her license, "[t]here's always the

risk of violence." Doc. 52-36 at 40; Doc. 101 at 9. In fact, Ms. Clark refrains from doing certain everyday activities because of the designation on her license. *See* Doc. 52-36 at 25; Doc. 52-37 at 3. For example, when she wants to buy alcohol in a store, she asks her boyfriend to buy it for her so she will not have to show her driver's license. Doc. 52-37 at 3.

When Ms. Clark does use her license, such as when she votes, it comes with humiliation and fear. While voting, Ms. Clark was humiliated when the clerk misgendered her in front of around fifty people. Doc. 52-36 at 25–26. She was also afraid: "If someone would have heard the polling person call me sir and refer to me with male pronouns and they wanted to cause a ruckus outside of the polling place, it's a danger to myself." *Id.* at 26.

## C.    Jane Doe.

Jane Doe proceeds in this case under a pseudonym to protect her safety and privacy. Doc. 41. Ms. Doe is a transgender woman. Doc. 52-42 at 2 (sealed).

Ms. Doe has tried many times to change the sex on her license, but the State has not allowed her to do so. Doc. 52-41 at 19–20 (sealed). Ms. Doe initially was not even permitted to change her name on her license despite having a court order. Doc. 48-3 at 12 (sealed). The clerk told her that because her sex was listed as male, they would not take her photograph while she was wearing makeup. *Id.* (sealed). She then went to another office, where they changed her name, but told her that she did

11

not have the correct paperwork to change her sex designation, and she should contact Montgomery. *Id.* at 20 (sealed). It was only after multiple other attempts and repeated missing information or misinformation that she finally learned that she needed to prove she had had what ALEA described as "the full surgery." *Id.* at 26–28 (sealed). Ms. Doe has not had any gender-affirming surgery because she cannot afford it. Doc. 52-42 at 7 (sealed); Doc. 101 at 7.

Ms. Doe has experienced serious anti-transgender violence in the past, including one incident that nearly killed her. Doc. 101 at 9. She has also experienced discrimination specifically because of the sex designation on her driver's license, including losing her job. *Id.* at 10; Doc. 52-41 at 17 (sealed); Doc. 52-42 at 6 (sealed). Another time, while visiting her credit union, Ms. Doe had to show her driver's license to the teller. The teller responded by telling Ms. Doe that she was "going to hell," saying that she could not "condone this," and refusing to serve her. Doc. 52-42 at 7 (sealed); *see also* Doc. 52-41 (sealed).

## III.    COURSE OF PROCEEDINGS.

Following the filing of Plaintiffs' First Amended Complaint, Doc. 34-1, the Parties conducted discovery and filed cross-motions for summary judgment. *See* Docs. 46, 50, 58, 60–62. At oral argument, the district court denied both of those motions. Doc. 69. The Parties agreed to submit the case on the record. *Id.* The district court then requested supplemental briefing on the impact of the U.S. Supreme

Court's ruling in *Bostock v. Clayton County, Ga.*, 140 S. Ct. 1731 (2020), whether the court should hold a hearing to determine if the State invented its interest in law enforcement identification "*post hoc* in response to litigation," and whether the Policy is consistent with the State's policy on amending sex designations on birth certificates. Doc. 81 at 2.

On January 15, 2021, the district court entered a judgment in favor of Plaintiffs. Doc. 102 at 1. The Court declared the Policy unconstitutional and enjoined and restrained the State "from failing to issue to plaintiffs Corbitt, Clark, and Doe new driver licenses with female sex designations, upon application for such licenses by them." *Id.* at 2.

In ruling for Plaintiffs on their Equal Protection claim, the court first examined the Plaintiffs' injuries for purposes of standing. It found these injuries "severe," noting that the surgery the State requires "results in permanent infertility in almost all cases" and may be "unaffordable." Doc. 101 at 7. The court detailed how a license with the wrong sex designation, the alternative to surgery, was also fraught with "pain and risk." *Id.* Indeed, Ms. Doe "lost a job after she showed her male-designated driver license to someone who informed her employer that she is transgender." *Id.* at 10. And for Ms. Corbitt, using a license that listed her as male would be "proclaiming a lie" and go against her beliefs as a "devout and practicing Christian." *Id.* at 7–8 (cleaned up).

13

The court then held that the Policy is a sex-based classification, subject to heightened scrutiny, because it "treats people differently based on the nature of their genitalia" and "sets the criteria by which [the State] channels people into its sex classifications." *Id.* at 11, 13.

Turning to the State's justifications, the court found that the State had proffered only two—to promote "consistency with the State's existing requirements for amending a birth certificate" and "to make it easier for law enforcement officers to identify people when determining appropriate post-arrest search and placement procedures." *Id.* at 17. For the first, the court found that the State had failed to "articulate the importance of their alleged interest" and, at most, provided "convenience." *Id.* at 19, 21. For the second, the court found that the interest was not genuine, but invented *post hoc*, and that the State's argument to the contrary lacked supporting evidence and "flirts with incoherence." *Id.* at 38.

The court also found that the statute of limitations did not bar Plaintiffs claims. *Id.* at 16 n.4.

The court did not rule on the Plaintiffs' other claims.

This appeal followed.

## SUMMARY OF THE ARGUMENT

The State adopted the Policy to only allow transgender Alabamians to correct the sex designation on their license if they undergone one or more forms of gender-

14

affirming surgery, including sterilizing genital surgery. The Policy unquestionably differentiates based on sex because it makes genital surgery a condition for transgender people to acquire a license that does not bear an inaccurate and endangering sex designation.

The State has no legitimate, much less important or compelling, reason for the Policy. The record fully supports the district court's finding that the "State's interest in conformity with the rules for birth certificates provides only the convenience of avoiding the need to gather some additional documentation of sex changes on infrequent occasions." Doc. 101 at 21. "[C]onformity with the State's birth certificate amendment procedures was the only interest ALEA considered when creating the policy," rendering the other proffered interests "*post hoc*" and thus irrelevant under heightened scrutiny. *Id.* at 10, 35. These findings are based on adequate record evidence and so may not be disturbed. *See Cooper v. Harris*, 137 S. Ct. 1455, 1465 (2017) ("A finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern.").

On appeal, the State tries to make this case about other (unenumerated) "sex-conscious policies and institutions." State Br. 17.[10] But Plaintiffs do not challenge those. Rather, they challenge only the State's demand that they submit to one or

---

[10] "State Br. ___" refers to Appellants' brief filed in this Court. The pin-cited page numbers correspond to the brief's original pagination.

more forms of invasive surgery; give up driving; or use a license bearing Alabama's preferred gender marker even though it is wrong, risks their health and wellbeing, conflicts with their deeply held religious and personal beliefs, and humiliates them.

The district court correctly held that the Policy is a sex-based classification that violates Plaintiff's Equal Protection rights and declined to reach Plaintiffs' other claims. Because the Policy also violates Plaintiffs' due process and free speech rights, affirmance on those grounds would be warranted. Plaintiffs' claims are not time barred.

