No. 21-10486

◆

DARCY CORBITT, et al.,
*Plaintiffs-Appellees,*

v.

HON. HAL TAYLOR, in his official capacity as Secretary of the
Alabama Law Enforcement Agency, *et al.*,
*Defendants-Appellants*.

◆

On Appeal from the United States District Court
for the Middle District of Alabama
Case No. 2:18-cv-00091-MHT-SMD

REPLY BRIEF OF THE STATE DEFENDANTS-APPELLANTS

Steve Marshall
  *Attorney General*
Edmund G. LaCour Jr.
  *Solicitor General*
Thomas A. Wilson
  *Deputy Solicitor General*
Brad A. Chynoweth
  *Assistant Chief Deputy Attorney General*
James W. Davis
Winfield J. Sinclair
Misty S. Fairbanks Messick
  *Assistant Attorneys General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300

August 30, 2021                    *Counsel for the State Defendants*

*Darcy Corbitt, et al. v. Hal Taylor, in his official capacity as Secretary of the Alabama Law Enforcement Agency, et al.,*
No. 21-10486

**AMENDED CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, the undersigned counsel certifies that the following listed persons and parties may have an interest in the outcome of this case:

1. Alabama Attorney General's Office;

2. Alabama Center for Law and Liberty;

3. Alabama Law Enforcement Agency;

4. Alabama Policy Institute;

5. American Civil Liberties Union Foundation;

6. American Civil Liberties Union Foundation of Alabama;

7. American Civil Liberties Union of Alabama;

8. American Medical Association;

9. American Psychiatric Association;

10. Amunson, Jessica R.;

11. Anti-Defamation League;

12. Archer, Jon;

13. Arkles, Gabriel;

14. Autistic Self Advocacy Network;

15. Balderas, Hon. Hector;

16. Barnes, Meridith H.;

*Darcy Corbitt, et al. v. Hal Taylor, in his official capacity as*
*Secretary of the Alabama Law Enforcement Agency, et al.,*
No. 21-10486

17. Barnes, Noel S.;

18. Bay Area Lawyers for Individual Freedom;

19. Ben-Asher, Noa;

20. Boccuzzi, Jr., Carmine D.;

21. Boone, Brock;

22. Bonta, Hon. Rob A.;

23. Borden, Hon. Gray M.;

24. Brown, David;

25. Bruck, Hon. Andrew J.;

26. California Attorney General's Office;

27. California Women Lawyers;

28. Calo, Ryan;

29. Chandy, Sunu P.;

30. Charles, Carl S.;

31. Chemerinsky, Erwin;

32. Chynoweth, Brad A.;

33. Cipolla, Matthew D.;

34. Cisneros, Lisa;

35. Clark, Destiny;

36. Clark, Matthew J.;

*Darcy Corbitt, et al. v. Hal Taylor, in his official capacity as*
*Secretary of the Alabama Law Enforcement Agency, et al.,*
No. 21-10486

37. Clarke, Kristen;

38. Coalition of Labor Union Women;

39. Colavecchio, JD;

40. Cooper, Leslie J.;

41. Corbitt, Darcy;

42. Crozier, Patience;

43. Davies, Andrew R.;

44. Davis, James W.;

45. De Nardo, Scott M.;

46. Doe, Jane (*see* DE41);

47. Doe, John (*see* DE10);

48. Donovan Jr., Hon. Thomas J.;

49. Dorfman, Doron;

50. Doyle, Hon. Stephen M.;

51. Eastman, Jeannie;

52. Ellison, Hon. Keith;

53. Equal Rights Advocates;

54. Equality Federation;

55. Equality Florida;

56. Equality Maine;

57. Equality Ohio Education Fund;

58. Equality South Dakota;

59. Equality Texas;

60. Esseks, James D.;

61. Fairness Campaign;

62. Family Equality;

63. Faulks, LaTisha Gotell;

64. Ferguson, Hon. Robert W.;

65. Ford, Hon. Aaron D.;

66. FORGE, Inc.;

67. FreeState Justice, Maryland's LGBTQ Advocates;

68. Gender Justice;

69. GLBTQ Legal Advocates & Defenders;

70. Garden State Equality;

71. Georgia Equality;

72. Godsoe, Cynthia;

73. Gonzalez-Pagan, Omar;

74. Green, Illyana A.;

75. Harris, Lindsay;

76. Harrison, Jack;

77. Hartzog, Woodrow;

78. Haupt, Claudia;

79. Hazeldean, Susan;

80. Healey, Hon. Maura;

81. In Our Own Voice: National Black Women's Reproductive Justice Agenda;

82. James, Hon. Letitia;

83. Kadri, Thomas;

84. KWH Law Center for Social Justice and Change;

85. LaCour Jr., Edmund G.

86. Lambda Legal Defense and Education Fund, Inc.;

87. Latino Justice PRLDF;

88. Law, Sylvia;

89. Lee, Jason;

90. Legal Aid at Work;

91. Legal Momentum, the Women's Legal Defense and Education Fund;

92. Legal Voice;

93. Leonard, Arthur;

94. Lombardi, Anthony;

95. Marshall, Randall C.;

*Darcy Corbitt, et al. v. Hal Taylor, in his official capacity as*
*Secretary of the Alabama Law Enforcement Agency, et al.,*
No. 21-10486

96. Marshall, Hon. Steve;

97. Martin, Emily;

98. Mass. Trans Political Coalition;

99. Massachusetts Attorney General's Office;

100. MassEquality;

101. Messick, Misty S. Fairbanks;

102. Minnesota Attorney General's Office;

103. Moore, Roy S.;

104. Movement Advancement Project;

105. NARAL Pro-Choice America;

106. National Association of Nurse Practitioners in Women's Health;

107. National Association of Social Workers;

108. National Association of Women Lawyers;

109. National Center for Transgender Equality;

110. National Center for Lesbian Rights;

111. National Council of Jewish Women;

112. National Network to End Domestic Violence;

113. National Organization for Women Foundation;

114. National Partnership for Women & Families;

115. National Women's Law Center;

*Darcy Corbitt, et al. v. Hal Taylor, in his official capacity as*
*Secretary of the Alabama Law Enforcement Agency, et al.,*
No. 21-10486

116. Neronha, Hon. Peter F.;

117. Nevada Attorney General's Office;

118. New Jersey Attorney General's Office;

119. New Mexico Attorney General's Office;

120. New York Attorney General's Office;

121. Newman, Michael L.;

122. Norton, Helen;

123. One Colorado;

124. Oregon Attorney General's Office;

125. Palma-Solana, Vilma;

126. Pregno, Deena;

127. PROMO;

128. Purvis, Dara;

129. QLaw Association of Washington;

130. Reproductive Health Access Project;

131. Rhode Island Attorney General's Office;

132. Robin-Vergeer, Bonnie I.;

133. Robinson, Michael W.;

134. Rosenblum, Darren;

135. Rosenblum, Hon. Ellen F.;

*Darcy Corbitt, et al. v. Hal Taylor, in his official capacity as*
*Secretary of the Alabama Law Enforcement Agency, et al.,*
No. 21-10486