## ARGUMENT

## I.    THE POLICY VIOLATES THE EQUAL PROTECTION CLAUSE.

### A.    The Policy Enacts a Sex-Based Classification.

The State refuses to allow transgender driver's license applicants to correct the sex designation on their license unless they have had "complete" surgery, by which the State means at least genital surgery (and possibly also chest surgery). Doc. 101 at 5. The Policy is a sex-based classification for at least three reasons: it uses *genitalia* to determine what *sex designation* the State will list for *transgender people* on their licenses. *See id.* at 11.

16

First, the district court correctly explained that the Policy "treats people differently based on the nature of their genitalia, classifying them by sex." *Id.* at 3.[11] In that way, the Policy is sex discrimination subject to heightened scrutiny under the Equal Protection clause. *See Bostock*, 140 S. Ct. at 1739 (noting "sex" includes, at a minimum, "reproductive biology").

Second, as the district court also correctly recognized, the Policy is a sex-based classification because it assigns people to a sex. Doc. 101 at 13; *see also Adams v. Sch. Bd. of St. Johns Cty., Fla.*, __ F.4th __, No. 18-13592, 2021 WL 2944396, at *3, 10 (11th Cir. July 14, 2021) (policy to "assign[] students to use bathrooms based solely on the sex indicated on a student's enrollment documents" is a sex-based classification); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) (policy classifying transgender boy as a girl for purposes of single-sex restroom use "cannot be stated without referencing sex" and is therefore "inherently based upon a sex-classification"); *cf. Loving v. Virginia*, 388 U.S. 1, 5–8 & n.4 (1967) (Virginia law assigning people to a race for purposes of marriage establishes a race-based classification).

---

[11] The State asserts that the district court developed this theory *sua sponte.* State Br. 21. But Plaintiffs argued it below. *See* Doc. 51 at 29 (the Policy is a sex-based classification because it "requires surgery on genitals"); *see also* Doc. 61 at 4 (defining the Policy's sex-based classification as based on *inter alia* "genital anatomy").

Third, under the Policy, driver's license applicants who are not transgender can access a driver's license that accurately reflects their gender identity and the sex in which they are living, without regard to their medical history or genital status.[12] Transgender people cannot do the same, precisely because their assigned sex at birth differs from their gender identity. Discrimination for that reason is sex-based. In fact, "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex," since "transgender status [is] inextricably bound up with sex." *Bostock*, 140 S. Ct. at 1741–42; *see also Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) ("[D]iscrimination against a transgender individual because of her gender-nonconformity is sex discrimination . . . .").

Furthermore, sex is the *only* category of descriptive information on a driver's license subject to such an invasive and burdensome requirement. For other descriptive information, such as height, weight, or hair color, the State permits people to provide updates based on their own self-knowledge, subject only to a

---

[12] Cisgender people (i.e., those who are not transgender) may have atypical genital anatomy for the sex listed on their driver's licenses because they were born with an intersex variation resulting in atypical genitalia at birth, they suffered a traumatic injury to the genitalia, or they received treatment for cancer or other conditions. *See* Doc. 52-45 at 10, 14 (explaining a range of reasons for genital variation); Doc. 52-27 at 9; Doc. 48-9 at 24 (describing incarceration of cisgender men who lost their genitals during the Vietnam War and a cisgender man with a micropenis).

"discreet[]" conversation asking for something "a little bit more true" if the self-disclosure is plainly not "reasonable" (as for someone changing their height from five feet to eight feet). Doc. 48-7 at 35. Indeed, the State accepted Ms. Corbitt's word when she updated her weight and address on her license, and only balked when it came to updating her sex. Doc. 52-29 at 23–24. Subjecting people who seek to change their sex information to different standards than those who seek to change any other descriptive information further demonstrates that the Policy treats people differently based on sex. *See Ray v. McCloud*, 507 F. Supp. 3d 925, 935 (S.D. Ohio 2020) (finding that vital records agency violated the Equal Protection Clause by treating transgender people "differently than people who have changed their birth parents or name"); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1141 (D. Idaho 2018), *clarified sub nom. F.V. v. Jeppesen*, 466 F. Supp. 3d 1110 (D. Idaho 2020), *and clarified*, 477 F. Supp. 3d 1144 (D. Idaho 2020) (same).

The State tries to avoid this logic by noting that the Policy does not use the word transgender, and it claims the Policy may affect others "who want their sex designation changed" in addition to transgender people. State Br. 26. The State hypothesizes the Policy might also apply to "those individuals who seek to 'de-transition' to their previous gender identities" and "those who are intersex." *Id.* at 26–27. In fact, the record here shows that the State does not apply the Policy to intersex driver's license applicants. Doc. 48-16 at 29 (sealed). And there is no

19

evidence in the record about "de-transition[ing]" or whether or how the State would apply the Policy to a person who sought to change their driver's license for such a reason.

But even if the Policy did impact some people who are not transgender, it would still be a sex-based classification, as it is explicitly based on a form of surgery that transgender people undergo. Doc. 52-1 (requiring "gender reassignment surgery"); Doc. 52-45 at 10, 12. That is more than enough to make out a sex-based classification. *See, e.g.*, *Hunter v. Underwood*, 471 U.S. 222, 232 (1985) (striking down law that disenfranchised some Black and some white voters because criteria chosen to target Black people); *Hecox v. Little*, 479 F. Supp. 3d 930, 975 (D. Idaho 2020) (appeal pending) (law that did not use the word "transgender" and also affected cisgender intersex and gender nonconforming girls still facially discriminated against transgender people because it was designed to define transgender girls as male and ban them from participating in girls' school sports).

### B. The Policy's Sex-Based Classification Is Subject to Heightened Scrutiny.

The Policy is subject to heightened scrutiny. The district court correctly reasoned that "the classification itself is the trigger" for heightened scrutiny. Doc. 101 at 12. To determine *whether* heightened scrutiny applies, it "does not matter whether the State classifies people by giving them different sex designations on their

driver licenses or by sending them to different schools. Intermediate scrutiny applies regardless of what sex-based action the State takes." *Id.*

The State nevertheless argues for the first time on appeal that the "classification of someone's sex, without accompanying treatment based on that classification, does not implicate the Equal Protection Clause," and that placing an unwanted, endangering, and inaccurate sex designation on the license transgender people must carry and show is not "treatment." *Id.* at 13. But misclassifying Plaintiffs as male very much involves differential treatment, much as misclassifying Drew Adams as female did. *See Adams*, 2021 WL 2944396, at *11 n.9 (rejecting the argument that "'the mere act of determining an individual's sex . . . does not treat anyone differently on the basis of sex'" where the determination dictated which restroom transgender boy could use). In *Adams*, the harm to the plaintiff from the policy that "determined" his sex was to be forced to use the girls' restrooms, inferior unisex restrooms, or no restrooms at all. Here, the harm to the Plaintiffs is that they were forced to use a driver's license bearing an erroneous sex designation against their will that put them at risk, undergo surgery, or use no license at all. *See F.V.*, 286 F. Supp. 3d at 1142 (refusal to amend sex on birth certificates was "refusal to treat transgender people like others"); *Darnell v. Lloyd*, 395 F. Supp. 1210, 1214 (D. Conn. 1975) (reviewing consequences of being unable to correct sex on birth certificate).