136. Rubin, Connor S.W.;

137. Saxe, Rose;

138. Sinclair, Winfield J.;

139. SisterLove, Inc.;

140. SisterReach;

141. Skinner-Thompson, Scott;

142. Society of OB/GYN Hospitalists;

143. Southern Legal Counsel, Inc.;

144. Suskin, Howard S.;

145. Taylor, Hon. Hal;

146. The Women's Law Center of Maryland;

147. Thompson, Hon. Myron H.;

148. Transgender Law Center;

149. Transgender Legal Defense and Education Fund;

150. TransOhio;

151. United States Department of Justice;

152. Velte, Kyle;

153. Vermont Attorney General's Office;

154. Waldman, Ari;

155. Ward, Charles;

*Darcy Corbitt, et al. v. Hal Taylor, in his official capacity as*
*Secretary of the Alabama Law Enforcement Agency, et al.,*
No. 21-10486

156. Washington Attorney General's Office;

157. Welborn, Kaitlin;

158. Wilson, Thomas A.;

159. Women's Bar Association of the District of Columbia;

160. Women's Bar Association of the State of New York;

161. Women's Law Project;

162. Wyoming Equality; and,

163. Zelbo, Howard S.

Counsel for the Appellants further certify they know of no additional publicly traded company or corporation with an interest in the outcome of this case or appeal.

*Darcy Corbitt, et al. v. Hal Taylor, in his official capacity as*
*Secretary of the Alabama Law Enforcement Agency, et al.,*
No. 21-10486

Respectfully submitted this 30th day of August, 2021.

Steve Marshall
  Attorney General
s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
  *Solicitor General*
Thomas A. Wilson
  *Deputy Solicitor General*
Brad A. Chynoweth
  *Assistant Chief Deputy Attorney General*
James W. Davis
Winfield J. Sinclair
Misty S. Fairbanks Messick
  *Assistant Attorneys General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300

*Counsel for the State Defendants*

Amended Certificate of Interested Persons ............................................C-1

Table of Contents ................................................................................. i

Table of Authorities ........................................................................... iii

Reply Brief ...........................................................................................1

Summary of the Argument.....................................................................2

Argument................................................................................................5

   I.    Policy Order 63 Does Not Violate the Equal Protection Clause...............5

       A. The Equal Protection Clause Does Not Subject the Policy to Heightened Scrutiny....................................................................5

          1.  Classification Is Not Discrimination .............................. 5

          2.  The Policy Does Not Discriminate Based on Sex or Transgender Status .......................................................... 8

       B. The Policy Survives Rational Basis and Intermediate Scrutiny .........13

          1.  The Policy Is Rationally Related to Legitimate Government Interests .................................................... 13

          2.  The Policy Substantially Relates to Important Government Interests .......................................................14

   II.   Plaintiffs' Alternative Constitutional Theories Likewise Fail .................20

       A. The Policy Does Not Violate Plaintiffs' First Amendment Rights................................................................................20

       B. The Policy Does Not Violate Plaintiffs' "Constitutional Right to Informational Privacy."........................................................24

    C. The Policy Does Not Violate Plaintiffs' Right to Refuse
       Unwanted Medical Treatment ............................................................ 25

  III.  The Statute of Limitations Bars Plaintiffs' Claims ................................. 26

Conclusion ......................................................................................................... 28

Certificate of Compliance .................................................................................. 29

Certificate of Service ......................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**

*Access Now, Inc. v. Sw. Airlines Co.*,
  385 F.3d 1324 (11th Cir. 2004) .............................................................5

*Adams v. Sch. Bd. of St. Johns Cty.*,
  3 F.4th 1299 (11th Cir. 2021), *vacated*, reh'g en banc granted,
  No. 18-13592 (11th Cir. Aug. 23, 2021) ................................ 6, 7, 16, 17

*Bostock v. Clayton Cty.*,
  140 S. Ct. 1731 (2020) .......................................................................10

*Bray v. Alexandria Women's Health Clinic*,
  506 U.S. 263 (1993).................................................................. 9, 10, 11

*Brown v. Ga. Bd. of Pardons & Paroles*,
  335 F.3d 1259 (11th Cir. 2003) ...................................................... 26, 27

*Caskey Baking Co. v. Virginia*,
  313 U.S. 117 (1941)........................................................................5, 10

*Collier v. Dickinson*,
  477 F.3d 1306 (11th Cir. 2007) ...........................................................24

*F.C.C. v. Beach Commc'ns, Inc.*,
  508 U.S. 307 (1993)............................................................................13

*F.S. Royster Guano Co. v. Virginia*,
  253 U.S. 412 (1920)............................................................................10

*Frontiero v. Richardson*,
  411 U.S. 677 (1973)............................................................................12

*Geduldig v. Aiello*,
  417 U.S. 484 (1974).............................................................................9

*Glenn v. Brumby*,
  663 F.3d 1312 (11th Cir. 2011) ...................................................... 16, 18

*Gonzalez-Servin v. Ford Motor Co.*,
  662 F.3d 931 (7th Cir. 2011) ...................................................................23

*Holt v. Hobbs*,
  574 U.S. 352 (2015) ...................................................................................2

*Jana-Rock Construction, Inc. v. New York Department of Economic Dev.*,
  438 F.3d 195 (2d Cir. 2006) ...................................................................7, 8

*Jones v. Governor of Fla.*,
  975 F.3d 1016 (11th Cir. 2020) (en banc) ......................................... 13, 14

*Knetsch v. United States*,
  364 U.S. 361 (1960) .................................................................................23

*Libertarian Party of Fla. v. State of Fla.*,
  710 F.2d 790 (11th Cir. 1983) ...................................................................4

*Lochner v. New York*,
  198 U.S. 45 (1905) .....................................................................................4

*McGroarty v. Swearingen*,
  977 F.3d 1302 (11th Cir. 2020) ......................................................... 26, 27

*NASA v. Nelson*,
  562 U.S. 134 (2011) .................................................................................25

*Orion Ins. Grp. v. Washington State Off. of Minority & Women's Bus. Enter*,
  2017 WL 3387344 (W.D. Wash. Aug. 7, 2017), *aff'd*,
  754 F. App'x 556 (9th Cir. 2018) ...............................................................6

*Personnel Adm'r of Mass. v. Feeney*,
  442 U.S. 256 (1979) .............................................................................9, 11