21

Indeed, the district court's recognition that the nature of the consequences that flow from a classification was immaterial to the question of what level of scrutiny applies does not mean that the district court found there was *no* consequence. To the contrary, the district court found that "[t]he injuries caused by Policy Order 63 are severe."[13] Doc. 101 at 7. The Policy has resulted in several months when Ms. Corbitt could not drive at all, discrimination against Ms. Doe, and constant fear for Ms. Clark. Doc. 52-37 at 3; Doc. 52-42 at 6 (sealed); Doc. 99-1 at 2.

Moreover, the State's argument that the government may make sex and race-based classifications without satisfying heightened—or indeed *any*—scrutiny has no basis in precedent. Decades of Supreme Court precedent have consistently affirmed that *all* suspect classifications are subject to heightened scrutiny. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 533 (1996) (noting that all sex classifications are presumptively invalid); *J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127, 136 (1994) ("'[A] long and unfortunate history of sex discrimination,' . . . warrants the heightened scrutiny we afford all gender-based classifications today."); *Missouri v. Jenkins*, 515 U.S. 70, 121 (1995) (ruling that "we must subject all racial classifications to the strictest of scrutiny" and that "[p]sychological injury or benefit is irrelevant to the question whether state actors have engaged in intentional discrimination"); *Loving*,

---

[13] Of course, no one could successfully challenge *any* sex classification if they did not have a sufficiently concrete and particularized injury for Article III standing.

388 U.S. at 9 ("[W]e deal with statutes containing racial classifications, and the fact of equal application does not immunize the statute from the very heavy burden of justification . . . .").

The out-of-circuit case the State now relies on for its argument is inapposite. *See Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195 (2d Cir. 2006) (addressing challenge to race-based minority contracting policy that applied only to Hispanic people born in select countries). In *Jana-Rock*, the Second Circuit recognized that it would be inappropriate to allow individuals challenging affirmative action programs a second bite at the apple by allowing challenges to the classification *after* it had already been proven not to be over- or under-inclusive. *Id.* at 200. Because the Supreme Court had already held that race-conscious affirmative action was permissible only to remedy specific past discrimination, *see City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989), the Second Circuit recognized that the government needed to decide which groups had experienced such discrimination to implement their programs. *Jana-Rock*, 438 F.3d at 208–09.[14] Here,

---

[14] Likewise, in *Peightal*, this Court found that the EEOC's classification of which individuals of Hispanic origin qualified for a remedial program was neither over- or under-inclusive because there was no evidence offered that past discrimination existed against the groups excluded from the program. *See Peightal v. Metro. Dade Cty.*, 26 F.3d 1545, 1559–61 (11th Cir. 1994).

in contrast, the Policy is not part of a larger remedial program that has already been upheld under strict scrutiny, and the Plaintiffs seek no second bite at the apple.

### C.    The Policy Fails Any Level of Review.

The district court appropriately held that the Policy fails heightened scrutiny. The Policy is arbitrary: it does not even treat similarly situated transgender people consistently with each other or serve the State's claimed interests. *See* Doc. 101 at 26, 28–31, 40. And, as the district court found, the only genuine reason Alabama offered for adopting the surgery requirement for driver's licenses was a desire for consistency with the State's standard for birth certificates, which is not a sufficiently important interest to satisfy heightened scrutiny. *Id.* at 20–21, 35.

The State now attempts to justify the Policy by pointing to other state policies that differentiate based on sex. These *post hoc* justifications are not at issue in this case, nor fit for consideration under heightened scrutiny. In any event, there is no evidence that the Policy serves these poorly defined interests. In fact, as every other federal court to consider the question has concluded, requiring transgender people to undergo sterilizing surgery as a condition of access to a driver's license they can safely use is not even rationally related to any legitimate government interest.

### i.    <u>The Policy serves no important purpose and fails heightened scrutiny.</u>

Under heightened scrutiny, the burden is on the government to prove that a sex-based classification bears "a close and substantial relationship to important

24

governmental objectives." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273 (1979). To adequately defend a policy against heightened scrutiny, the government must "demonstrate an 'exceedingly persuasive justification'" for its action. *Virginia*, 518 U.S. at 531. *Post-hoc* rationalizations cannot survive heightened scrutiny. *See id.* at 533 ("The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation."). To be permissible, the policy must have a factual basis not rooted in generalization. *Id.*; *Craig v. Boren*, 429 U.S. 190, 199 (1976).

### a. *The Policy is arbitrary.*

A policy "fails heightened scrutiny" when it "targets some transgender" people "but not others," thereby failing to advance the government's "purported interest." *Adams*, 2021 WL 2944396, at *5. In a directly analogous context, this Court has held that where a school district banned some transgender students from using the restroom consistent with their gender identity but permitted others to do so depending on the sex listed on their enrollment forms, the challenged policy could not have served its alleged purpose in protecting privacy and failed heightened scrutiny. *Id.* The Policy here fails for the same reasons.

Under the Policy, a transgender woman who has never had any form of surgical care could change the sex designation on her Alabama license if she happened to have been born in one of the 25 U.S. jurisdictions that do not require

proof of surgery to update the sex on a birth certificate.[15] She could also obtain an Alabama license with a female sex designation if she sought her first an Alabama license *after* she had already changed the sex designation on a license from one of the at least 40 U.S. jurisdictions that permit such changes without proof of surgery.[16] *See* Doc. 48-7 at 24–25; Doc. 52-2 at 21. Indeed, the only reason Ms. Corbitt was not able to get an Alabama license that accurately listed her sex as female after moving to Alabama from North Dakota (where she carried a driver's license with a female sex designation) was because she had lived in Alabama before she transitioned and had had an Alabama driver's license at that time. Doc. 48-7 at 24–25; Doc. 52-29 at 23.

The State has also enforced the Policy inconsistently. Although the Policy requires only "gender reassignment surgery," the district court found that in some cases, including that of Ms. Clark, the State applied the "complete surgery" rule—by which it means at least genital surgery—while in other cases it omitted this requirement.[17] Doc. 101 at 28–29 (State at times approved applications without

---

[15] *See Equality Maps: Identity Document Laws and Policies*, Movement Advancement Project, https://www.lgbtmap.org/equality-maps/identity_document_laws (last visited July 26, 2021).

[16] *See infra* n.7.