*Pleasant Grove City, Utah v. Summum*,
  555 U.S. 460 (2009) .................................................................................20

*Pryor v. Reno*,
171 F.3d 1281 (11th Cir. 1999), *cert. granted, judgment vacated on other grounds*, 528 U.S. 1111 (2000) ....................................................24

*Rozar v. Mullis*,
85 F.3d 556 (11th Cir. 1996) ........................................................ 26, 28

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
547 U.S. 47 (2006) ........................................................... 21, 22, 23, 25

*Tuan Anh Nguyen v. I.N.S.*,
533 U.S. 53 (2001) ................................................................. 14, 16, 17

*United States v. Virginia*,
518 U.S. 515 (1996) ................................................................... 12, 14

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015) ............................................................................20

*Washington v. Glucksberg*,
521 U.S. 702 (1997) ........................................................... 4, 24, 26

*West Virginia Bd. of Ed. v. Barnette*,
319 U.S. 624 (1943) ............................................................................21

*Wooley v. Maynard*,
430 U.S. 705 (1977) ............................................................................21

**Constitutional Provisions**

U.S. Const. amend. X .........................................................................12

**Statutes**

18 U.S.C. § 2725(1) .............................................................................25

Ala. Code §6-2-8(*l*) ..............................................................................26

Ala. Code §32-6-9(a) ........................................................ 21, 22, 23, 24

**Rules and Regulations**

6 C.F.R. §37.17(c)................................................................................15

**Other Authority**

Abigail Shrier, *A Pediatric Association Stifles Debate on Gender Dysphoria*,
   The Wall Street Journal (Aug. 9, 2021), https://perma.cc/3GAS-6J85................11

ATT'Y GEN. N.J., LAW ENFORCEMENT INTERACTIONS WITH TRANSGENDER
   INDIVIDUALS 12 (2019), https://perma.cc/6CYN-QF8N ........................................18

Marilynn Marchione, *Nurse Mistakes Pregnant Transgender Man as Obese.
   Then, the Man Births a Stillborn Baby*, USA Today
   (May 16, 2019), https://perma.cc/V4M4-GAM7 .................................................20

*Office of Minority Business Enterprise*,
   Ala. Dep't of Econ. & Cmty. Affairs, https://perma.cc/LF3T-B5EY
   (last accessed August 30, 2021)............................................................15

Religious Land Use and Institutionalized Persons Act of 2000 ...............................2

U.S. Department of Homeland Security,
   *Current Status of States/Territories*, https://perma.cc/5KE4-75FA .....................15

# REPLY BRIEF

This case is, as it has always been, a case about whether Alabama may objectively define "sex" on its State-issued driver's licenses. Plaintiffs and amici appearing on their behalf try to recast the case as one requiring this Court to decide "whether Alabama may force transgender people to undergo surgery as a condition of receiving a driver's license that accurately designates their sex." Resp.Br.2. But what they and the district court missed is that Policy Order 63 is merely an accommodation that provides some—but not all—with the ability to change a license's sex designation. If the Policy had never been implemented, Plaintiffs would be no closer to obtaining Alabama driver's licenses with their preferred sex designations. The accommodation plainly does not "force" anyone to do anything.

Ultimately, Plaintiffs' attempt to reframe the case only underscores the State's position: whether a license "accurately designates … sex" necessarily turns on how one defines "sex" in the first instance. Thus, even by Plaintiffs' lights, the case reduces to a contest between competing definitions of this term.

The question for this Court is therefore whether the Constitution permits a sovereign State to define sex on its driver's licenses based on objective physical characteristics that nearly always correspond with a person's sex. The answer is yes.

Each Alabama driver's license includes certain important identifying information, including the license holder's sex. In nearly every instance, persons born male receive an "M" and persons born female an "F." Policy Order 63 allows individuals who have undergone a sex-change operation to subsequently change the sex designation on their driver's licenses. The Policy formalizes an accommodation for some who seek a new sex designation.

Contrary to Plaintiffs' and their amici's framing, that there are conditions to the Policy's accommodation does not implicitly "force" anyone to fulfill them. That fact is easy to see in other contexts where a generally applicable rule applies unless someone is eligible for an accommodation. For example, prisons often prohibit prisoners from growing beards, but under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), a prison must accommodate a prisoner whose religion requires him to grow a beard. *See Holt v. Hobbs*, 574 U.S. 352, 355-56 (2015). It does not, however, follow that RLUIPA "forces" anyone to become "a devout Muslim." *Id.* at 355. Likewise, the general rule for government disability benefits is that no one gets them unless he is disabled, which hardly suggests that the benefits regime "forces" anyone to become disabled. Similarly, the general rule in Alabama is that the sex designation on a driver's license is grounded

in biological distinctions between male and female. That Policy Order 63 provides an accommodation for some people does not mean that it forces anything on anyone.

Indeed, all the Policy does is inform how the State classifies sex on licenses; it does not discriminate or treat any individuals differently based on sex. And because the State is merely defining categories, the lines it draws need be only rational to withstand constitutional review. Plaintiffs contend that the mere mention of "sex" triggers heightened scrutiny. But there is a critical distinction between "classification itself" (DE101:12) and treatment based on classification. The latter may warrant heightened scrutiny, but the former does not.

Moreover, the Policy is facially neutral and applies equally to all individuals. It treats both sexes identically. Of course, the accommodation *relates* to sex because it informs the legal definition of "male" and "female." But mere relation to sex does not amount to discrimination based on the same.

The Policy also treats cisgender and transgender individuals identically. The Policy is facially neutral. Thus, to trigger heightened scrutiny, Plaintiffs were required to prove that animus motivated the Policy's adoption. But while Plaintiffs lob in baseless accusations that the Policy expresses the State's "anti-transgender views," Resp.Br.46, they never explain how an accommodation that was intended to—and does—make it *easier* for people to change their sex designations was driven by anti-transgender views.

3

Plaintiffs' alternative constitutional theories fare even worse. Plaintiffs merely rehash the First Amendment position they took below and ignore the State's central arguments. Nor do Plaintiffs make much effort to support their substantive-due-process claims, never even attempting, for example, to show how their alleged rights constitute "fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997). Instead, they bypass the constitutional inquiry and simply point to differing policies from other jurisdictions. But "[a] court is no more free to impose the legislative judgments of other states on a sister state than it is free to substitute its own judgment for that of the state legislature." *Libertarian Party of Fla. v. State of Fla.*, 710 F.2d 790, 794 (11th Cir. 1983). And just as "[t]he 14th Amendment does not enact Mr. Herbert Spencer's Social Statistics," *Lochner v. New York*, 198 U.S. 45, 75 (1905) (Holmes, J., dissenting), it does not compel the State to adopt Plaintiffs' theories of sex or gender.