[17] What "complete" surgery means to the State is inconsistent and everchanging. One 30(b)(6) witness said that "complete" surgery "would have to be having all your – the top part, bottom part done surgical to make you a female or a male." Doc. 48-4

mention of "complete" surgery but at other times rejected applications for explaining the surgical procedure but omitting that the surgery was "complete"). Thus, the district court found that "whether defendants will approve a change of sex designation appears to turn on the particular phrasing of the doctor's letter provided, or even an ALEA staff member's impressionistic sense of the letter's sufficiency." Doc. 101 at 28.

Under heightened scrutiny, this arbitrariness is fatal. In *Adams*, this Court held that the school's bathroom policy "fails heightened scrutiny because it targets some transgender students for bathroom restrictions but not others." 2021 WL 2944396, at *5. The policy "[ran] afoul of the Fourteenth Amendment" because the bathroom policy restricted some transgender students "while others are beyond [the policy's] reach." *Id.* at *6. Here, too, failing to treat all transgender applicants alike dooms the Policy under heightened scrutiny.

> **b.**    ***Consistency with Alabama's birth certificate policy is not an important government interest for purposes of heightened scrutiny.***

The district court also found that the only reason ALEA had identified as motivating it at the time it adopted and retained the surgery requirement was consistency with the Alabama birth certificate statute, and the only reason for

---

at 16. She made up that definition herself. *Id.* A different 30(b)(6) witness characterized "sexual reassignment surgery" as changing genitals "from a penis to a vagina or a vagina to a penis" but said nothing about top surgery. Doc. 48-5 at 30.

wanting such consistency was for the sake of consistency itself. Doc. 101 at 18, 22, 36 ("Defendants have done little to elucidate why their alleged interest in uniformity between birth certificate and driver license amendment standards is important."). This ruling reflected the evidence in the record. Doc. 52-3 at 11–12, 14, 16. The State offered no evidence of any other reason that motivated the adoption of this requirement. And they could not explain why consistency with the birth certificate statute mattered, at best suggesting it might cause some "minimal" "inconvenience." Doc. 101 at 25, *see also* Doc. 52-3 at 33.

A desire for consistency with another state policy—the justification for which the government has offered neither evidence nor argument—does not meet the demands of heightened scrutiny. Even if the state birth certificate statute *required* a similar driver's license policy (which it does not), compliance with state law is not a defense for violating rights protected by the U.S. Constitution. *See, e.g.*, *Shelley v. Kraemer*, 334 U.S. 1, 19 (1948) (reaffirming that state actions, whether by state courts or otherwise, must comply with the Equal Protection clause).

The State asks this Court to reach a different conclusion based on its own view of the record evidence. That is not the role of appellate review. They insist that the district court committed reversible error because the "context" of the State's testimony regarding the Policy's purpose gives it an implication different from its plain meaning. State Br. 33. But it is not reversible error for a district court to rely

on and draw plausible inferences from a witness's statements rather than read between the lines to reach a different conclusion. *Anderson v. City of Bessemer, N.C.*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."); *see also Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc*., 830 F.3d 1242, 1253 (11th Cir. 2016) (noting that the "decidedly more deferential" clear error standard is appropriate when the district court treats cross-motions for summary judgment as a bench trial).

Moreover, the district court was correct in its assessment of the record. It is true that the State's 30(b)(6) witness, Chief Pregno, was talking about the 2012 version of the Policy when she made some of her statements disclaiming any motivation other than maintaining consistency with birth certificates (and formalizing a policy in writing) for the Policy's adoption. *See* Doc. 48-5 at 13–14. But the State offered no evidence whatsoever, through Chief Pregno's testimony or otherwise, that it had any other contemporaneous reason for adopting any earlier version of the policy.[18] The State's argument appears to be that the district court

---

[18] Although Chief Pregno testified to other interests the State thought the Policy served, she never stated that any of those interests motivated ALEA's adoption of any version, written or unwritten, of the surgery requirement, at any time. Additionally, Chief Pregno—and thus the government—expressly disclaimed any ability to testify about any policy or procedure that may have been in place prior to the first written version of the policy in 2012. *See* Doc. 48-5 at 12 (witness was

erred in not assuming, without any supporting evidence, that the State must have had a good reason for adopting the Policy at some point, because, after all, the State has required people to show driver's licenses for a long time. *See* State Br. 35.

The State now argues for the first time on appeal that "consistency" actually refers to an interest in maintaining consistency with "numerous sex-conscious laws and policies." *Id.* at 28. The State does not specify what these laws or policies are, but nonetheless asks the Court to take for granted that consistency between the driver's license and birth certificate policies is closely and substantially related to unstated important purposes for these unspecified government actions. In short, the State argues that if treating people differently based on sex is *ever* permissible, then the Policy's differential treatment based on sex *must be* permissible. The government cannot meet its burden to satisfy heightened scrutiny with such vague and conclusory reasoning. *See McLaughlin v. State of Fla.*, 379 U.S. 184, 195 (1964) (noting that the possibility that a different discriminatory state law might be constitutional did

_____

asked, "What's the first policy or procedure for changing sex designation on a license that you are prepared to testify about today?" and answered, "This policy, DPS policy 63, September 1, 2012."); *see also id.* at 9 (in response to question about when an unwritten policy was first developed, the witness stated, "I can't say"); Doc. 52-2 at 17 (witness responded to questions concerning earlier policies and policy changes with "I don't know" and "I'm not sure"). Counsel for the State indicated an inability to locate anyone with any greater knowledge than the 30(b)(6) witness, Doc. 48-5 at 12, and the State is bound by the witness's statements, Fed. R. Civ. P. 30(b)(6).

not insulate the challenged law from "independent examination under the Fourteenth Amendment"); *Glenn*, 663 F.3d at 1321 (holding that hypothetical justifications are "wholly irrelevant to the heightened scrutiny analysis that is required here").

> **c.** ***The State's* post-hoc *justifications cannot satisfy heightened scrutiny.***

The only "sex-conscious" policies the State has identified involve accurately identifying individuals and implementing sex-based law enforcement and correctional policies. As discussed above, these interests did not genuinely motivate the government to adopt the Policy. As such, they cannot be considered under heightened scrutiny. However, even if they were genuine and not *post hoc*, the Policy's surgery requirement does not advance them. In fact, the surgery requirement undermines these interests.

> **1)    The Policy undermines accurate identification.**

Every federal court to consider a policy restricting transgender people's access to identification that reflects their current sex (as opposed to the sex they were assigned at birth) has rejected government arguments that such restrictions advance an interest in accurate identification. This is for two simple reasons. First, identifying a person's sex based on their genitals—a characteristic that is rarely visible or known to others—instead of the sex they identify as, live as, and are perceived to be, undermines accurate identification. Second, although all states and the federal government share an interest in accurate identification of crime suspects and missing

persons, the overwhelming majority of them achieve that interest without restrictions such as the one Alabama insists on. *See infra* n.8.