Lastly, Plaintiffs misstate both law and facts in their effort to bring the claims of Plaintiffs Clark and Corbitt within the statute of limitations. The "continuing violation" doctrine does not apply where, as here, the Plaintiffs knew or should have known about the facts underlying their claims in this litigation. Furthermore, Plaintiffs failed to meet their burden of proving either Clark or Corbitt was "justifiably ignorant." Clark's and Corbitt's claims are therefore barred, and all Plaintiffs' claims fail for the reasons described here and in the State's opening brief.

**ARGUMENT**

## I.     Policy Order 63 Does Not Violate the Equal Protection Clause.

### A.     The Equal Protection Clause Does Not Subject the Policy to Heightened Scrutiny.

#### 1.     Classification Is Not Discrimination.

"Classification is not discrimination," *Caskey Baking Co. v. Virginia*, 313 U.S. 117, 121 (1941), so "classification itself" (DE101:12) does not trigger heightened scrutiny.[1] Only when the State *treats* similarly-situated persons differently is the Equal Protection Clause triggered. State.Br.16-18. Though the Policy relates to the State's classification of the sexes for identification purposes, this "classification itself" does not treat anyone differently based on sex.

Moreover, if the threshold criteria for suspect classes were subject to heightened scrutiny, then everything from censuses to affirmative-action programs would suddenly face an extraordinary uphill battle. Plaintiffs mustered no response to the State's question whether the federal government's decision not to count

---

[1] This appeal is the first opportunity the State had to respond to the district court's *sua sponte* rationale. Plaintiffs claim they argued that "classification itself" triggers heightened scrutiny below, *see* Resp.Br.17 n.11 (citing DE51:29), but the snippet they quote supported an entirely different argument: that "Policy Order 63 classifies people based on their transgender status for purposes of sex designations on licenses, and is therefore a sex-based classification." DE51:29. Because denying the State an opportunity to respond to the district court's novel position "would result in a miscarriage of justice," *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1332 (11th Cir. 2004), this Court should not hesitate to consider the State's argument.

Sudanese-Americans as "African American" could possibly survive strict scrutiny, State.Br.24, yet questions like this demand answering because they illustrate the sweeping implications of Plaintiffs' argument.

For example, when Ralph Taylor, who "grew up thinking of himself as Caucasian," applied for highway funds set aside for minority-owned businesses, the government would have likely violated the Constitution by denying him minority status if strict scrutiny had applied. *See Orion Ins. Grp. v. Washington State Off. of Minority & Women's Bus. Enterprises*, 2017 WL 3387344, at *2 (W.D. Wash. Aug. 7, 2017), *aff'd*, 754 F. App'x 556 (9th Cir. 2018). After all, Taylor had "results from a genetic ancestry test that estimated that he was …4% Sub-Saharan African," and he had eventually come to "consider[] himself to be Black," "joined the NAACP," and even "subscribed to Ebony magazine." *Id.* at *3. But the court had no trouble rejecting Taylor's claim on the ground that the agency "did not act in an arbitrary or capricious manner when it found that there was insufficient evidence that Mr. Taylor was … Black." *Id.* at *8.

That approach was correct because heightened scrutiny does not apply to threshold determinations divorced from treatment. Indeed, this Court recently suggested as much in its now-vacated *Adams* decision, with the majority appearing to recognize a distinction between "the mere act of determining an individual's sex" and using that determination to "assign[] students to bathrooms on the basis of sex."

6

*Adams v. Sch. Bd. of St. Johns Cty.*, 3 F.4th 1299, 1317 n.9 (11th Cir. 2021), *vacated*, reh'g en banc granted, No. 18-13592 (11th Cir. Aug. 23, 2021) (emphasis omitted).

The Second Circuit's rationale in *Jana-Rock Construction, Inc. v. New York Department of Economic Development*, 438 F.3d 195 (2d Cir. 2006), remains instructive. There, plaintiff Rocco Luiere "[brought] a challenge under the Equal Protection Clause of the Fourteenth Amendment to … New York's 'affirmative action' statute for minority-owned businesses, because the law [did] not include in its definition of 'Hispanic' people of Spanish or Portuguese descent unless they also c[a]me from Latin America." *Id.* at 200. The Second Circuit affirmed the district court's decision to "apply rational basis review rather than strict scrutiny," *id.*, concluding that heightened scrutiny "has little utility in supervising the government's definition of its chosen categories," *id.* at 210. As in *Jana-Rock*, Plaintiffs in this case argue that the Policy violates the Equal Protection Clause because it permits some, but not all, people to obtain a sex designation on their driver's licenses that differs from their sex. The Second Circuit's holding shows that such an under-inclusiveness challenge to the criteria informing the designation itself receives rational basis review.

To support the contention that classifications by themselves trigger heightened scrutiny, Plaintiffs rely on many of the same cases the district court cited below. *See* Resp.Br.22-23. But as the State noted in its opening brief, many cases—

7

including those on which Plaintiffs rely—refer to "classification" as shorthand for class-based application of the legal prohibitions or entitlements at issue. *See* State.Br.17-18. These cases therefore do not support the proposition that "classification itself" is sufficient to trigger heightened scrutiny. DE101:12.

Plaintiffs misread *Jana-Rock* as a case about multiple "bite[s] at the apple" in equal-protection litigation. Resp.Br.23-24. To say nothing of the inapposite metaphor, that "Plaintiffs seek no second bite at the apple," *id.* at 24, is irrelevant. *Jana-Rock* shows that when litigants bring equal-protection challenges against government programs on under-inclusivity grounds, the government's decision about who constitutes what group warrants only rational basis review even where the decision implicates government benefits. *See Jana-Rock*, 438 F.3d at 210.

The district court's conclusion that "classification itself" triggers heightened scrutiny is unworkable and wrong. That conclusion was the district court's sole basis for ruling for the Plaintiffs, and so this error alone warrants reversal.

## 2. The Policy Does Not Discriminate Based on Sex or Transgender Status.

The decision below also warrants reversal because, even if the Policy does provide some attendant benefit, it does so equally. The Policy applies to men and women in precisely the same way. Neither Plaintiffs nor their amici argue otherwise. And the Policy does not so much as mention transgender individuals, let alone "target[]" them. Resp.Br.25.

The Policy is therefore facially neutral, and Plaintiffs accordingly bore the burden of proving that "invidious gender-based discrimination" animated the Policy's implementation. *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979). "[D]iscriminatory purpose implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271-72 (1993) (quoting *Feeney*, 442 U.S. at 279) (cleaned up). In *Bray*, the Supreme Court rejected the claim that protesting abortion "reflect[ed] an animus against women in general," *id.* at 269, reasoning that "while it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification." *Id.* at 271 (cleaned up); *see also Geduldig v. Aiello*, 417 U.S. 484, 495-97 (1974) (holding that a state insurance policy excluding pregnancy coverage did not classify on the basis of sex).