The State's refusal to correct the sex designation on transgender people's driver's licenses "bears little, if any, connection to Defendant's purported interests" in maintaining accurate identity documents. *Love v. Johnson*, 146 F. Supp. 3d 848, 856 (E.D. Mich. 2015). As the district court found, "licenses denoting the license-holder's genital statute are wholly unhelpful for this purpose." Doc. 101 at 40. In fact, not only does the Policy not "further[] . . . the state's interest in accurate documentation and identification" but, in fact, creates a risk of "inaccurate and inconsistent identification documents." *K.L. v. State, Dep't of Admin., Div. of Motor Vehicles*, No. 3AN-11-05431-CI, 2012 WL 2685183, at *7 (Alaska Super. Ct. Mar. 12, 2012). Identity documents bearing a transgender person's assigned sex at birth "inaccurately describe the discernable appearance of the license holder by not reflecting the holder's lived gender expression of identity," creating problems for the document's owner and all those who need to see the document.[19] *Id.*

---

[19] Courts have relied on similar reasoning to strike down surgery rules for sex designations on birth certificates or name changes. *See In re Childers-Gray*, 487 P.3d 96, 123 (Utah 2021) (granting sex designation changes on birth certificates for transgender people who have not had surgery "promote clarity and avoid confusion"); *F.V.*, 286 F. Supp. 3d at 1142 (birth certificate policy prohibiting sex designation changes lacked rational basis); *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018) (birth certificate policy prohibiting sex designation changes was "not justified by any legitimate government interest"); *Ray*,

Ms. Corbitt, Ms. Clark, and Ms. Doe have consistently and persistently identified as female throughout their lives. Doc. 52-29 at 13; Doc. 52-36 at 11–12; Doc. 52-41 at 10 (sealed). Each has obtained a court-ordered name change, changed the type of clothing she wore, told her close family and friends about her gender, and asked them to begin using appropriate pronouns (*she* and *her*) for them. Doc. 48-2 at 10; Doc. 52-29 at 16–17; Doc. 52-30 at 2; Doc. 52-38 at 2; Doc. 52-43 at 2 (sealed). Starting years ago, each consulted healthcare providers, who diagnosed them with gender dysphoria and prescribed hormone therapy that makes many aspects of their bodies typical of cisgender women. Doc. 48-3 at 8 (sealed); Doc. 52-36 at 21; Doc. 52-45 at 9. Some of them also received other treatment for gender dysphoria, such as breast surgery, voice coaching, and electrolysis. Doc. 48-1 at 9; Doc. 48-2 at 11. All three of them changed their sex designation to female on all the documents and records they could change it on, such as social security records, a passport, and a license from another state. Doc. 48-2 at 7–8; Doc. 52-36 at 28; Doc. 52-41 at 14–16 (sealed).

---

507 F. Supp. 3d at 938–40 (historical accuracy did not justify birth certificate policy prohibiting sex designation changes under heightened scrutiny or even rational basis review); *In re Golden*, 56 A.D.3d 1109, 1111 (N.Y. App. Div. 2008) (noting that potential for confusion about her gender was inappropriate basis to deny a transgender woman a name change); *In re Feldhaus*, 796 S.E.2d 316, 318 (Ga. Ct. App. 2017) (same).

The Plaintiffs "have traditionally feminine features." Doc. 101 at 8. "They dress as other women dress." *Id.* Strangers, friends, co-workers, and family consistently perceive them to be female. *See* Doc. 52-28 at 2; Doc. 52-37 at 3; Doc. 52-42 at 6–7 (sealed). A female sex designation on their license would only make it easier for the Plaintiffs to be correctly identified as the holders of their licenses. It would also make it easier to identify them if they ever were to become missing persons or crime suspects. *K.L.*, 2012 WL 2685183, at \*7 (explaining that policy requiring surgery before transgender people can update the sex designation on their license means that a "third-person [sic] is likely to conclude that the furnisher is not the person described on the license"). Changing their sex designation to female also means the government would then have in its records an indication that their sex designation had changed, should that information ever be relevant or helpful in an identification process. Indeed, even the State has acknowledged that under most situations where law enforcement officers seek to identify whether the person presenting a driver's license truly is its holder, the person's surgical history, genitalia, and reproductive organs are irrelevant, and a sex designation based on them might cause confusion. *See* Doc. 52-3 at 23–25.

That is why most other states and the federal government achieve their interests in accurate identification without a surgery requirement. *See Love*, 146 F. Supp. 3d at 857 (noting that other states and the District of Columbia "do not require

a transgender person to undergo surgery to change the gender on his or her driver's license or state ID card" and stating "[t]he Court seriously doubts that these states have any less interest in ensuring an accurate record-keeping system"). At least 38 states, as well as the District of Columbia and Puerto Rico, currently permit sex-designation changes on driver's licenses without proof of surgery. *See infra* n.7. The federal government similarly permits transgender people to correct the sex designation on federal documents like passports without surgery. *See infra* n.8. The State has not and cannot point to any problems with identification in these jurisdictions stemming from these policies, or indeed, with Alabama's own correction of sex designations on licenses for some transgender people without surgery. Nor could it offer any reason why Alabama's interests in this regard might be unique. Doc. 48-5 at 32.

Nothing about the Real ID Act supports the State's position that genital or any other surgery ought to be required prior to correcting the sex designation on a license, and no evidence in the record suggests that was a reason for the Policy's adoption. Although the Real ID Act requires identification used for federal purposes to list "gender," it permits the states to develop their own policies for determining which gender to list. 6 C.F.R. § 37.17(c) (requiring compliant IDs to list "[g]ender, as determined by the State").

35

In arguing that the Policy serves an interest in accuracy, the State points out the obvious: most people are not transgender. State Br. 31. That is beside the point. The Policy by its own terms applies only to "individual[s] wishing to have the sex changed on their Alabama driver license." Doc. 52-1. That the Policy's irrelevance to non-transgender people does nothing to justify it. The "proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *City of L.A., Cal. v. Patel*, 576 U.S. 409, 418 (2015); *see also Adams*, 2021 WL 2944396, at *34 ("The relevant inquiry in this case is not what percentage of St. Johns students are transgender, but whether the challenged policy furthers the important goal of student privacy.").[20]

### 2) The Policy is not closely or substantially related to any other important law enforcement or correctional interests.

The State has also argued that requiring surgery serves other law enforcement and correctional goals related to sex-specific arrest, booking, search, and classification procedures. As the district court found, these hypothetical interests

---

[20] To the extent the State argues that its interest involves maintaining a tradition of defining sex exclusively based on genitalia, that interest is insufficient under heightened scrutiny. *Obergefell v. Hodges*, 576 U.S. 644, 671 (2015) ("If rights were defined by who exercised them in the past, then received practices could serve as their own continued justification and new groups could not invoke rights once denied."). Indeed, virtually any form of sex discrimination could be justified under such reasoning. *See Frontiero v. Richardson*, 411 U.S. 677, 685 (1973) (noting that earlier in the nation's history women could not "hold office, serve on juries, or bring suit in their own names").