The same logic applies here. While transgender individuals may be particularly likely to seek sex-designation changes, it does not follow that the Policy targets or disadvantages them. That the Policy accommodates some does not imply that it harms others; had the State never instituted the accommodation, Plaintiffs would be no closer to obtaining licenses with their preferred sex designations.

Moreover, the testimony Plaintiffs elicited below reaffirms that the State enacted the Policy to "allow more latitude" for those seeking sex-designation changes, and to help these individuals "get what they want" on their driver's licenses. DE48-5:14. Accordingly, heightened scrutiny does not apply.

Plaintiffs and their amici try to resist this conclusion through a battery of theories superficially linking the Policy to sex discrimination. None succeeds. Plaintiffs assert the Policy requires heightened scrutiny "for at least three reasons: it uses *genitalia* to determine what *sex designation* the State will list for *transgender* people on their licenses." Resp.Br.16 (emphases in original). *First*, Plaintiffs assert that "us[ing] genitalia" to define sex discriminates "based on" sex because "'sex' includes, at a minimum, 'reproductive biology.'" *Id.* at 17 (quoting *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1739 (2020)). But because sex includes reproductive biology, Plaintiffs' point reduces to the nonsensical proposition that it is discriminatory to define sex based on sex. And, in any event, genitalia's relation to sex does not necessarily imply sex-based discrimination. *Cf. Bray*, 506 U.S. at 271. *Second* and relatedly, a sex classification, by itself, does not equate to discriminatory treatment. *Caskey Baking Co.*, 313 U.S. at 121; *see also F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920). And *third*, the Policy facially applies to everyone—not just transgender people—and, absent proof of discriminatory intent,

mere disparate impact does not warrant heightened scrutiny. *Feeney*, 442 U.S. at 274; *Bray*, 506 U.S. at 271-72.

Plaintiffs further suggest that the Policy demands intermediate scrutiny because "it is explicitly based on a form of surgery that transgender people undergo." Resp.Br.20. But cisgender individuals undergo this surgery too—most identifiably, those who transition and then detransition. According to Plaintiffs' and their amici's theory of gender, "gender identity is innate" and "cannot be altered voluntarily." DE38:7; *see also* Br. of American Medical Association et al. 8 (same). Based on that theory, when an individual transitions and later detransitions to realign her gender identity and sex, it becomes clear that the individual is—and thus always was— cisgender, transitions notwithstanding. Neither Plaintiffs nor their amici refute this. Instead, Plaintiffs seek to minimize detransitioners' relevance by noting "no evidence in the record" describes this phenomenon. Resp.Br.19-20. But record evidence does not determine facial neutrality. Plaintiffs' non-response is a far cry from meeting their burden of proving animus. *Feeney*, 442 U.S. at 274.[2]

The federal amici take a more aggressive tack, leaning into the logical conclusion of Plaintiffs' position: The Policy "discriminates against transgender

---

[2] Plaintiffs' evasiveness telegraphs the difficulty "growing numbers of detransitioners" pose for their theories in this case and beyond. Abigail Shrier, *A Pediatric Association Stifles Debate on Gender Dysphoria*, The Wall Street Journal (Aug. 9, 2021), https://perma.cc/3GAS-6J85.

individuals," the federal government asserts, "based on their nonconformity with gender stereotypes by assuming that a person is 'male' or 'female' only if their genitalia and chest correspond to what is typical for male and female individuals." U.S. Br. 13. But to say that the relationship of genitalia to sex is merely a harmful "gender stereotype" is like saying that having a spinal column is merely "stereotypical" of vertebrates. To make the argument is to refute it.

Sex is defined by objective differences between men and women. Though the Supreme Court's imprimatur is unnecessary to support this claim, it bears noting that the law of the land takes this baseline reality for granted. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("Physical differences between men and women are enduring: The two sexes are not fungible.") (cleaned up); *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion) ("[S]ex … is an immutable characteristic determined solely by the accident of birth."). If the United States or Plaintiffs wish to impose a new definition of sex on the States, they must do so through the political branches, not the courts, for the Constitution does not prohibit States from observing and classifying based on objective biological distinctions. If anything, it protects their right to do so. *See* U.S. Const. amend. X.

**B.**     **The Policy Survives Rational Basis and Intermediate Scrutiny.**

      **1.**     **The Policy Is Rationally Related to Legitimate Government Interests.**

Rational basis review "is a paradigm of judicial restraint." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993). "For this reason, the Supreme Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny. In the rare instances when it has done so, a common thread has been that the laws at issue lack any purpose other than a bare desire to harm a politically unpopular group." *Jones v. Governor of Fla.*, 975 F.3d 1016, 1034 (11th Cir. 2020) (en banc) (internal quotation marks omitted). The Policy's accommodation of some sex-designation-change requests is rationally related to every government interest discussed in the intermediate-scrutiny section below, *see infra* §I.B.2, and surely more.

Plaintiffs and their amici misunderstand rational basis review. They claim the Policy "hinders" the State's ability to identify individuals and "protects no one." Resp.Br.39. As demonstrated by the State's testimony in this case, *see, e.g.*, DE48-5:14, 16, 18-23, Plaintiffs' claims are "at least debatable," and therefore fail to invalidate the Policy under rational review. *Jones*, 975 F.3d at 1036. Nor do alleged inconsistencies compel an alternate conclusion, for "the State need not strike at all evils at the same time or in the same way, and a statute is not invalid under the Constitution because it might have gone farther than it did." *Id.* (cleaned up). Indeed, though "every reform that benefits some more than others may be criticized for what

it fails to accomplish, that reality does not invalidate the measure under the Equal Protection Clause." *Id.* (quotations omitted).

## 2. The Policy Substantially Relates to Important Government Interests.

If intermediate scrutiny applied, it would require that Alabama show (1) the Policy's limitations "serve[] important governmental objectives" that do not stem from "overbroad generalizations about the different talents, capacities or preferences of males and females, *Virginia*, 518 U.S. at 533; and (2) "the discriminatory means employed are substantially related to the achievement of those objectives," *id.*

Intermediate scrutiny does not require that a policymaker use "the most scientifically advanced method," *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 63 (2001), and "[n]one of [the Supreme Court's] gender-based classification equal protection cases have required that the statute under consideration must be capable of achieving its ultimate objective in every instance," *id.* at 70. Indeed, the *Nguyen* Court upheld a policy applying an additional burden on men to prove parentage because "[i]t is almost axiomatic that a policy which seeks to foster the opportunity for meaningful parent-child bonds to develop has a close and substantial bearing on the governmental interest in the actual formation of that bond." *Id.* In other words, facilitating the opportunity for a legitimate government interest to be realized is enough to satisfy intermediate scrutiny's substantial-relation standard.