36

were invented *post hoc* in response to litigation and cannot satisfy heightened scrutiny. Doc. 101 at 10.

Even the State's 30(b)(6) witness could not explain how the Policy advanced any relevant law enforcement or correctional policies. Chief Pregno stated that she was able to testify about "[n]one" of the search procedures or practices used by any Alabama law enforcement agency, and that she "can't speak to" Alabama correctional practices. Doc. 48-5 at 21; Doc. 52-3 at 27. When asked how she knew that the Policy served the interests behind these unknown search procedures, she testified, "Well, it just -- it does." Doc. 52-3 at 27. When asked how she knew that genitals were the sole criterion that law enforcement and corrections agencies wished to use in applying these policies, she pointed back to the Policy: "I'm going off the information that we use based on the identifiers on the license." *Id.* at 28. Moreover, the State's own expert on corrections does not believe that genital surgery is necessary to advance the State's interest. He testified that *any* driver's license policy with a "standardized" definition for sex would be useful. Doc. 52-27 at 7. In particular, he stated that a policy based on gender identity, which he defined as "how

one perceives themselves . . . what they view their sex to be," rather than surgery would serve the same state interests.[21] *Id.* at 7; Doc. 48-9 at 6.

Lacking record evidence, the State relies on *De Veloz v. Miami-Dade Cty*., 756 F. App'x 869 (11th Cir. 2018), an unpublished opinion in which this Court did not consider anything about "introducing individuals with penises into communities of individuals with vaginas." State Br. 29. *De Veloz* addressed a situation where a cisgender woman alleged that she was placed into a men's jail against her will, and this Court held that, accepting her allegations as true, she had stated a claim for deliberate indifference. 756 F. App'x at 877. The State's suggestion that *De Veloz* requires them to classify transgender people in prisons and jails based on genitalia alone (or that a driver's license would be necessary for them to do so) is wildly beyond anything within the four corners of *De Veloz* or anything this Court has ever held.[22]

In contrast to the baseless speculation about prison violence should transgender people be permitted to carry licenses that accurately identify them,

---

[21] In fact, it might serve them better, since currently the sex designation on an Alabama license is based at least as much on where a transgender person was born as it is on their genitalia. *See* Doc. 52-27 at 10.

[22] Treating transgender women as if they are men for purposes of incarceration is inconsistent with federal law and risks transgender people's safety. *See* 28 C.F.R. § 115.42(c), (e); *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); Statement of Interest of the United States at 9, *Diamond v. Owens*, 5:20-cv-00453-MTT, Doc. No. 64 (M.D. Ga. Apr. 22, 2021).

Plaintiffs submitted uncontroverted evidence of discrimination, harassment, and violence they and other transgender people experience—all of which is made more likely by an incongruent driver's license. *See, e.g.*, Doc. 52-45 at 8. As a court explained in finding a policy preventing sex-designation changes on birth certificates would not even satisfy rational basis review, the Policy "does not further public safety, such that it would amount to a valid exercise of police power. To the contrary, it exposes transgender individuals to a substantial risk of stigma, discrimination, intimidation, violence, and danger." *Arroyo Gonzalez*, 305 F. Supp. at 333 (internal citations omitted).

### ii.  The Policy would not withstand even rational basis review.

The State has not only offered no evidence that the Policy serves an important government interest but also has created a policy so wholly removed from the interests it purports to serve that it could not survive even rational basis review. *See F.V.*, 286 F. Supp. 3d at 1142. Rather than assist with identification, the Policy hinders it. *See Love*, 146 F. Supp. 3d at 856. Rather than assist with promoting safety, it endangers transgender people and protects no one. *See Arroyo Gonzalez*, 305 F. Supp. 3d at 333 (holding that policy would fail rational basis review because it exposed transgender people to violence).

It imposes a surgical standard that contradicts medical science, and that was apparently adopted without consultation with the Medical Review Board that is

involved in other agency medical decisions. Doc. 52-45 at 13 ("[I]t is scientifically inaccurate, clinically inappropriate, and unethical to require a set of medical and surgical procedures to define who should be provided with appropriate identity documentation."); Doc. 48-5 at 10; Doc. 52-3 at 9. It even treats transgender people differently based solely on where they were born, as well as whether they have an out-of-state license and never held an Alabama license. As the district court concluded, it appears the only real motivation behind the Policy was to deny transgender people "the ability to decide their sex for themselves instead of being told who they are by the State." Doc. 101 at 13. This interest is not legitimate. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) ("[B]are congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.").

## II.  THE POLICY UNCONSTITUTIONALLY DEPRIVES PLAINTIFFS OF DUE PROCESS AND COMPELS SPEECH.

In addition to violating Equal Protection, the Policy deprives Plaintiffs of Due Process and violates their rights against compelled speech under the First Amendment. These claims provide three alternative bases for upholding the district court's conclusion that the Policy is unconstitutional.

### A.  The Policy Violates Plaintiffs' Right to Informational Privacy.

Under the Policy, the State forces transgender people like Plaintiffs to disclose their transgender status and assigned sex at birth every time they display their

40

driver's license. Their license also discloses that they have a stigmatized medical condition (gender dysphoria) and have not had genital surgical treatment for that condition. This information is exquisitely intimate. By requiring this disclosure, the Policy violates Plaintiffs' right to informational privacy.

The Supreme Court has acknowledged that the "constitutionally protected 'zone of privacy'" includes an "individual interest in avoiding disclosure of personal matters," such as health-related information. *Whalen v. Roe*, 429 U.S. 589, 598–99 (1977). This Court has long recognized a right to "informational privacy." *See, e.g.*, *James v. City of Douglas, Ga.*, 941 F.2d 1539, 1543–44 (11th Cir. 1991); *Plante v. Gonzalez*, 575 F.2d 1119, 1127 (5th Cir. 1978).[23]

By forcing Plaintiffs to disclose private, intimate information about their transgender status, surgical status, and genitalia, the State violates Plaintiffs' right to informational privacy. Being transgender alone "is likely to provoke both an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others." *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999); *see also Love*, 146 F. Supp. 3d at 856 ("[T]he Policy creates a very real threat to Plaintiffs' personal security and bodily integrity . . . by requiring Plaintiffs to disclose their transgender status, the Policy directly implicates their fundamental right of privacy."); *Ray v.*

---

[23] *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (decisions from former Fifth Circuit binding in Eleventh Circuit).

*Himes*, No. 2:18-CV-272, 2019 WL 11791719, at *9 (S.D. Ohio Sept. 12, 2019) (a "Policy of refusing to change birth certificates to reflect gender identity implicates a release of personal information that is of a 'sexual, personal, and humiliating nature' and 'could lead to bodily harm,' resulting in a violation of Plaintiffs' informational right to privacy"). At the time the State required the Plaintiffs to disclose their birth certificate as a condition of getting a driver's license, they had no reason to suspect the State would years later insist on disclosing their transgender status and intimate health information on their license.