The State's interest in defining sex and thus limiting the scope of the Policy's accommodation is (at least) important. As Chief Pregno explained, the State has important interests in providing accurate sex designations on State-issued licenses to give law-enforcement personnel and medical first responders "the information they need to make decisions on how to handle this person for arrest procedures, medical, emergency procedures, booking and retaining procedures, interviewing and questioning procedures, and as well as maintaining the actual physical identifiers of that person." DE48-5:16. Moreover, this definition can affect the scope of every sex-conscious law or policy in the State.[3] The State also has an important interest in providing its citizens with REAL-ID-Act-compliant licenses that will, among other things, let them board flights; the State must provide information about license holders' sex or gender to comply with the Act, and its interest in upholding a consistent definition of sex thus dovetails with its interest in furthering its citizens' ability to travel.[4]

---

[3] Plaintiffs complain that the State "does not specify" the various sex-conscious laws and policies at issue. Resp.Br.30. Sex-conscious laws or policies comprise any law or policy classifying based on sex, from laws regulating separate bathrooms to the policies of the State's Office of Minority Business Enterprise, which "identif[ies] … women-owned businesses," among others, and "advocate[s] on their behalf." *Office of Minority Business Enterprise*, Ala. Dep't of Econ. & Cmty. Affairs, https://perma.cc/LF3T-B5EY (last accessed August 30, 2021).

[4] That the REAL ID Act specifies "[g]ender, as determined by the State," Resp.Br.25 (quoting 6 C.F.R. §37.17(c)), is beside the point. Alabama, like many other REAL-ID-compliant States, complies with the REAL ID Act by providing sex designations for its license-holders. U.S. Department of Homeland Security, *Current Status of*

The limited scope of the Policy substantially relates to each of these interests. By accommodating a sex-designation change only for those who have undergone a sex-change operation, the Policy minimizes the inaccuracies a more lenient accommodation would produce. In this same vein, the Policy's conditions allow the State to maintain its definition of sex while providing licenses that let its citizens board planes. And the Policy's limitations help ensure that the State's law enforcement and medical first responders receive "the information they need" to respond to various forms of emergencies and conduct necessary procedures. DE48-5:16. By tying its accommodation to the State's understanding of sex, the Policy allows the State to issue accurate sex designations more than 99% of the time. *See* DE52-46:2 ("[A]n estimated 0.3% of adults are transgender."). Not only do the Policy's boundaries "foster the opportunity" for the State to reinforce its important objective of defining sex, *Nguyen*, 533 U.S. at 70, they actually ensure the State will be able meet this important objective with near-perfect consistency.

Beyond heightened scrutiny's inapplicability to this case, Plaintiffs' intermediate-scrutiny analysis rests on several fundamental errors. Many of these flaws mirror those in the decision below. *First*, Plaintiffs allege that, in practice, the

---

*States/Territories*, https://perma.cc/5KE4-75FA (listing Alabama among "Compliant States/Territories"); *see Glenn v. Brumby*, 663 F.3d 1312, 1315 (11th Cir. 2011) (noting that "the Supreme Court" has sometimes used the terms "gender and sex … interchangeably").

Policy is inconsistent. Resp.Br.25-27. They cite the now-vacated *Adams* decision, 3 F.4th 1299—and only *Adams*—to explain why these inconsistencies are relevant. But the facts of *Adams* were never "directly analogous" to those of this case. Resp.Br.25. There, the Court dealt with a policy that the Court said "target[ed] some transgender students for bathroom restrictions but not others," *Adams*, 3 F.4th at 1308; here, the Court must evaluate a limited accommodation—not a "restriction[]"—that "targets" no one. Moreover, *Adams* concerns which bathrooms a student was allowed to use, thus going well beyond the mere sex classifications at issue here.

Moreover, the alleged inconsistencies are too insignificant to jeopardize the Policy's constitutionality. Plaintiffs and their amici make much of the State's willingness to accept out-of-State sex designations, arguing that out-of-State individuals' ability to change genders and then import their new genders to Alabama "dooms the Policy under heightened scrutiny." Resp.Br.27. But the State's decision not to spend limited resources retrieving and analyzing out-of-State applicants' medical records makes perfect sense considering that, even by Plaintiffs' count, virtually every applicant presents the State with accurate sex designations. The Policy need not "achiev[e] its ultimate objective in every instance," *Nguyen*, 533 U.S. at 70; a 99.7% success rate will do.

*Second*, to argue against the State's important interest in accurate identification, Plaintiffs rely on the very sex stereotyping they purport to denounce. They insist, for example, that their "traditionally feminine features" and style of dress suggest that "[a] female sex designation on their license would only make it easier for the Plaintiffs to be correctly identified as the holders of their licenses." Resp.Br.34 (quoting DE101:8). Such an argument "presume[s] that men and women's appearance and behavior will be determined by their sex," and therefore "embod[ies] 'the very stereotype the law condemns.'" *Glenn v. Brumby*, 663 F.3d 1312, 1320 (11th Cir. 2011). Moreover, the argument completely overlooks the State's interests in accurately identifying individuals' sex.

And, as with Plaintiffs' other claims, the absence of any limiting principle poses a profound problem for this line of reasoning. To take just one example, if a man dresses in a "traditionally masculine" fashion during daytime but dresses in "traditionally feminine" styles in the evening, Plaintiffs' approach would require that Alabama issue two driver's licenses. And if an individual's gender identity vacillates throughout the day or is neither male nor female,[5] then what, under the Plaintiffs'

---

[5] Amicus New Jersey, for example, legally recognizes the genders of those who identify as "non-binary"—that is, "neither male nor female"—and that such individuals "may use other terms to describe themselves, such as gender fluid, agender, bigender, or gender expansive." ATT'Y GEN. N.J., LAW ENFORCEMENT INTERACTIONS WITH TRANSGENDER INDIVIDUALS 12 (2019), https://perma.cc/6CYN-QF8N.

theory, could stop the Constitution from compelling on-demand licenses with new

genders to suit every identity?

And *third*, Plaintiffs and their amici mischaracterize the State's interests and

adopt the district court's erroneous reading of the record, stripping the State's

testimony of its context and thereby deeming the interests to which the State testified

"*post hoc*."[6] Plaintiffs claim, for example, that Chief Pregno "could not explain how

the Policy advanced any relevant law enforcement or correctional policies."

Resp.Br.37. In fact, Chief Pregno provided pages of testimony explaining how the

Policy furthered the State's interests, *see* DE48-5:18-23 (describing how Policy aids

identification, arrest procedures, and search procedures), and testified to how and

why the Policy aided law enforcement and first responders, *see id.* at 13; *see also*

State.Br.27-36.