*Pryor v. Reno*, relied on by the State, resembles this case only in that it too involves information about drivers. *See* 171 F.3d 1281 (11th Cir. 1999), *vacated*, 528 U.S. 1111 (2000). The personal information at issue in that case did not include sex designations, much less disclosure of transgender status, gender dysphoria, or genital surgery on the face of one's license. *See id.* at 1282 n.1. Similarly, in *Collier,* this Court ruled that selling information such as names and mailing addresses from motor vehicle records to mass marketers did not violate the Constitution. *Collier v. Dickinson*, 477 F.3d 1306, 1308 (11th Cir. 2007). The State cannot do an end run around the 14th Amendment's protection of informational privacy by requiring people to disclose intimate personal information as a condition of driving and then declaring that information will not be held in confidence.

42

In fact, the information in this case is exactly the sort of "intimate personal information" this Court has recognized is protected from disclosure under the Due Process Clause. *Pryor*, 171 F.3d at 1288 n.10. A sex designation on a license that reveals a person to be transgender is far more intimate than a mailing address. Even if *Collier* and *Pryor* had addressed sex designations, decontextualized sex designations on a marketer's spreadsheet are not the same as a woman presenting a driver's license that lists her as male. *See Ray*, 2019 WL 11791719, at *9 ("[T]he invasion of privacy becomes different and significant when that information is linked to particular Plaintiffs upon presentation of their birth certificates."). Getting unwanted coupons in the mail might be annoying, but it does not make you lose your job, like the Policy did for Ms. Doe. Doc. 101 at 10. It does not make you choose between adhering to your religion or driving to a family member's funeral, like the Policy did for Ms. Corbitt. Doc. 99-1 at 3. It does not make you scared to cast your ballot, like the Policy did for Ms. Clark. Doc. 52-36 at 27.

Plaintiffs' interest in keeping their transgender status private outweighs the State's purported interests. *See infra* Part I.C.i.a.–b. The State's interest in "using consistent definitions in similar State documents," State Br. 44, does not outweigh Plaintiffs' interest in controlling the disclosure of information that is "highly

43

sensitive and of a personal nature" and that presents "a real danger of physical harm."

*See Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992) (cleaned up).[24]

## B.    The Policy Violates Plaintiffs' Right to Refuse Medical Care.

The Policy also infringes on Plaintiffs' right to refuse medical care. The

Fourteenth Amendment protects the right of a competent person to refuse unwanted

medical treatment. *See Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278

(1990). That is particularly true when the treatment involves procreation or

sterilization. *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851 (1992);

*Skinner v. Oklahoma*, 316 U.S. 535, 541–42 (1942). Procreation—one of the "most

intimate and personal choices a person may make in a lifetime"—is "central to the

---

[24] The State's attempt to minimize the frequency with which the Plaintiffs need to show their license is inappropriate. As the district court found, "[s]howing one's license is a common occurrence," Doc. 101 at 20; *see also id.* at 8–10 (reviewing past harms and future risks of harm to Plaintiffs arising from display of license, including safety threats and loss of employment). The State cannot show that these findings are clear error, unsupported by the record. Moreover, the State requires people to comply with requests from law enforcement officers to show their driver's license, carry a license while driving, and show their license to others involved in traffic accidents. *Sly v. State*, 387 So. 2d 913, 916 (Ala. Crim. App. 1980); Ala. Code § 32-6-1; Ala. Code § 32-6-18; Ala. Code § 32-6-9; Ala. Code § 32-10-2. The State also permits or requires people to show a driver's license as a condition of participation in many other aspects of public life. *See e.g.*, Ala. Code § 16-27-4 (apply to become school bus driver); Ala. Code § 17-9-30 (vote); Ala. Code § 9-11-44 (apply for hunting license); Ala. Code § 8-17-222 (purchase fireworks); Ala. Code § 16-64-3 (receive in-state tuition rates); Ala. Admin. Code r. 540-X-7App.B (apply for physician assistant license); Ala. Admin. Code r. 790-X-2.01 (apply for real estate license); Ala. Admin. Code r. 660-5-29.02 (qualify as a foster parent); Ala. Admin. Code r. 262-X-4.02(13)(b)(1) (show eligibility to receive crime victim's compensation).

liberty protected by the Fourteenth Amendment." *Casey*, 505 U.S. at 851. The government may not infringe upon fundamental liberty interests "unless the infringement is narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). And the government may not condition access to a government benefit on giving up a constitutional right. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). "'[W]hat the state may not do directly it may not do indirectly.'" *Lebron v. Sec'y, Fla. Dep't of Child. & Fam.*, 710 F.3d 1202, 1217 (11th Cir. 2013) (quoting *Bailey v. Alabama*, 219 U.S. 219, 244 (1911)). As discussed above, the Policy serves no compelling interest. *See infra* Part I.C.i.a.–b.

Not every transgender person can, should, or wants to undergo gender-affirming genital surgery in treatment of gender dysphoria. Ms. Doe cannot afford it. Doc. 52-42 at 7 (sealed). Ms. Clark does not want it. Doc. 52-36 at 32. And for Ms. Corbitt, it would not accord with her understanding of what God wants for her at this time. Doc. 52-28 at 4. People will have multiple and varied reasons for declining gender-affirmation surgery. Doc. 52-45 at 10–11; Doc. 52-51 at 5. They have the right to refuse it.

The State misconstrues the benefit at stake, arguing that the Plaintiffs could access a driver's license. State Br. 45. As the State is well aware, the benefit Plaintiffs seek is not a license with a male sex designation, but a license that lists their sex as female—that is, a license *they can actually use* without sacrificing being

their "true self" and adhering to their "religious beliefs," experiencing "harassment or assault from a law enforcement officer who learned they were transgender," and a "serious risk of violence." Doc. 101 at 8–9. That is undoubtedly a valuable government benefit.

### C.    The Policy Violates Plaintiffs' Free Speech Rights.

Finally, the Policy compels Plaintiffs to communicate the State's message that their sex is male. It also forces them to disclose their transgender status. Such compelled speech violates the First Amendment. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797–98 (1988). This is all the more true when the speech concerns political, ideological, or moral positions. *Wooley v. Maynard*, 430 U.S. 705, 713 (1977) (the government may not require a person to display an ideological message "in a manner and for the express purpose" that the public see it). The First Amendment does not permit the State to demand that Alabamians express its anti-transgender views on their own driver's licenses. *See N.A.A.C.P. v. Hunt*, 891 F.2d 1555, 1565 (11th Cir. 1990) ("Government communication is legitimate as long as the government does not abridge an individual's 'First Amendment right to avoid becoming the courier for such message.'").