What is more, neither Plaintiffs nor *any* of their amici so much as contest the

State's important interest in providing accurate sex designations to first responders

for "medical, emergency procedures." DE48-5:16. Perhaps this is because men and

women can have drastically different needs in a medical emergency, and the State's

interest in providing accurate information to the medical providers serving its

citizens is indisputably important. For example, it is not hard to imagine a situation

---

[6] For a detailed explanation of the district court's misinterpretation of the record and errant conclusion that the State's interests were developed *post hoc*, *see* State.Br.31-36.

where a medical worker fails to consider pregnancy as a possibility with an individual presenting as a man. If news reports are accurate, this has already happened. *See* Marilynn Marchione, *Nurse Mistakes Pregnant Transgender Man as Obese. Then, the Man Births a Stillborn Baby*, USA Today (May 16, 2019), https://perma.cc/V4M4-GAM7.

*    *    *

Though only rational basis review applies, the Policy nevertheless survives heightened scrutiny because its limitations serve to promote the State's paramount interests in defining sex for identification purposes. Only by misreading the record and misstating the stakes of this case could the district court (and Plaintiffs) contend otherwise.

## II.    Plaintiffs' Alternative Constitutional Theories Likewise Fail.

### A.    The Policy Does Not Violate Plaintiffs' First Amendment Rights.

If this case implicates anyone's right to speak, it is the right of the State, not the rights of the Plaintiffs. Whatever speech a State-issued license contains is government speech, *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 212 (2015), and when the government speaks it "has the right to speak for itself," *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) (internal quotation marks omitted). To hold otherwise would provide litigants the right to wrest from the State's control *any* license information with which they disagree.

Moreover, it is uniquely unlikely in this context that one would associate the State's sex designation with Plaintiffs' viewpoint, thus drastically diminishing concerns over compelled speech.

Equally important, any alleged constitutional harm is "plainly incidental" to the State's unquestionably legitimate requirement that its drivers carry licenses. *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006) ("*FAIR*"); *see also* Ala. Code §32-6-9(a). Here, as in *FAIR*, the State regulates conduct: there, by requiring educational institutions to "afford equal access to military recruiters," *FAIR*, 547 U.S. at 60; here, by requiring citizens to keep and, in specific circumstances, present licenses, *see* Ala. Code §32-6-9(a). And, also as in *FAIR*, this conduct implicates speech: there, "e-mails" and "notices" relating to military recruitment, *FAIR*, 547 U.S. at 61; here, descriptive information on a license. So what the Court said in *FAIR* applies with equal force here: Suggesting that requiring citizens to hold and bear the information included in a State-issued license is anything like "forcing a student to pledge allegiance, or forcing a Jehovah's Witness to display the motto 'Live Free or Die,' … trivializes the freedom protected in *Barnette* and *Wooley*." 547 U.S. at 62 (citing *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624 (1943); *Wooley v. Maynard*, 430 U.S. 705 (1977)).

Plaintiffs argue that those who view their licenses are likely to assume the sex designation represents Plaintiffs' viewpoint because "[t]he express purpose of a

driver's license is for the holder to convey information about the holder to someone else." Resp.Br.46-47. This misstates the test. While a license indeed conveys information to others, the relevant compelled-speech inquiry examines the "likelihood that the views of those engaging in the expressive activities would be identified with the [license's] owner." *FAIR*, 547 U.S. at 65. If "[s]trangers, friends, co-workers, and family members consistently perceive [Plaintiffs] to be female," Resp.Br.34, there is exceedingly little doubt that these same groups of people would identify the "M" on Plaintiffs' driver's licenses with the State's view, not Plaintiffs'.[7]

Plaintiffs then rehash the general proposition that governments may not compel speech, engaging none of the contours this case presents and simply ignoring the State's arguments. Resp.Br.47-48. Of course, unchecked, compulsory endorsement of government ideology would "eviscerate freedom from compelled speech." Resp.Br.47. But that is not this case. Here, the alleged "compelled speech" is a non-ideological physical descriptor on a State-issued license created to identify the holder to government officials. Ala. Code §32-6-9(a). And Plaintiffs even argue "the State is free to eliminate the problem by eliminating sex designations from licenses altogether," Resp.Br.48, wholly ignoring the important interests the State

---

[7] Moreover, Plaintiffs' sex designation is not a "political, ideological, or moral position[]," and certainly does not embody any "anti-transgender views." Resp. Br. 46. Indeed, insofar as they are separate concepts, a license's *sex* designation does not necessarily imply any message whatsoever about the license-holder's *gender identity*.

articulated and disregarding the impact that would have on Alabamians who need REAL-ID-Act-compliant driver's licenses.

Plaintiffs further ignore the State's question, "What is to stop Plaintiffs, by their own logic, from challenging a license's date-of-birth designation because it reinforces a Christian conception of time?" State.Br.38. The answer is "nothing"; as with their equal-protection arguments, Plaintiffs' reasoning here has no limiting principle. And most conspicuously, Plaintiffs completely ignore the *FAIR* Court's decision. By "pretending that potentially dispositive authority against [their claim] does not exist," *Gonzalez-Servin v. Ford Motor Co.*, 662 F.3d 931, 934 (7th Cir. 2011), Plaintiffs implicitly concede that a license's sex designation is "plainly incidental" to the State's interest in requiring identification, *FAIR*, 547 U.S. at 62. The Policy does not violate Plaintiffs' First Amendment rights.[8]

---

[8] The law-professor amici discuss *FAIR*, arguing "[t]he State's assertion that '*FAIR* is fatal to Plaintiffs' claim,' … is based on the flawed premise that the object of the State's regulation is conduct, not speech. But Policy Order 63 directly compels Plaintiffs to endorse the State's contrary perception of their gender." Professors Br. 22. Where a point is advanced only by amici and not by the parties, courts "have no reason to pass upon it." *Knetsch v. United States*, 364 U.S. 361, 370 (1960). Regardless, the professors misunderstand the State's argument. The State's driver's-license requirements regulate conduct, *i.e.*, carrying a State-issued license bearing State-issued information. Ala. Code §32-6-9(a). Plaintiffs complain the Policy violates their rights because "the State requires people to comply" with various license-related laws. Resp.Br.44 n.24. Contrary to the professors' equivocation, it is these legitimate license-requirement laws—not the Policy itself—to which Plaintiffs' alleged speech impingement is "plainly incidental." *FAIR*, 547 U.S. at 62.