The State asserts that "nothing about a government-issued driver's license suggests Plaintiffs agree with the sex designation." State Br. 41. That defies belief. The express purpose of a driver's license is for the holder to convey information

about the holder to someone else. A reasonable person would think that someone who presented a driver's license was expressing that the license was theirs and the information it contained about them was accurate. In fact, it seems considerably *more* plausible that a viewer would assume a person agreed with the information on their license than with a message printed on the license plate of everyone in the state. *See Wooley*, 430 U.S. at 713. But to the extent the Court's resolution of this issue turns on this question, which is one of fact, a remand would be the proper remedy.

The State makes much of sex designations on licenses being government speech. *See* State Br. 37. But in all cases finding compelled speech, the government compelled someone to repeat, display, subsidize, associate themselves with, or otherwise endorse some message—sometimes the speech of other private parties, but often government speech. *See, e.g.*, *Wooley*, 430 U.S. at 713 (compelled display of government message violated First Amendment); *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (same); *see also Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2252 (2015) ("Our determination that Texas's specialty license plate designs are government speech does not mean that the designs do not also implicate the free speech rights of private persons."). That is the nature of the right: To say that the government may compel people to endorse a message so long as it is a government message is to eviscerate freedom from compelled speech. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S.

624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us.").

The State also argues that Plaintiffs do not seek to refrain from speaking, but to compel the government to convey their own message. State Br. 39. That, it is true, private parties may not do. *Walker*, 576 U.S. at 219. But here, what Plaintiffs seek is to refrain from asserting that they are male or disclosing that they are transgender when displaying their driver's licenses. Certainly, the State is free to eliminate the problem by eliminating sex designations from licenses altogether.[25] But the relief the Plaintiffs sought was far less sweeping, leaving the State's overall regime for sex designations on licenses intact. Within the system the State has created, where every Alabama license holder has either a male or female sex designation on that license,

___

[25] Removing sex designations only for transgender people would not resolve the problem. While Plaintiffs would no longer have to convey the message that they are their assigned sex at birth, they would still be disclosing that they were transgender against their will, and they would also be conveying another message to which they object—that transgender people, uniquely among all Alabamians, have no sex at all. It would also raise new Equal Protection problems, as transgender residents would be uniquely deprived of access to state identification they could use for federal purposes under the REAL ID Act. *See* REAL ID Act of 2005, Pub. L. No. 109-13, § 202(b)(3), 119 Stat. 231, 312 (states must include gender on each driver's license).

the *only* way for Plaintiffs to refrain from endorsing a message they abhor is to change the sex designation on their license.

## III.  THE PLAINTIFFS SUED WITHIN THE STATUTE OF LIMITATIONS.

Each of the Plaintiffs filed suit well within the two-year statute of limitations. *See* Ala. Code § 6-2-38(*l*). As the district court noted, Ms. Corbitt first sought a female sex designation on an Alabama license only six months prior to filing suit. *See* Doc. 101 at 16 n.4; *see also* Doc. 52-29 at 27. Likewise, Ms. Clark's claims accrued in February 2017—a year prior to filing the complaint—when ALEA informed her that she could not change the sex designation on her license despite her receiving breast augmentation. *See* Doc. 48-39; Doc. 48-1 at 12–14.

These arguments are unavailing because the Policy remains on the books, and thus presents a "continuing violation into the present," which extends the limitations period. *Beavers v. Am. Cast Iron Pipe Co.*, 975 F.2d 792, 798 (11th Cir. 1992) (internal quotation marks omitted); *see also Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1338 (11th Cir. 1999) (violation continuing where relief sought is prospective); *Va. Hosp. Ass'n v. Baliles*, 868 F.2d 653, 663 (4th Cir. 1989) (observing that "continued enforcement of an unconstitutional statute cannot be insulated by the statute of limitations" is foundational to seminal precedents such as

*Brown v. Board of Education*, 347 U.S. 483 (1954), which challenged unconstitutional policies dating back decades) (internal quotation marks omitted).[26]

In any event, a statute of limitations begins to run when the facts supporting the cause of action "are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Rozar v. Mullis*, 85 F.3d 556, 561–62 (11th Cir. 1996) (internal quotation marks omitted). As the district court found, Doc. 101 at 16 n.4, neither Ms. Corbitt nor Ms. Clark could have known the relevant facts—that the State would not permit them to change the sex designation on their license—until six months and a year, respectively, before filing suit. Defendants do not contest this finding as clear error, and so it may not be reversed on appeal.

Nevertheless, the State argues Ms. Corbitt should have discovered the Policy when she changed her name on her license in 2013. State Br. 49. The State assumes that, when changing their name, a reasonable person would ask about an unrelated process. But most people do not ask extra questions or spend more time at the DMV than necessary. Ms. Corbitt "neither knew nor had reason to know that she had been injured by [the Policy] until she requested a female-designated license and was

---

[26] This doctrine also serves a practical purpose. Where a government policy of general applicability affects tens of thousands of people, *see infra* n.2, a dismissal of a challenge as time-barred would simply cause a new plaintiff to come forward and challenge it. The continuing violation doctrine thus promotes judicial efficiency.

denied"—in 2017. Doc. 101 at 16 n.4; Doc. 52-29 at 22–27. "Indeed, she had not been injured by the policy until that point." Doc. 101 at 16 n.4.

Likewise, the State asserts that Ms. Clark's limitations period began to run when she first tried to change the sex designation on her license in 2015. State Br. 48–49. But Ms. Clark planned to undergo gender-affirming surgery in March 2016, Doc. 48-1 at 12, and thus reasonably believed the State would change her sex designation when that was complete. In February 2017, Ms. Clark learned that the State refused to change her sex designation even after she submitted proof of her surgery. *See* Doc. 52-39 (sealed). It was only at that time, a year before filing, that Ms. Clark realized that she would be unable to obtain a license with the correct sex designation. That is when the statute began running—not back in 2015 when Ms. Clark still believed that changing her sex designation would be easy as a keystroke. Doc. 52-36 at 29.

## CONCLUSION

For the foregoing reasons, this Court should affirm the decision below.

Respectfully submitted,

<u>s/ Kaitlin Welborn</u>
Kaitlin Welborn
LaTisha Gotell Faulks
ACLU FOUNDATION OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 420-1741

Gabriel Arkles
David Brown
TRANSGENDER LEGAL DEFENSE AND
EDUCATION FUND
520 Eighth Avenue, Ste. 2204
New York, NY 10018
(646) 993-1688

Rose Saxe
James D. Esseks
Leslie J. Cooper
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2605

*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.    I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 32. This motion contains 12,839 words, including all headings, footnotes, and quotations, and excluding the parts of the brief exempted under Fed. R. App. P. 32(f).

2.    In addition, this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

s/ Kaitlin Welborn
Kaitlin Welborn
*Attorney for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2021, I electronically filed the foregoing using the CM/ECF system, thereby serving all counsel of record.

s/ Kaitlin Welborn
Kaitlin Welborn
*Attorney for Plaintiffs-Appellees*