**B.     The Policy Does Not Violate Plaintiffs' "Constitutional Right to Informational Privacy."**

"The Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 720-721 (1997) (internal quotation marks omitted). Plaintiffs' assertion of a right to "informational privacy" does not fit the bill. Indeed, this Court has twice concluded that the Constitution does not protect the right Plaintiffs assert. *See Pryor v. Reno*, 171 F.3d 1281 (11th Cir. 1999), *cert. granted*, *judgment vacated on other grounds*, 528 U.S. 1111 (2000); *Collier v. Dickinson*, 477 F.3d 1306 (11th Cir. 2007). The State requires Plaintiffs to use their driver's licenses only in a few circumstances, and only when the audience is an official State actor. *See* Ala. Code. §32-6-9(a). No right to withhold vital identifying information from State actors is "deeply rooted in this Nation's history and tradition." *Glucksberg*, 521 U.S. at 721.

Rather than argue that the Constitution protects their right to conceal their sex designation from State actors, Plaintiffs (at 42-43) seek only to distinguish this Court's holding that "there is no constitutional right to privacy in motor vehicle record information." *Pryor v. Reno*, 171 F.3d 1281, 1288 n.10 (11th Cir. 1999). Their efforts fail, for while Plaintiffs contend that "[t]he personal information at issue in [*Pryor*] did not include sex designations," that's far from clear, as the case turned on whether the State could share, among other things, "any record that

24

pertains to a[n] … *identification card* issued by a department of motor vehicles." *Id.* at 1282 n.2 (quoting 18 U.S.C. § 2725(1)) (emphasis added). And *Pryor*'s reference to protections to "intimate personal information" included only such information "given to a state official in confidence," which is not at issue here. *Id.* at 1288 n.10. Ultimately, Plaintiffs' approach fails to engage the relevant constitutional inquiry, never so much as citing *Glucksberg* or attempting to ground their supposed constitutional right in the Constitution. This effort is insufficient to show the alleged right even exists, *see NASA v. Nelson*, 562 U.S. 134, 160 (2011) (Scalia, J., concurring) ("A federal constitutional right to 'informational privacy' does not exist."), let alone that the State violated it.

**C.     The Policy Does Not Violate Plaintiffs' Right to Refuse Unwanted Medical Treatment.**

Only by blatantly misconstruing the effects of the Policy can Plaintiffs and their amici suggest it impinges their "right to refuse unwanted medical treatment." Resp.Br.44. The Policy is an optional, limited accommodation; that those individuals who receive the accommodation have generally undergone surgery in no way implies that "Alabama force[s] transgender people"—or anyone else seeking the accommodation—"to undergo surgery." Resp.Br.2. As noted above, Plaintiffs confuse the baseline rule with the accommodation. RLUIPA does not "force" men in prison who want facial hair to join a religion that requires beards, and Policy 63 does not "force" anyone to undergo surgery.

Plaintiffs concede that the "benefit [they] seek is not a license with a male sex designation, but a license that lists their sex as female." Resp.Br.45. That "benefit"— a license that misstates its holder's sex—is not one the State provides, and is surely not "deeply rooted in this Nation's history and tradition." *Glucksberg*, 521 U.S. at 720-21.

## III. The Statute of Limitations Bars Plaintiffs' Claims.

An allegedly "continuous violation" cannot save plaintiffs who slept on their rights. The continuous-violation doctrine "is premised on the equitable notion that the statute of limitations ought not to begin to run until facts supportive of the cause of action are or should be apparent to a reasonably prudent person," so "[this Court] [has] previously refused to apply the continuing violation doctrine to plaintiffs who were able to avoid the problem by filing within the statute of limitations period." *McGroarty v. Swearingen*, 977 F.3d 1302, 1308 (11th Cir. 2020) (cleaned up). Where defendants assert the facts supporting plaintiffs' claim were or should have been apparent "to a person with a reasonably prudent regard for his rights," *Brown v. Ga. Bd. of Pardons & Paroles*, 335 F.3d 1259, 1261 (11th Cir. 2003), plaintiffs bear the burden of proving "they were justifiably ignorant," *Rozar v. Mullis*, 85 F.3d 556, 562 (11th Cir. 1996).

The two-year statute of limitations bars claims by Plaintiffs Clark and Corbitt. Ala. Code §6-2-8(*l*). The State denied Clark's first sex-designation-change request

in April 2015. DE48-1:12 ("That is when I sent all of the information I had, plus my letter from my doctor. And that's when it was denied the first time."). By Clark's own testimony, the "cause of action [was] apparent" around April 2015. *Brown*, 335 F.3d at 1261. Yet Clark waited until February 2018 to bring suit, DE1, well exceeding the two-year statute-of-limitations period. And Plaintiffs claim that Corbitt, despite having obtained a name change in 2013 as part of Corbitt's gender transition, remained "justifiably ignorant" of the Policy until 2017.

The decisions on which Plaintiffs rest their "continuous violation" argument are inapposite, as the only Eleventh Circuit continuous-violation decision they cite is from the Title VII context, and in any event, awareness of "facts supportive of the cause of action" nullifies the tolling a continuous violation might otherwise effect. *McGroarty v. Swearingen*, 977 F.3d at 1308.

Plaintiffs claim Clark's cause of action was not apparent to Clark until February 2017, when the State refused to change Clark's sex designation despite Clark having undergone partial surgery. Resp.Br.51. But this was Clark's second rejection; by Clark's own testimony, Clark knew at least as early as April 2015 that the Policy permitted sex-designation changes only for those who underwent surgery, DE48-1:12, and it is this aspect of the Policy that Clark now challenges. The statute of limitations therefore began running well over two years before Clark brought suit.

And, though Plaintiffs were required to prove Corbitt was "justifiably ignorant" of the Policy despite identifying as a woman and receiving a State-issued name-change in 2013, *Rozar*, 85 F.3d 556, 562 (11th Cir. 1996), they merely hypothesize that "most people do not ask extra questions or spend more time at the DMV than necessary," Resp.Br.50. Such conjecture is inadequate to meet the burden this Court's precedent places on them.

### CONCLUSION

For the foregoing reasons, this Court should reverse the decision below and render judgment for the State Defendants.

Respectfully Submitted,

Steve Marshall
  Attorney General
s/Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
  *Solicitor General*
Thomas A. Wilson
  *Deputy Solicitor General*
Brad A. Chynoweth
  *Assistant Chief Deputy Attorney General*
James W. Davis
Winfield J. Sinclair
Misty S. Fairbanks Messick
  *Assistant Attorneys General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300

*Counsel for the State Defendants*

1. I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B)(ii). The brief contains 6,479 words, including all headings, footnotes, and quotations, and excluding the parts of the brief exempted under Fed. R. App. P. 32(f).

2. In addition, this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for the State Defendants*

**CERTIFICATE OF SERVICE**

I certify that on August 30, 2021, I electronically filed this document using the Court's CM/ECF system, which will electronically serve a copy of this document to all counsel of record electronically registered with the Clerk.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for the State Defendants*
