No. 21-10486

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

DARCY CORBITT, et al.,

Plaintiffs-Appellees.

v.

HON. HAL TAYLOR, in his official capacity as
Secretary of the Alabama Law Enforcement Agency, et al.,
Defendants-Appellants,

On Appeal from the United States District Court
for the Middle District of Alabama
Case No. 2:18-cv-00091-MHT-SMD

PLAINTIFFS-APPELLEES' PETITION FOR
REHEARING OR REHEARING EN BANC

Rose Saxe
James D. Esseks
Leslie J. Cooper
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2605

Z Gabriel Arkles
Shayna Medley
TRANSGENDER LEGAL DEFENSE AND
EDUCATION FUND
520 Eighth Avenue, Ste. 2204
New York, NY 10018
(202) 642-4542

Alison Mollman
ACLU FOUNDATION OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(510) 909-8908

*Attorneys for Plaintiffs-Appellees*

i

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, 11th Cir. R. 26.1-1, and 11th Cir. R. 26.1-2(d), Plaintiffs-Appellees hereby submit the following Certificate of Interested Persons and Corporate Disclosure Statement, and certifies that the following persons and entities have an interest in the outcome of this appeal, listed in alphabetical order with descriptions:

1. Advocates for Trans Equality Education Fund – counsel for plaintiffs;

2. Alabama Attorney General's Office – counsel for defendants;

3. Alabama Center for Law and Liberty – amicus curiae;

4. Alabama Law Enforcement Agency - defendant;

5. Alabama Policy Institute – amicus curiae;

6. Allen & Overy LLP – counsel for amicus curiae;

7. American Civil Liberties Union Foundation – counsel for plaintiffs;

8. American Civil Liberties Union Foundation of Alabama – counsel for plaintiffs;

9. American Medical Association – amicus curiae;

10. American Psychiatric Association – amicus curiae;

11. Amunson, Jessica Ring – counsel for amicus curiae;

12. Anti-Defamation League – amicus curiae;

13. Archer, Col. Jon - defendant;

14. Arkles, Gabriel – counsel for plaintiffs

15. Autism Self Advocacy Network – amicus curiae;

16. Barnes, Meridith H. - counsel for defendants;

17. Barnes, Noel S. - counsel for defendants;

18. Bay Area Lawyers for Individual Freedom (BALIF) - amicus curiae;

19. Ben-Asher, Noa – amicus curiae;

20. Boccuzzi, Carmne D. Jr. - counsel for amicus curiae;

21. Boone, Brock – former counsel for plaintiffs;

22. Bonta, Rob – counsel for amicus curiae;

23. Borden, Hon. Gray M. - magistrate judge;

24. Brown, David – former counsel for plaintiffs;

25. Butts, Talmadge – counsel for amicus curiae;

26. California – amicus curiae;

27. California Attorney General's Office– counsel for amicus curiae;

28. California Women Lawyers – amicus curiae;

29. Calo, Ryan – amicus curiae;

30. Chandy, Sunu P. – counsel for amicus curiae;

31. Charles, Carl – counsel for amicus curiae;

32. Chemerinsky, Irwin – amicus curiae;

33. Chynoweth, Brad A. - counsel for defendants;

34. Cipolla, Matthew D. - counsel for amicus curiae;

35. Cisneros, Lisa – counsel for amicus curiae;

36. Clark, Destiny - plaintiff;

37. Clark, Matthew J. – counsel for amici;

38. Clarke, Kristen – counsel for amicus curiae;

39. Cleary Gottlieb Steen & Hamilton LLP – counsel for amicus curiae;

40. Coalition of Labor Union Women – amicus curiae;

41. Colaveccio, JD – counsel for amicus curiae;

42. Connecticut – amicus curiae;

43. Cooper, Leslie J. – counsel for plaintiffs;

44. Corbitt, Darcy - plaintiff;

45. Crozier, Patience – counsel for amicus curiae;

46. Davies, Andrew Rhys - counsel for amicus curiae;

47. Davis, James W. - counsel for defendants;

48. De Nardo Scott M. - counsel for amicus curiae;

49. District of Columbia – amicus curiae;

50. Doe, Jane (see doc. 41) - plaintiff;

51. Doe, John (see doc. 10) – former plaintiff;

52. Dorfman, Doron – amicus curiae;

53. Doyle, Hon. Stephen M. - magistrate judge;

54. Eastman, Jeannie - defendant;

55. Eidsmoe, John Allen – counsel for amicus curiae;

56. Equal Rights Advocates – amicus curiae;

57. Equality Federation – amicus curiae;

58. Equality Florida – amicus curiae;

59. Equality Maine – amicus curiae;

60. Equality Ohio Education Fund – amicus curiae;

61. Equality South Dakota – amicus curiae;

62. Equality Texas – amicus curiae;

63. Esseks, James D. – counsel for plaintiffs;

64. Fairness Campaign – amicus curiae;

65. Family Equality – amicus curiae;

66. Faulks, LaTisha Gotell - former counsel for plaintiffs;

67. Feldhaus, D. Matthew – counsel for amicus curiae;

68. FreeState Justice – amicus curiae;

69. FORGE, Inc. - amicus curiae;

70. Foundation for Moral Law – amicus curiae;

71. Gender Justice – amicus curiae;

72. GLBTQ Advocates and Defenders – amicus curiae

73. Garden State Equality – amicus curiae;

74. Georgia Equality – amicus curiae;

75. Godsoe, Cynthia – amicus curiae;

76. Gonzalez-Pagan, Omar – counsel for amicus curiae;

77. Green, Illyana A. - counsel for amicus curiae;

78. Harris, Lindsay – counsel for amicus curiae;

79. Harrison, Jack B. - amicus curiae;

80. Hartzog, Woodrow – amicus curiae;

81. Hawaii – amicus curiae;

82. Haupt, Claudia – amicus curiae;

83. Hazeldean, Susan V. – amicus curiae;

84. In Our Own Voice – National Black Women's Reproductive Justice Agenda – amicus curiae;

85. Jenner & Block LLP – counsel for amicus curiae;

86. Kadri, Thomas E. - amicus curiae;

87. KWH Law Center for Social Justice and Change – amicus curiae;

88. LaCour Jr., Edmund G. - counsel for defendants;

89. LatinoJustice PRLDEF – amicus curiae;

90. Lambda Legal Defense and Education Fund, Inc – amicus curiae;

91. Law, Sylvia A. - amicus curiae;

92. Lee, Jason - counsel for amicus curiae;

93. Legal Aid at Work – amicus curiae;

94. Legal Momentum – amicus curiae;

95. Legal Voice – amicus curiae;

96. Leonard, Arthur S. - amicus curiae;

97. Lombardi, Anthony - counsel for amicus curiae;

98. Maine – amicus curiae;

99. Marshall, Randall C. - former counsel for plaintiffs;

100.    Marshall, Hon. Steve – counsel for defendants;

101.    Martin, Emily – counsel for amicus curiae;

102.    Massachusetts – amicus curiae;

103.    MassEquality – amicus curiae;

104.    Mass. Trans Political Coalition – amicus curiae;

105.    Medley, Shayna – counsel for plaintiffs

106.    Messick, Misty S. Fairbanks – counsel for defendants;

107.    Minnesota – amicus curiae;

108.    Mollman, Alison – counsel for plaintiffs;

109.    Moore, Roy Stuart – counsel for amicus curiae;

110.    Movement Advancement Project – amicus curiae;

111.    NARAL Pro Choice America – amicus curiae;

112.    National Association of Nurse Practitioners in Women's Health –

amicus curiae;

113.    National Association of Social Workers – amicus curiae;

114.    National Center for Lesbian Rights – amicus curiae;

115.    National Center for Transgender Equality – amicus curiae;

116.    National Council of Jewish Women – amicus curiae;

117.    National Network to End Domestic Violence – amicus curiae;

118.    National Organization for Women Foundation – amicus curiae;

119.    National Partnership for Women & Families – amicus curiae;

120.    National Women's Law Center – amicus curiae;

121.    Nevada – amicus curiae;

122.    New Jersey – amicus curiae;

123.    New Mexico – amicus curiae;

124.    New York – amicus curiae;

125.    Newman, Michael L. - counsel for amicus curiae;

126.    Norton, Helen – amicus curiae;

127.    One Colorado – amicus curiae;

128.    Oregon – amicus curiae;

129.    Palma-Solano, Vilma – counsel for amicus curiae;

130.    Pregno, Deena - defendant;

131.    PROMO – amicus curiae;

132.   Purvis, Dara – amicus curiae;

133.   QLaw Assocation of Washington – amicus curiae;

134.   Reproductive Health Access Project- amicus curiae;

135.   Rhode Island – amicus curiae;

136.   Robin-Vergeer, Bonnie I. – counsel for amicus curiae;

137.   Robinson, Michael W. - counsel for defendants;

138.   Rosenblum, Darren – amicus curiae;

139.   Rubin, Connor S.W. - counsel for amicus curiae;

140.   Saxe, Rose – counsel for plaintiffs;

141.   Sinclair, Winfield J. - counsel for defendants;

142.   SisterLove Inc. - amicus curiae;

143.   SisterReach – amicus curiae;

144.   Skinner-Thompson, Scott – amicus curiae;

145.   Society of Ob/Gyn Hospitalists – amicus curiae;

146.   Suskin, Howard S. - counsel for amicus curiae;

147.   Taylor, Hon. Hal - defendant;

148.   The Women's Law Center of Maryland – amicus curiae;

149.   Transgender Law Center – amicus curiae;

150.   Thompson, Hon. Myron H. - district judge;

151.   Transgender Legal Defense and Education Fund – counsel for

plaintiffs;

152. TransOhio – amicus curiae;

153. United States – amicus curiae;

154. Velte, Kyle – amicus curiae;

155. Vermont – amicus curiae;

156. Waldman, Ari – amicus curiae

157. Ward, Charles - defendant;

158. Washington – amicus curiae;

159. Welborn, Kaitlin – former counsel for plaintiffs;

160. Wilson, Thomas A. - counsel for defendants;

161. Women's Bar Association of the District of Columbia – amicus curiae;

162. Women's Bar Association of the State of New York – amicus curiae;

163. Women's Law Project – amicus curiae;

164. Wyoming Equality – amicus curiae; and

165. Zelbo, Howard S. - counsel for amicus curiae.

Counsel for Appellees further certify that no additional publicly traded company or corporation has an interest in the outcome of this case or appeal.

Respectfully submitted this 11th day of October, 2024.

_____
Alison Mollman
ACLU Foundation of Alabama
P.O. Box 6179
Montgomery, AL 36106-0179
(510) 909-8908

*Attorney of Record for Plaintiffs-Appellees*

## STATEMENT OF COUNSEL

I, Alison Mollman, express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to the following decision(s) of the Supreme Court of the United States or the precedents of this circuit and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court:

1. *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020);

2. *J.E.B. v. Alabama*, 511 U.S. 127 (1994);

3. *McClendon v. Long*, 22 F.4th 1330 (11th Cir. 2022);

4. *United States v. Virginia*, 518 U.S. 515 (1996);

5. *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015); and

6. *Wooley v. Maynard*, 430 U.S. 705 (1977).

I further express a belief, based on a reasoned and studied professional judgment, that this appeal involves questions of exceptional importance:

1. Whether denying transgender driver's license applicants a license with a gender marker that reflects their gender, unless they undergo specific genital surgery that they may not need, may not want, or may not be able to afford is a form of sex discrimination under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution?

2. Whether an action taken "because of sex" under Title VII of the Civil Rights Act of 1964 is a sex classification under the Equal Protection Clause?

3. Whether requiring individuals to convey government speech through a driver's license violates the Free Speech Clause of the Fourteenth Amendment to the U.S. Constitution?

Panel rehearing or en banc review is particularly appropriate here because the U.S. Supreme Court is considering substantially similar legal arguments regarding the application of sex discrimination precedent to classifications based on transgender status in *United States v. Skrmetti*, No. 23-477, which will be heard this term. The question before the Supreme Court in *Skrmetti* is whether a state law that categorically prohibits all medical treatments intended to allow "a minor to identify with, or live as" a gender identity that is inconsistent with the minor's sex assigned at birth, or to treat "discomfort or distress from a discordance between the minor's sex and asserted identity," Tenn. Code Ann. § 68-33-103(a)(1), violates the Equal Protection Clause of the Fourteenth Amendment. That was also the core issue in *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1227 (11th Cir. 2023), *reh'g denied*, 114 F.4th 1241 (11th Cir. Aug. 28, 2024), which the panel here viewed as dispositive of Appellees' Equal Protection claims. *See* Add. 16-17; Add. Concurrence at 2 (Jill Pryor, J., concurring) ("As I discuss below, this Court's

binding precedent requires it. I merely observe that this case is the latest in a series of cases from this Court rejecting equal protection claims by transgender individuals challenging government policies that prohibit them from living their lives consistently with their gender identity.").

Because *Skrmetti* is likely to resolve threshold questions about the level of scrutiny in this case and determine whether this case was properly decided in light of controlling law, we respectfully request that this Court stay issuance of the mandate and hold this case in abeyance pending resolution of *Skrmetti* by the U.S. Supreme Court.

_____

Alison Mollman
ACLU FOUNDATION OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(510) 909-8908

*Attorney of Record for Plaintiffs-Appellees*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................. ii

STATEMENT OF COUNSEL ............................................................... xii

TABLE OF AUTHORITIES .................................................................. xvi

STATEMENT OF THE ISSUES .............................................................. 1

COURSE OF THE PROCEEDINGS AND DISPOSITION OF THE CASE ........... 3

    I. Proceedings Leading to the Panel Disposition. .................................... 3

    II. The Panel Disposition. ................................................................. 5

STATEMENT OF FACTS ..................................................................... 7

ARGUMENT ..................................................................................... 8

    I. The scope of Fourteenth Amendment protections for sex discrimination is a question of exceptional importance that is before the U.S. Supreme Court this term in *U.S. v. Skrmetti*. ................................................................. 8

    II. The panel's compelled speech holding is contrary to U.S. Supreme Court precedent. ................................................................................... 11

CONCLUSION ................................................................................ 14

CERTIFICATE OF COMPLIANCE ........................................................ 16

CERTIFICATE OF SERVICE .............................................................. 17

ADDENDUM ................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*Adams ex rel. Casper v. Sch. Bd. Of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) (en banc)............................................................................................1

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) ................................. xii, 1, 3, 10

*Counterman v. Colorado*, 143 S. Ct. 644 (2023)....................................................11

*Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023), *reh'g denied*, 114 F.4th 1241 (11th Cir. Aug. 28, 2024).............. xiii, 1, 2, 5, 8, 9, 10, 15

*Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011) .............................................10

*J.E.B. v. Alabama*, 511 U.S. 127 (1994) ...................................................... xii, 9, 10

*McClendon v. Long*, 22 F.4th 1330 (11th Cir. 2022) ..................................... xii, 14

*N.A.A.C.P. v. Hunt*, 891 F.2d 1555 (11th Cir. 1990) .............................................13

*Polansky v. Executive Health Resources Inc.*, 17 F.4th 376 (3d Cir. 2021)............11

*State of Georgia v. McCarthey*, No. 15-14035 (11th Cir. 2016)...........................11

*U.S. v. Virginia*, 518 U.S. 515 (1996) .................................................................2

*United States v. Daniel Baker*, No. 21-13749 (11th Cir. 2023) .............................11

*United States v. Skrmetti*, No. 23-477 (U.S. S. Ct.) ................ xiii, xiv, 2, 8, 9, 11, 15

*United States v. Virginia*, 518 U.S. 515 (1996)................................................ xii, 10

*USA v. John Mcavoy*, 20-10604 (11th Cir. 2021) ...................................................11

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015) ...................................................................................... xii, 2, 13

*Wooley v. Maynard*, 430 U.S. 705 (1977) ............................................ xii, 2, 12, 14

**Statutes**

11th Cir. R. 26 ................................................................................................. ii

Fed. R. App. P. 26.1............................................................................................ ii

Fed. R. App. P. 35 ..............................................................................................1

Tenn. Code Ann. § 68-33-103 ............................................................................ xiii

**Other Authorities**

Alabama Law Enforcement Agency Policy Order 63 .................................... 7, 8, 12

Movement Advancement Project, "Snapshot: LGBTQ Equality By State," https://www.lgbtmap.org/equality-maps/equality-maps......................................11

Pursuant to Federal Rule of Appellate Procedure 35(b), Plaintiffs-Appellees Darcy Corbitt, Destiny Clark, and Jane Doe ("Appellees") file this Petition for Rehearing En Banc of the panel's September 20, 2024 Opinion in this case, a copy of which is enclosed in the Addendum attached hereto and referred to as "Add." herein.

## STATEMENT OF THE ISSUES
## MERITING EN BANC CONSIDERATION

The panel opinion here was issued over two and a half years after this case was briefed and argued, and after several intervening circuit cases involving related legal issues were decided. *See, e.g.*, *Adams ex rel. Casper v. Sch. Bd. Of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) (en banc); *Eknes-Tucker*, 80 F.4th 1205 (11th Cir. 2023). The panel's holding that the Alabama driver's license policy at issue—requiring proof of specific genital surgery as a condition of updating the sex designation on a license—did not constitute sex discrimination rests almost entirely on this Circuit's decision in *Eknes-Tucker* (holding that Alabama law banning gender affirming healthcare for transgender youth was not a sex-based classification). Add. 16-19. Appellees recognize that *Eknes-Tucker* is binding circuit precedent, but it is inconsistent with the U.S. Supreme Court's reasoning in *Bostock v. Clayton County Ga.*, 140 S. Ct. 1731 (2020) (holding that firing an employee because she is

1

transgender is sex discrimination under Title VII of the Civil Rights Act of 1964), *U.S. v. Virginia*, 518 U.S. 515 (1996) (holding that all sex classifications are subject to heightened scrutiny)*,* and other Supreme Court sex discrimination precedent both longstanding and recent.

On June 24, 2024, the U.S. Supreme Court granted certiorari in *United States v. Skrmetti*. The Court's decision in *Skrmetti* this term will address questions of the scope of sex discrimination protections for transgender people under the Equal Protection clause in the context of a challenge to law similar to the one challenged in *Eknes-Tucker*, and will determine whether *Eknes-Tucker* remains good law—and therefore whether it will continue to control the panel's analysis of the classification at issue here. Accordingly, Appellees request that this Court stay the mandate in this case and hold this case in abeyance pending a decision from the Supreme Court in *Skrmetti.*

With respect to the First Amendment compelled speech claim, the panel held that all information on a driver's license is government speech, and concluded that under *Walker v. Texas Div., Sons of Confederate Veterans*, 576 U.S. 200 (2015), Alabama had the right to determine its own ideological views about sex. Add. 32. But the panel did not address how, under binding U.S. Supreme Court precedent such as *Walker* or *Wooley v. Maynard*, 430 U.S. 705 (1977), the government may make private citizens speak its preferred message about their own sex by bearing a

driver's license with a sex designation that declares them to be male. This error warrants en banc consideration to the extent that Appellees do not prevail on their equal protection claim.

## COURSE OF THE PROCEEDINGS AND DISPOSITION OF THE CASE

### I. Proceedings Leading to the Panel Disposition.

Appellees filed this action on February 6, 2018, asserting that Alabama's policy of requiring genital surgery in order to update the sex designation on a state driver's license violated their rights to equal protection, due process and free speech. Following discovery, the parties cross-moved for summary judgment. *See* Docs. 46, 50, 58, 60–62. At oral argument, the district court denied both of those motions. Doc. 69. The parties agreed to submit the case on the record. *Id.* The district court then requested supplemental briefing on the impact of the U.S. Supreme Court's ruling in *Bostock v. Clayton County, Ga.*, 140 S. Ct. 1731 (2020), whether the court should hold a hearing to determine if the State invented its interest in law enforcement identification "*post hoc* in response to litigation," and whether the Policy is consistent with the State's policy governing the amendment of sex designations on birth certificates. Doc. 81 at 2.

On January 15, 2021, the district court entered a judgment in favor of Appellees. Doc. 102 at 1. The Court declared the Policy unconstitutional and enjoined and restrained the State "from failing to issue to plaintiffs Corbitt, Clark,

and Doe new driver licenses with female sex designations, upon application for such licenses by them." *Id.* at 2. In ruling for Appellees on their equal protection claim, the court first examined the Appellees' injuries for purposes of standing. It found these injuries "severe," noting that the surgery the State requires "results in permanent infertility in almost all cases" and may be "unaffordable." Doc. 101 at 7. The court detailed how a license with the wrong sex designation, the alternative to surgery, was also fraught with "pain and risk." *Id.* Indeed, Ms. Doe "lost a job after she showed her male-designated driver license to someone who informed her employer that she is transgender." *Id.* at 10. And for Ms. Corbitt, using a license that listed her as male would be "proclaiming a lie" and go against her beliefs as a "devout and practicing Christian." *Id.* at 7–8 (cleaned up).

The court held that Policy Order 63 classifies based on sex and therefore triggers heightened equal protection scrutiny. The district court concluded that by treating people differently "based on the nature of their genitalia," and setting "the criteria by which [the State] channels people into its sex classifications," the policy classifies based on sex. *Id.* at 11, 13. Turning to the State's justifications, the court found that the State had proffered only two—to promote "consistency with the State's existing requirements for amending a birth certificate" and "to make it easier for law enforcement officers to identify people when determining appropriate post-arrest search and placement procedures." *Id.* at 17. For the first, the court found that

the State had failed to "articulate the importance of their alleged interest" and, at most, provided "convenience." *Id.* at 19, 21. For the second, the court found that the interest was not genuine, but invented *post hoc*, and that the State's argument to the contrary lacked supporting evidence and "flirts with incoherence." *Id.* at 38. The court did not address Appellees' other claims.

The district court subsequently issued a permanent injunction requiring Alabama to issue a license with a female sex designation to each Appellee. Doc. 102 at 2.

## II. The Panel Disposition.

On September 20, 2024, the panel reversed the district court's decision and rejected the district court's reasoning on Equal Protection: "We conclude that this language is 'neutral in the sense that it is not gender-based'—*i.e.*, the Policy does not impose a sex-based classification." Add. 16. Specifically, the panel held that "[i]ndividuals wishing to have their sex designation changed from male to female, and individuals wishing to have their sex designation changed from female to male, are all covered by the Policy and subject to the same requirements. *See Eknes-Tucker,* 80 F.4th at 1228 (concluding that an Alabama statute prohibiting the prescription or administration of puberty blockers and crosssex hormones did not impose a sex-based classification where 'the statute [did] not establish an unequal regime for males and females' and 'establishe[d] a rule that applie[d] equally to both sexes')."

Add. 16-17.

Taking a formalistic approach, the court found that there was no differential treatment due to sex-based classification: "The Policy imposes one set of requirements without regard to an individual's genitalia. If an individual wants to change his or her sex designation, then the Policy merely lists the documentation requirements for doing so. . . . Nor does the Policy Order assign anyone to a sex: it takes them as they are and designates the circumstances under which the State will agree to change the sex shown on the individual's driver's license. Accordingly, we conclude that Policy Order 63 does not impose a sex-based classification." Add. 18-19. Applying rational basis review, the panel found that Policy Order 63 was rationally related to a government interest in consistently defining sex across government documents. Add. 21-22.

The panel further held that Appellees could not prevail on either their Due Process or their First Amendment compelled speech claims. With respect to the Due Process informational privacy claim, the panel viewed itself as bound by previous panel precedent and held that there was no "constitutional privacy interest [in] the information displayed on their driver's license." Add. 26-27. The panel also rejected the Due Process medical decision-making claim, because Appellees could have received an Alabama license that erroneously designated their sex as "male." Add. 27-28. Finally, the panel rejected Appellees' compelled speech claim, determining

that "any speech at issue is government speech—not compelled speech—and to the extent it implicates Plaintiffs' First Amendment rights, such infringement is incidental to the broader regulation requiring drivers to carry licenses." Add. 29.

## STATEMENT OF FACTS

Alabama Law Enforcement Agency's ("ALEA") Policy Order 63 prevents transgender Alabamians from changing the sex designation on their driver's licenses unless they provide a letter from a doctor stating that they have had "complete" "gender reassignment surgery," including genital surgery. This means that transgender individuals like Appellees, who may not need, want, or be able to afford this specific surgery, cannot obtain an Alabama driver's license with a sex designation that matches their sex. Instead, they are forced to choose between going without a license, or bearing a license that erroneously labels their sex as "male," and thus discloses their transgender status. As a result of Policy Order 63, among other harms, Ms. Clark has feared for her life when casting a ballot; Ms. Doe has been turned away for services at a credit union; and Ms. Corbitt had to miss a family member's funeral. The only contemporaneous justification that Appellants offered for this policy was a desire for consistency with state law regarding birth certificates; they further provided purely speculative, *post-hoc* rationales regarding identification and the implementation of sex-based law enforcement and correctional policies.

**ARGUMENT**

I. **The scope of Fourteenth Amendment protections for sex discrimination is a question of exceptional importance that is before the U.S. Supreme Court this term in *U.S. v. Skrmetti*.**

The question of whether rational basis review or heightened scrutiny applies to classifications like those in Policy Order 63 is currently before the Supreme Court. Relying on this Court's decision in *Eknes-Tucker*, the panel held that Policy Order 63 was sex-neutral because it does not "establish an unequal regime for males and females." Add. 16 (quoting *Eknes-Tucker v. Gov. of Ala.,* 80 F.4th at 1228 (11th Cir. 2023) (holding that a law banning medical care for adolescents with gender dysphoria did not classify based on sex because it did "not establish an unequal regime for males and females"). The Supreme Court recently granted review of precisely the same issue in *U.S. v. Skrmetti,* in which the Sixth Circuit issued a decision very much like *Eknes-Tucker* (and upon which the panel decision in *Eknes Tucker* relied – *see Eknes-Tucker*, 80 F.4th at 1228, 1229).

In the United States's petition for certiorari in *Skrmetti*, the government explained that a law's "even-handedness" does not insulate it from heightened scrutiny: "In *J.E.B.*, for example, the Court held that sex-based peremptory challenges violate the Equal Protection Clause even though 'the system as a whole [wa]s evenhanded' in the sense that men and women were equally likely to be struck based on their sex. 511 U.S. 127, 159-60 (Scalia, J., dissenting)." The Supreme Court

is thus poised to resolve whether a law needs to burden men or women as a group in order to trigger heightened scrutiny under the Equal Protection Clause.

The panel here further concluded that Policy Order 63 was not a sex-based classification because it "imposes one set of requirements without regard to an individual's genitalia. If an individual wants to change his or her sex designation, then the Policy merely lists the documentation requirements for doing so: submitting an amended birth certificate and/or a physician's letter." Add. 18. This reasoning repeats the erroneous logic of *Eknes-Tucker*, 80 F.4th at 1228 ("[T]he statute refers to sex only because the medical procedures that it regulates—puberty blockers and cross-sex hormones as a treatment for gender dysphoria—are themselves sex-based."), and it too is before the Supreme Court in *Skrmetti*. *See* Petition for Certiorari of United States ("Because [a] minor's sex at birth determines whether or not the minor can receive certain types of medical care," a ban on gender-affirming care necessarily "discriminates on the basis of sex.").

This question of the scope of Equal Protection sex discrimination protections for transgender individuals is a question of exceptional importance. As the Supreme Court recognized in *Bostock*: "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex," since "transgender status [is] inextricably bound up with sex." *Bostock*, 140 S. Ct. at 1741-42; *see also Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011)

("[D]iscrimination against a transgender individual because of her gender-nonconformity is sex discrimination . . . ."). Equal application of a sex-based rule to both males and females does not render it sex-neutral. As Supreme Court precedent recognizes, such a policy is sex-based even if it subjects all males and females to the same rule. *See Bostock*, 140 S. Ct. at 1744 ("[A]n employer who intentionally fires an individual … transgender employee … violates the law *even if the employer is willing to subject all male and female … transgender employees to the same rule*." (emphasis added)); *J.E.B.*, 511 U.S. at 140-41 (holding peremptory challenges based on a juror's sex are unconstitutional, even though they can be applied equally to both sexes, because the Equal Protection Clause protects *each person*—not merely women as a group or men as a group—from disparate treatment based on sex). Rather, all gender-based classifications must survive heightened scrutiny. *United States v. Virginia*, 518 U.S. 515, 518 (1996).

The extension of *Eknes-Tucker* to all facially sex-based laws so long as they apply equally to both sexes or classify based on asserted biological differences between male and females would exempt countless facially discriminatory laws and policies from meaningful review. In the past four years, over a hundred laws targeting transgender individuals have been enacted at the state level. *See* Movement Advancement Project, "Snapshot: LGBTQ Equality By State," https://www.lgbtmap.org/equality-maps/equality-maps. Whether and how long-

standing constitutional sex discrimination protections extend to such laws is presently before the U.S. Supreme Court.

Because *Skrmetti* is likely to resolve the proper standard of review in this case, we respectfully request that this Court stay issuance of the mandate and hold this case in abeyance pending resolution of *Skrmetti* by the U.S. Supreme Court. *Cf.* Order to hold matter in abeyance, 1, *USA v. John Mcavoy*, 20-10604 (11th Cir. 2021) (holding matter before en banc court in abeyance pending Supreme Court resolution of *Polansky v. Executive Health Resources Inc.*, 17 F.4th 376 (3d Cir. 2021)); Order to hold matter in abeyance, 1, *United States v. Daniel Baker*, No. 21-13749 (11th Cir. 2023) (holding matter in abeyance pending Supreme Court resolution of *Counterman v. Colorado*, 143 S. Ct. 644 (2023)); *see also State of Georgia v. McCarthey*, No. 15-14035 (11th Cir. 2016) (holding case in abeyance until Sixth Circuit issues decision on nationwide stay of the Clean Water Rule).

## II.     The panel's compelled speech holding is contrary to U.S. Supreme Court precedent.

Plaintiffs-Appellees also seek reconsideration of their First Amendment claim (Count III), which the district court did not rule upon and the concurring opinion did not touch upon. The panel concluded that driver's licenses were "government speech" (Add. 30), and essentially ended the inquiry there. *See* Add. 32 ("Policy Order 63 simply does not compel Plaintiffs 'to communicate the State's message that their sex is male' and does not 'force them to disclose their transgender status.'").

Disregarding the way Policy Order 63 operates, the panel stated that "[i]f anything, the Policy helps to do the opposite by providing an avenue for 'individual[s] wishing to have the[ir] sex changed on their Alabama driver['s] license.'" *Id*. at 32.

By setting forth the terms under which transgender driver license holders may change the sex designation on their license, Policy Order 63 operates not only as "an avenue" to change the license, but also as a *barrier* to anyone who does not meet its surgery requirement. Its restrictions are the reason that Plaintiffs would be required to carry a license that discloses their sex as male or go without a license at all – and it is only because of the district court's injunction of that Policy that they have obtained a license that shows their sex as female. Policy Order 63; Doc. 102 at 2.

Even if the information displayed on a license is properly characterized as government speech, the government nonetheless cannot mandate that individuals display the government's speech on a matter as personal as their gender. *See Wooley v. Maynard*, 430 U.S. 705, 706 (1977) (the government may not require a person to display an ideological message "in a manner and for the express purpose" that the public see it); *see also Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 219 (2015) ("Our determination that Texas's specialty license plate designs are government speech does not mean that the designs do not also implicate the free speech rights of private persons.").

The panel decision inappropriately stopped its inquiry after concluding that

"Alabama 'has the right to speak for itself,' 'is entitled to say what it wishes,' and is free 'to select the views that it wants to express.'" Add. 32. Alabama may be able to make whatever statements *it* wants, but the First Amendment does not permit the State to demand that Alabamians express its anti-transgender views on their own driver's licenses. *See N.A.A.C.P. v. Hunt*, 891 F.2d 1555, 1566 (11th Cir. 1990) ("Government communication is legitimate as long as the government does not abridge an individual's 'First Amendment right to avoid becoming the courier for such message.'"). *Walker*, which the panel cited as supporting its holding, in fact makes clear that even in the context of government speech, "the Free Speech Clause may constrain the government's speech if, for example, the government seeks to compel private persons to convey the government's speech." 576 U.S. at 208. Presumably it would be no more acceptable for the state of New Hampshire to require all *driver's license* holders declare their intent to "Live Free or Die" as it was for the state to mandate that a *license plate* bear the same motto. *Cf. Wooley*, 430 U.S. at 713.

The panel observed that "At bottom, Plaintiffs disagree with . . . Alabama's viewpoint." Add. 32. Just so. Identifying information like name or sex is directly associated with the license holder. Alabama cannot require private citizens to carry and convey its ideological views about their own sex, any more than New Hampshire could require drivers to bear a motto on their license plates, *Wooley,* 430 U.S. at 713,

a sheriff could require registered sex offenders to bear a government sign on their front lawns, *McClendon v. Long*, 22 F.4th 1330, 1337 (11th Cir. 2022)*, or Alabama could have required individuals to carry a flag, *Hunt*, 891 F.2d at 1565. Plaintiffs do not want to state that they are male or to disclose that they are transgender when displaying their driver's licenses. If the panel were correct, the government could force individuals to display any kind of message without recourse, as long as it would be considered government speech. *See McClendon*, 22 F.4th at 1337 ("No limiting principle exists under the district court's . . . version of the free speech doctrine.... the Sheriff could place *any* sign identifying himself as the speaker in *any* county resident's yard.").

While the panel decision's inconsistency with free speech jurisprudence provides grounds for rehearing, if the Supreme Court in *Skrmetti* holds that heightened scrutiny applies to laws that discriminate against transgender people, this Court need not revisit the First Amendment analysis in this case. This provides an additional reason to hold the case in abeyance pending resolution of *Skrmetti*.

## CONCLUSION

This case has been pending since 2018, and Appellees are the only three individuals who are the subject of the district court's injunction. The state will not be harmed by a modest additional delay. But Appellees will have no opportunity to benefit from a decision in *U.S. v. Skrmetti* that classifications like the ones at issue

here and in *Eknes-Tucker* are sex-based classifications, unless the mandate is stayed and this case is held in abeyance pending the Supreme Court's resolution of related Equal Protection claims this term.

Respectfully submitted this 11th day of October, 2024.

Alison Mollman
ACLU FOUNDATION OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(510) 909-8908

Rose Saxe
James D. Esseks
Leslie J. Cooper
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2605

Z Gabriel Arkles
Shayna Medley
TRANSGENDER LEGAL DEFENSE AND
EDUCATION FUND
520 Eighth Avenue, Ste. 2204
New York, NY 10018
(202) 642-4542

*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that:

1. This petition complies with the type-volume limitation, as provided in Fed. R. App. P. 35(b)(2) and 11th Cir. R. 35-1, because, exclusive of the exempted portions of the petition, the petition contains 3,432 words.

2. This brief complies with the type-face requirements, as provided in Fed. R. App. P. 32(a)(5), and the type-style requirements, as provided in Fed. R. App. P. 32(a)(6), because the brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14 point Times New Roman font.

3. As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated this 11th day of October, 2024.

_____
Alison Mollman
ACLU FOUNDATION OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(510) 909-8908

*Attorney of Record for Plaintiffs-Appellees*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 11, 2024, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send notification

of such filing to all counsel of record.

_____
Alison Mollman
ACLU Foundation of Alabama
P.O. Box 6179
Montgomery, AL 36106-0179
(510) 909-8908

*Attorney of Record for Plaintiffs-Appellees*

**ADDENDUM**

Panel opinion

Corbitt v. Taylor, No. __, __ F.4th __, 2024 WL ___ (11th Cir. Sept. 20, 2024)
(Panel Opinion, published)

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-10486

_____

DARCY CORBITT,
DESTINY CLARK,
JANE DOE,

                                        Plaintiffs-Appellees,

JOHN DOE,

                                                Plaintiff,

*versus*

SECRETARY OF THE ALABAMA LAW ENFORCEMENT
AGENCY,
DIRECTOR OF THE DEPARTMENT OF PUBLIC SAFETY,
CHIEF OF THE DRIVER LICENSE DIVISION,
DRIVER LICENSE SUPERVISOR IN THE DRIVER LICENSE
DIVISION,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:18-cv-00091-MHT-SMD

_____

Before JILL PRYOR, BRANCH, and ED CARNES, Circuit Judges.

BRANCH, Circuit Judge:

Alabama driver's licenses display biographical information about the driver, including the driver's sex.  The sex listed is taken from the driver's birth certificate.  In some states, that is the end of the matter, because certain states do not allow drivers to change the sex listed on their license or birth certificate.[1]  But in Alabama,

---

[1] *See, e.g.*, Oklahoma Exec. Order. No. 2023-20 (Aug. 1, 2023) (ordering that, for purposes of administrative rules and disputes, sex shall be defined by reference to the ordinary function of a person's reproductive system); Tenn. Comp. R. & Regs. 1340-01-13-.18(2)(c) (driver's licenses must display the licensee's sex), and Tenn. Code Ann. § 1-3-105(c)(defining sex as "immutable biological sex as determined by anatomy and genetics existing at the time of birth"); Fla. Dep't of Highway Safety and Motor Vehicles, Driver License Operation Manual-Issuance Requirements-IR08-Gender Requirements (Jan. 26, 2024), https://perma.cc/AQY5-Y395 (rescinding a guidance document permitting the alteration of the gender marker on an individual's license as "not supported by statutory authority"); Kan. Stat. Ann. § 77-207(a)(1), (c) (defining sex to mean biological sex); *Foster v. Stanek*, No. 18-2552-DDC-KGG,

a guidance document called "Policy Order 63" permits "an individual wishing to have the sex changed on their Alabama driver['s] license due to gender reassignment surgery" to change their sex by submitting certain documentation. In particular, the individual must submit a letter from the physician who performed the reassignment procedure, or else an amended birth certificate reflecting a changed sex designation. *See* Ala. Code § 22-9A-19(d).

In this case, Plaintiffs, transgender residents of Alabama, seek to change the sex on their driver's licenses without undergoing (what Alabama accepts as) sex-change surgery. They argue that Policy Order 63 violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment, as well as the Free Speech Clause of the First Amendment. The district court entered judgment in favor of Plaintiffs, declaring Policy Order 63 unconstitutional under the Equal Protection Clause and enjoining the enforcement of the Policy.

The district court found that Policy Order 63 "classifies [the Plaintiffs] by sex" because it "mak[es] the content of people's driver licenses depend on the nature of their genitalia." Thus, applying the heightened form of constitutional scrutiny reserved for sex-based classifications, the district court concluded that Alabama

---

2023 WL 5625433, at *1 (D. Kan. Aug. 31, 2023) (granting a motion for relief from judgment based on the passage of SB 180, "requir[ing] all Kansas birth certificates to identify a person's sex as the one assigned to the person at birth"); *Kansas ex rel. Kobach v. Harper*, No. SN-2023-CV-422 (Shawnee Cnty. Dist. Ct. Mar. 11, 2024), https://perma.cc/SD84-24WZ (ordering Kansas Department of Revenue officials to comply with SB 180).

"ha[d] not presented an adequate justification" for the Policy Order.

After review, and with the benefit of oral argument, we conclude that decision was error.  Policy Order 63 does not violate the Equal Protection Clause because it does not impose a sex-based classification—the Policy Order does not single out or disadvantage anyone because of their sex, or regulate based on stereotypes; rather, it imposes the same objective conditions on everyone.  Our recent decision in *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1228 (11th Cir. 2023), confirms as much, and it controls the analysis here.  That case establishes that rational basis review—the most deferential standard under the Equal Protection Clause—applies.  Policy Order 63 survives that review because it rationally advances Alabama's legitimate interest in providing a consistent set of requirements to amend the sex listed on state documents like driver's licenses and birth certificates.

We also consider and reject Plaintiffs' due process and First Amendment challenges.  Because Policy Order 63 deals only with when and how the State will revise information on state documents, Policy Order 63 neither violates Plaintiffs' right to informational privacy, nor infringes their right to refuse medical care like sex-change surgery, under our due process precedents.  For similar reasons, Policy Order 63 does not compel Plaintiffs to speak the government's message about their sex or gender identity in violation of the First Amendment—after all, driver's licenses are *government* speech, not private speech.

Thus, for the reasons explained in more detail below, we reverse the judgment of the district court.

## I.      BACKGROUND

Alabama law requires that driver's licenses "bear . . . a distinguishing number assigned to the licensee and a color photograph of the licensee, the name, birthdate, address, and a description of the licensee."  Ala. Code § 32-6-6 (2009).  According to the Alabama Law Enforcement Agency ("ALEA"), the statutory "description of the licensee" refers to the licensee's physical description, including sex, height, weight, hair color, and eye color. A birth certificate is the "default" for establishing a licensee's sex.

Sometime around 2004, the Alabama Department of Public Safety adopted an unwritten practice of permitting an individual who had sex-change surgery to change the sex designation on their driver's license.  Under the unwritten policy, individuals had to produce both an amended birth certificate *and* a letter from the physician who performed their gender reassignment surgery.

Alabama later adopted a written policy—Policy Order 63— to formalize the existing practice.  In 2015, the Policy was revised to "allow more latitude for people requesting" a change to their sex designations on their driver's licenses by requiring either an amended state birth certificate or a letter from the physician that performed the reassignment procedure—not both.

The current version of Policy Order 63 requires the submission of either an amended birth certificate reflecting a changed sex designation or a letter from the physician who

performed the reassignment procedure.   Specifically, the Policy states:

> It is the policy of the Chief of the Driver License Division that an individual wishing to have the sex changed on their Alabama driver license due to gender reassignment surgery [is] required to submit to an Examining office OR the Medical Unit the following:
>
> > 1. An amended state certified birth certificate and/or a letter from the physician that performed the reassignment procedure. The letter must be on the physician's letterhead.[2]

The amended birth certificate option means that Alabama accepts altered birth certificates from other states without regard to the other state's procedures for amending the individual's sex.   For an Alabama birth certificate, the procedure for changing the sex listed also requires proof of a surgical sex-change procedure.   *See* Ala. Code § 22-9A-19(d).[3]

---

[2] Despite the appearance of indenting an item "1" in describing "the following" sufficient items, number 1 is the only item on the list.

[3] Alabama Code § 22-9A-19(d) provides:

> Upon receipt of a certified copy of an order of a court of competent jurisdiction indicating that the sex of an individual born in this state has been changed by surgical procedure and

In 2018, Darcy Corbitt, Destiny Clark, and Jane Doe[4] sued the following Alabama officials in their official capacities: Hal Taylor, the Secretary of the ALEA; Charles Ward, the Director of Public Safety; Deena Pregno, the Chief of the Driver License Division; and Jeannie Eastman, a Medical Unit supervisor. Plaintiffs challenged Policy Order 63 under 42 U.S.C. § 1983, claiming it violated the Free Speech Clause of the First Amendment, the Fourteenth Amendment's Equal Protection Clause, and their right to informational privacy and interest in refusing unwanted medical treatment under the Fourteenth Amendment's Due Process Clause.[5] Plaintiffs alleged that Policy Order 63 "serve[s] no legitimate governmental interest" and is "directed solely at transgender people [to] discriminate against them on the basis of sex, as well as on the basis of transgender status." The evidence in the record shows the following.

---

that the name of the individual has been changed, the certificate of birth of the individual shall be amended as prescribed by rules to reflect the changes.

[4] The district court granted Jane Doe's motion for leave to proceed under a pseudonym and for a protective order under our precedent in *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992) ("Courts have permitted plaintiffs to proceed anonymously in cases involving mental illness, homosexuality, and transsexuality." (citations omitted)). The motion was unopposed below, and the district court's order is not challenged on appeal.

[5] Plaintiffs did not challenge the constitutionality of the statute permitting an individual who has had sex-change surgery to change the sex listed on their birth certificate. *See* Ala Code § 22-9A-19(d).

Plaintiffs Corbitt, Clark, and Doe are all transgender women, meaning they were born males and now identify as females. Each of their Alabama driver's licenses lists their sex as "male," and they are each seeking to change their sex designation to "female."

Corbitt grew up in Alabama but moved to North Dakota as a young adult. While in North Dakota, Corbitt changed the sex listed on Corbitt's North Dakota driver's license to "female." After returning to Alabama in 2017, Corbitt could not obtain a driver's license with a "female" sex designation without the documentation required by Policy Order 63 because Alabama records listed Corbitt's sex as male. Corbitt explained in a sworn declaration that "undergo[ing] surgical procedures . . . [is not] right for me at this time." Accordingly, Corbitt is unable to use Policy Order 63 to change the sex on Corbitt's Alabama driver's license.

Clark lives in Alabama and has unsuccessfully attempted to change the sex designation on Clark's license from "male" to "female" multiple times. Clark had "medically necessary gender-conforming surgery" but was denied a sex change on Clark's driver's license because Clark did not get "the full sexual reassignment surgery."

Finally, Doe also lives in Alabama and has unsuccessfully tried to change the sex listed on Doe's Alabama driver's license multiple times. Doe has engaged in hormone treatment since 2013 but "has not yet been able to receive any gender-confirmation surgical procedures because of cost."

Plaintiffs allege that they are personally harmed by Alabama's Policy because, as transgender women, once police officers or other people see their licenses with their sex listed as male, they are at a higher risk of being attacked, harassed, or treated poorly. And Plaintiffs assert that when they present their licenses with the incorrect sex, they are compelled to endorse a message about their gender with which they strongly disagree.

Plaintiffs' expert, Dr. Nicholas Gorton—a physician licensed to practice in California—submitted a declaration explaining that "[t]ransgender people who are diagnosed with [g]ender [d]ysphoria may, as part of their prescribed medical treatment plan, change their legal name and their gender marker on official documents such as [a] driving license, passport, birth certificate, and social security card." Dr. Gorton asserted that "[the] process of changing identity documents has profound health benefits for patients with gender dysphoria as well as significant social, legal, and safety implications for transgender people navigating the world in accordance with their gender identity." Dr. Gorton also asserted that "Policy [O]rder 63 provides no medical or scientific justification for [its] decision" and that, "[w]ere Alabama to decide to choose the route that is most clinically appropriate, [it] would adopt policies [in which] transgender individuals submit a form where they certify their gender, [and] the genders allowed are three: male, female, and none or non-binary, and their identity document is changed based on the patient's affirmation."

Defendant Deena Pregno, the Chief of the ALEA Driver License Division, testified in her deposition that Policy Order 63 furthers two state interests.  First, she explained that the Policy was based on the state statute for amending a birth certificate to change one's sex and that Alabama "want[s] to be consistent . . . [by] requiring the same types of documents when [it is] dealing with the same type of situation."  In other words, Alabama wants to have a paper trail that links its identification documents together so that, if there are different sex designations on different documents, Alabama can know "why [they are] different."  Thus, according to Pregno, Policy Order 63 serves the interest of maintaining consistency with requirements for Alabama birth certificates because the Policy Order is "consistent with the State of Alabama's requirements to change [one's] sex designation."  Second, Pregno explained that Policy Order 63 helps law enforcement officers identify the person they are interacting with, determine the proper search procedures to use, and choose which arrest and post-arrest procedures to use (like booking procedures, for example).

In a similar vein, Defendants' expert, Dr. Donald Leach—an expert in correctional administration—testified in a deposition that "it's helpful from a correctional perspective . . . for there to be a policy that leads to consistent information about sex on a driver's license."  In his opinion, "there is a governmental interest in having a standardized definition of sex, such as that established in Policy Order 63 for law enforcement and administrative purposes . . . so there is consistency in the development and application of administrative and operational policies and procedures."  He

agreed that "correctional administrators typically take into account the sex designation on a driver's license in deciding how to apply . . . sex-based policies" and testified that sex is "probably . . . one of the foremost pieces of information that's used when booking an individual."

After the district court denied the parties' cross-motions for summary judgment, the parties agreed to resolve this case on the evidence and briefs they submitted to the district court. The parties agreed that the court could resolve disputed issues of fact and draw reasonable factual inferences and conclusions from the evidence. After conducting a "bench trial on the papers," the district court entered judgment in favor of Plaintiffs and enjoined Defendants "from failing to issue to [P]laintiffs . . . new driver['s] licenses with female sex designations, upon application for such licenses by them." In its accompanying order, the district court concluded that Policy Order 63 is unconstitutional. The district court explained that Policy Order 63 "classifies by sex" "[b]y making the content of people's driver['s] licenses depend on the nature of their genitalia." As such, the district court reasoned that the Policy is subject to intermediate scrutiny under the Equal Protection Clause.

Applying intermediate scrutiny, the district court concluded that Alabama had not presented "adequate justification[s] for Policy Order 63" and "the [P]olicy [was] inadequately tailored to advancing those interests." Specifically, the district court found that Alabama's first stated interest—"maintaining consistency between the sex designation on an Alabama birth certificate and an

Alabama driver['s] license"—was insufficient to satisfy intermediate scrutiny because "marginal administrative convenience . . . cannot support a sex-based policy." And although the district court found that Alabama's second stated interest— "facilitating identification by law enforcement"—was "important," the court concluded that this interest had not "played any part in ALEA's calculus when it developed Policy Order 63." Thus, the district court concluded that it "need not reach the question whether [the Policy] is adequately tailored to advancing that interest" because the State's interest may not be "hypothesized or invented *post hoc* in response to litigation."

Because the district court concluded that Policy Order 63 violated the Equal Protection Clause, it did not reach Plaintiffs' other constitutional claims. The State timely appealed the district court's order and judgment.

## II.    STANDARD OF REVIEW

This case comes to us in the unusual posture of what the parties call a "bench trial on the papers."[6] *See Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1253 (11th Cir. 2016) (discussing the "limited circumstances wherein the district court may treat cross-motions for summary judgment as a trial and resolve the case on the merits" (quotation omitted)). On review of such a decision, "we . . . review legal questions *de novo* but . . .

---

[6] Both parties consented to this arrangement below, and neither complains about it on appeal.

factual findings only for clear error . . . ." *Id*. "A factual determination is clearly erroneous only if we are left with a definite and firm conviction that a mistake has been committed." *Smith v. Owens*, 13 F.4th 1319, 1325 (11th Cir. 2021) (quotation omitted).

## III.    DISCUSSION

Each of Plaintiffs' claims was presented to and fully briefed before the district court and this Court on appeal. Accordingly, we review them all. *See Singleton v. Wulff*, 428 U.S. 106, 121 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases."); *cf. Kernel Recs. Oy v. Mosley*, 694 F.3d 1294, 1298 n.5 (11th Cir. 2012) (declining to exercise our jurisdiction to consider alternative grounds). We begin with Plaintiffs' Equal Protection Clause claim and then discuss Plaintiffs' due process and First Amendment claims.[7]

### A. Equal Protection Claim

The Fourteenth Amendment prohibits "any State" from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. "The basic framework

---

[7] On appeal, Alabama argues that two of the three plaintiffs—Corbitt and Clark—brought their claims after the statute of limitations period had expired. Alabama, however, has not raised this defense against the third plaintiff, Jane Doe. Accordingly, we must decide the constitutional claims for at least one Plaintiff. Because we reject all the constitutional claims on the merits, we need not pass on the statute of limitations issue as to Corbitt and Clark.

of [an equal-protection] analysis . . . is well settled." *Maher v. Roe*, 432 U.S. 464, 470 (1977). First, we must decide whether a state law "operates to the disadvantage of some suspect class." *Id.* (quoting *San Antonio Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973)). If so, we apply a heightened judicial scrutiny. *See id.* "If not, the [state law] must still be examined to determine whether it rationally furthers some legitimate, articulated state purpose and therefore does not constitute . . . invidious discrimination." *Id.* (quoting *Rodriguez*, 411 U.S. at 17 (second alteration adopted)).

Sex is a "suspect class" entitled to heightened judicial scrutiny. "In the Supreme Court's leading precedent on [sex]-based intermediate scrutiny under the Equal Protection Clause, the Court held that heightened scrutiny applies to 'official action that closes a door or denies opportunity to women (or to men).'" *Eknes-Tucker*, 80 F.4th at 1228 (quoting *United States v. Virginia*, 518 U.S. 515, 532 (1996)); *see also id.* at 1233 (Brasher, J., concurring) ("The Equal Protection Clause prohibits 'giving a mandatory preference to members of either sex over members of the other.'" (alteration adopted) (quoting *Reed v. Reed*, 404 U.S. 71, 76 (1971))). In this way, precedent directs us to ensure that sex is not used as an "inaccurate proxy for other, more germane bases of classification." *Craig v. Boren*, 429 U.S. 190, 198 (1976). And, along the same lines, the Equal Protection Clause forbids classifications based on sex stereotypes. *See Glenn v. Brumby*, 663 F.3d 1312, 1314, 1316–17, 1320 (11th Cir. 2011).

If a law does draw a sex-based classification, it "will pass constitutional muster only if it satisfies intermediate scrutiny." *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 801 (11th Cir. 2022) (en banc). "To satisfy intermediate scrutiny, the government must show 'that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Id.* (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)).

In accordance with this "well settled" framework, we first determine what standard of review applies to Policy Order 63—*i.e.*, whether the Policy discriminates against a suspect class and thus triggers heightened scrutiny—and then apply that standard of review to the Policy. In the end, we conclude that the Policy does not impose a sex-based classification, and thus does not implicate a suspect class or trigger heightened scrutiny, and we hold that Policy Order 63 survives rational basis review. We address each step in turn.

### i. *Policy Order 63 does not impose a sex-based classification.*

To begin, we must decide whether Policy Order 63 imposes a sex-based classification. If so, then we apply intermediate scrutiny and require the "classification[] [to] bear a close and substantial relationship to important governmental objectives." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273 (1979).

With these principles in mind, we turn back to the language of the Policy:

It is the policy of the Chief of the Driver License Division that an individual wishing to have the sex changed on their Alabama driver license due to gender reassignment surgery [is] required to submit to an Examining office OR the Medical Unit the following:

> 1. An amended state certified birth certificate and/or a letter from the physician that performed the reassignment procedure. The letter must be on the physician's letterhead.

We conclude that this language is "neutral in the sense that it is not gender-based"—*i.e.*, the Policy does not impose a sex-based classification. *Id*. at 274. It does not distinguish between males and females in any respect. Rather, it applies to *all* "individual[s] wishing to have the[ir] sex changed on their Alabama driver['s] license[.]" Individuals wishing to have their sex designation changed from male to female, and individuals wishing to have their sex designation changed from female to male, are all covered by the Policy and subject to the same requirements. *See Eknes-Tucker*, 80 F.4th at 1228 (concluding that an Alabama statute prohibiting the prescription or administration of puberty blockers and cross-sex hormones did not impose a sex-based classification where "the statute [did] not establish an unequal regime for males and females" and "establishe[d] a rule that applie[d] equally to both

sexes"). In short, the Policy does not separate or classify individuals based on sex.[8]

Our conclusion does not deny that sex is the subject matter at issue in the Policy. Indeed, the Policy lays out the document submission requirements for "an individual wishing to have the sex changed on their Alabama driver['s] license due to gender reassignment surgery." But the Equal Protection Clause does not proscribe all laws and regulations that relate to or implicate sex in their subject matter. *See id.* at 1227–28 (rejecting the argument that a statute "directly classifies on the basis of sex [merely] because it uses explicitly sex-based terms" (quotation omitted)); *see also id.* at 1233 (Brasher, J., concurring) ("I see the word 'sex' in this law. But I don't see a sex *classification*—at least, not as the idea of a sex

---

[8] Indeed, the Policy's failure to classify based on sex stands in sharp contrast to the body of cases that address and analyze sex-based classifications under the Equal Protection Clause. *See, e.g., Hogan*, 458 U.S. at 720 (analyzing a public university's policy of denying otherwise qualified males the right to enroll for credit in its nursing school because of their sex); *Craig*, 429 U.S. at 192 (analyzing a state statute that prohibited the sale of certain alcohol to males under the age of 21 and to females under the age of 18); *Reed*, 404 U.S. at 73 (analyzing a probate statute that provided that "males must be preferred to females"); *Brumby*, 663 F.3d at 1313–20 (holding that "a government agent violates the Equal Protection Clause's prohibition of sex-based discrimination when he or she fires a transgender . . . employee because of his or her gender non-conformity"). As discussed, these cases find sex-based classifications where official action provides different opportunities to men and women as such or rely on gender stereotypes. *See Eknes-Tucker*, 80 F.4th at 1228–29 (surveying cases). Policy Order 63 simply does not distinguish between men and women in any way. *See id.*

classification appears in our equal protection [cases].”); *Geduldig v. Aiello*, 417 U.S. 484, 495–97, 497 n.5 (1974) (holding that a state insurance policy excluding pregnancy coverage did not classify on the basis of sex, explaining that “while it is true . . . that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification”). Rather, the Equal Protection Clause is concerned with differential treatment, especially when the differential treatment is due to sex-based classifications. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

Plaintiffs argue that Policy Order 63 enacts a sex-based classification because the Policy treats people differently based on the nature of their genitalia and because the Policy assigns people to a sex. But the Policy does neither. The Policy imposes one set of requirements without regard to an individual’s genitalia. If an individual wants to change his or her sex designation, then the Policy merely lists the documentation requirements for doing so: submitting an amended birth certificate and/or a physician’s letter. The Policy does not inquire into the nature of an individual’s genitalia. Nor does the Policy Order assign anyone to a sex: it takes them as they are and designates the circumstances under which the State will agree to change the sex shown on the individual’s driver’s

license.  Accordingly, we conclude that Policy Order 63 does not impose a sex-based classification.[9]

Additionally, Plaintiffs make no argument that the Policy adversely affects one sex over the other, nor that the Policy was adopted due to invidious discrimination.  *See Feeney*, 442 U.S. at 273. To the contrary, the record suggests that the Policy was adopted and revised "to allow more latitude for people requesting" a change to the sex listed on their driver's license.  Accordingly,

---

[9] Plaintiffs also argue that "under the Policy, driver's license applicants who are not transgender can access a driver's license that accurately reflects their gender identity and the sex in which they are living, without regard to their medical history or genital status" but that "transgender people cannot do the same."  Therefore, Plaintiffs conclude, the Policy imposes a sex-based classification.

But rather than showing that the Policy imposes a sex-based classification, Plaintiffs instead reveal the heart of their dissatisfaction with the Policy: the reasons Alabama accepts for changing designated sex on a driver's license. This dissatisfaction is ultimately just an argument about the Policy's merits or demerits.  Indeed, this merits-based disagreement is also illustrated by the relief that Plaintiffs seek: they want a declaration and an injunction that Alabama must permit them to change the sex on their driver's licenses on their terms, too.

Moreover, to the extent that Plaintiffs seek to argue that the Policy should be subject to heightened scrutiny because it classifies based on transgender status, that argument fails.  We have never recognized transgender persons as a suspect class and instead have expressed "grave 'doubt' that transgender persons constitute a quasi-suspect class" for purposes of the Equal Protection Clause.  *Adams*, 57 F.4th at 803 n.5; *see also Eknes-Tucker*, 80 F.4th at 1227–30 (rejecting the argument that an Alabama statute is subject to heightened scrutiny because it classifies on the basis of transgender status).

because we conclude that the Policy is gender-neutral and not a product of invidious discrimination, heightened scrutiny does not apply.  *See Eknes-Tucker*, 80 F.4th at 1227–30.

### ii. The Policy Order survives rational basis review.

Because we conclude that Policy Order 63 does not impose a sex-based classification, we review the Policy under rational basis review.  *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("[U]nless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest.").  "Under this deferential standard, the question that we ask is simply whether the challenged legislation is rationally related to a legitimate state interest."  *Eknes-Tucker*, 80 F.4th at 1224–25 (quotations omitted); *see also City of Cleburne*, 473 U.S. at 446.  At bottom,

> the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.

*Nordlinger*, 505 U.S. at 11 (internal citations omitted).  "Such a relationship may merely 'be based on rational speculation' and

need not be supported 'by evidence or empirical data.'" *Eknes-Tucker*, 80 F.4th at 1225 (quoting *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)); *see also Jones v. Governor of Fla.* ("*Jones I*"), 950 F.3d 795, 809 (11th Cir. 2020) (explaining that under the rational basis standard, "a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data" (quotations omitted)).  Thus, "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."  *City of Cleburne*, 473 U.S. at 440.

Alabama asserts that Policy Order 63 serves the State's interest in ensuring consistency with the State's existing requirements for amending a birth certificate.[10]    It does so,

---

[10] Alabama also asserts that Policy Order 63 serves the State's interest in providing an accurate description of the bearer of an Alabama driver's license to make it easier for law enforcement officers to identify people when determining appropriate post-arrest search and placement procedures.  But, applying intermediate scrutiny, the district court found that Alabama did not consider this purpose when developing Policy Order 63 and refused to evaluate whether the Policy Order adequately advanced it.  Because we conclude that the Policy is rationally related to Alabama's first asserted interest, it is not necessary for us to go further and review the district court's finding on this second asserted interest.  We note, however, that the first step of rational basis review typically involves "identifying a legitimate government purpose . . . which the enacting government body *could* have been pursuing.  The *actual* motivations of the enacting governmental body are entirely irrelevant."  *United States v. Ferreira*, 275 F.3d 1020, 1025 (11th Cir. 2001) (quotation omitted).

Alabama explains, by facilitating the ability to "us[e] identity documents to provide physical descriptions of individuals and . . . provid[e] a uniform understanding of 'sex' on a driver['s] license for law enforcement." Thus, in "objectively defining sex" for purposes of driver's license designations, Alabama submits that Policy Order 63 rationally achieves the State's goal by "consistently defining sex" across government documents.[11]  In response, Plaintiffs assert that Alabama has offered "no evidence that the Policy serves an important government interest."

We agree with Alabama. Modeling a policy after a preexisting statute is rationally related to accomplishing Alabama's goal of developing and maintaining a uniform legal scheme and consistent policies and procedures. *Cf. Gore v. Lee*, 107 F.4th 548, 561 (6th Cir. 2024) ("Maintaining a consistent definition [of sex] . . . is a legitimate state interest." (internal citation omitted)). Indeed, creating an internally consistent body of law makes sense in this context, where identity documents are at issue and often those documents reference each other. For example, when someone applies for a driver's license for the first time, Alabama requires, among other things, two forms of identification—with a birth certificate being an acceptable form of identification.

---

[11] Applying intermediate scrutiny, the district court concluded that the State's interest in uniform procedures was not a sufficiently important justification for a state policy based on sex. But, as we have explained above, we review Policy Order 63 under a rational basis standard—not heightened scrutiny—meaning the district court's conclusion and reasoning have no application under this more deferential standard of review.

Accordingly, we conclude that a policy that permits one's sex designation on a driver's license to be changed because the person's birth certificate has changed or because the person has undergone sex-reassignment surgery is a "rational line" to draw. *Jones v. Governor of Fla.* ("*Jones II*"), 975 F.3d 1016, 1035 (11th Cir. 2020) (en banc) (quotation omitted); *see id.* (explaining that a state is not required "to draw the perfect line [or] even to draw a line superior to some other line it might have drawn" because the Constitution requires "only a 'rational line'" (quoting *Armour v. City of Indianapolis*, 566 U.S. 673, 685 (2012))); *see also Nordlinger*, 505 U.S. at 11 (requiring only a "plausible policy reason" under rational basis review).

Plaintiffs respond that Policy Order 63 fails to withstand rational basis review because, "[r]ather than assist with identification, the Policy hinders it," and "[r]ather than assist with promoting safety, [the Policy] endangers transgender people and protects no one." For example, Plaintiffs argue that "identifying a person's sex based on their genitals—a characteristic that is rarely visible or known to others—instead of the sex they identify as . . . undermines accurate identification." Conversely, Plaintiffs reason, "[a] female sex designation on their license[s] would [in fact] make it easier for the Plaintiffs to be correctly identified as the holders of their licenses," because Plaintiffs "have traditionally feminine features" and are "consistently perceive[d]" as female.

But Plaintiffs' arguments are all aimed at Alabama's policy choices. Under our "extremely narrow" review, we simply look to

see whether the State's interest is rationally related to its Policy. *Jones II*, 975 F.3d at 1034. Using this "deferential standard," we conclude that it is, and so we decline to second-guess Alabama's choice to use "genitals" rather than "perception" as the touchstone for its Policy.[12] *Id.* at 1035; *see also id.* at 1034 ("We must uphold the classification unless [the plaintiffs] negat[e] every conceivable basis which might support it." (quotation omitted)). We are not here to second-guess the State's line-drawing, evaluate the efficacy of the State's Policy, or rewrite the Policy based on our own sense of fairness. *See City of Cleburne*, 473 U.S. at 440 ("When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." (internal citation omitted)); *see also Jones II*, 975 F.3d at 1036 (explaining that "the State need not strike at all evils at the same time or in the same way, and a statute is not invalid under the Constitution because it might have gone farther than it did" (quotations and internal citations omitted) (alteration

---

[12] As Alabama points out in its brief, grounding a sex designation in perceptions and "feminine"- or "masculine"-type appearances presents a host of issues, including relying on sex-stereotyping and the absence of a limiting principle. *See* Reply Brief at 18 ("'To take just one example, if a man dresses in a 'traditionally masculine' fashion during daytime but dresses in 'traditionally feminine' styles in the evening, Plaintiffs' approach would require that Alabama issue two driver's licenses. And if an individual's gender identity vacillates throughout the day or is neither male nor female, then what, under the Plaintiffs' theory, could stop the Constitution from compelling on-demand licenses with new genders to suit every identity?" (footnote omitted)).

adopted)).  We leave those tasks to the political branches and hold that Policy Order 63 satisfies the "low bar" of rational basis review. *Jones II*, 975 F.3d at 1034 (explaining that "the Supreme Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny").

### B.  Due Process Claims

Next, Plaintiffs bring claims under the Fourteenth Amendment's Due Process Clause, arguing that Policy Order 63 violates (1) their right to informational privacy and (2) their right to refuse medical care.  Our precedent forecloses Plaintiffs' first claim, and their second claim also lacks merit.  We address each in turn.

The Due Process Clause prohibits "any state" from "depriv[ing] any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1.  First, Plaintiffs argue that Policy Order 63 violates their right to informational privacy because it forces Plaintiffs "to disclose their transgender status and assigned sex at birth every time they display their driver's license."  In other words, "[b]y forcing Plaintiffs to disclose private, intimate information about their transgender status, surgical status, and genitalia, [Plaintiffs argue that] the State violates [their] right to informational privacy."  Plaintiffs ground the existence of this right in *Whalen v. Roe*, 429 U.S. 589, 599 (1977), which acknowledged an "individual interest in avoiding disclosure of personal matters."

Taking our cue from *Whalen*, we have also recognized an individual's interest in avoiding disclosure of personal matters. *See, e.g.*, *James v. City of Douglas*, 941 F.2d 1539, 1543–44 (11th Cir. 1991) (recognizing an individual's privacy interest in avoiding disclosure of personal matters, including a sex tape); *Plante v. Gonzalez*, 575 F.2d 1119, 1133–34 (5th Cir. 1978) (using a balancing test to weigh the privacy interest of state candidates for public office in their financial records).[13]  But critically, we have held that there is no right to informational privacy for information contained in motor vehicle records.

In *Collier v. Dickinson*, we concluded that a state did not violate the plaintiffs' constitutional privacy rights when the Department of Highway Safety and Motor Vehicles sold the plaintiffs' personal information provided to the Department to obtain driver's licenses and vehicle registrations.  477 F.3d 1306, 1308 (11th Cir. 2007).  We explained that we were bound by a previous panel opinion, *Pryor v. Reno*, 171 F.3d 1281, 1288 n.10 (11th Cir. 1999), *rev'd on other grounds*, 528 U.S. 1111 (2000).  *Collier*, 477 F.3d at 1308.  *Pryor*, in turn, explained that we have "acknowledged a constitutional right to privacy . . . for intimate personal information given to a state official in confidence" but that the "information contained in motor vehicle records is not this sort of information."  *Pryor*, 171 F.3d at 1288 n.10 (emphasis omitted).  As

---

[13] Decisions of the Fifth Circuit handed down by the close of business on September 30, 1981, are binding precedent in our Circuit.  *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

such, "an individual does not have a reasonable expectation that the information [contained on one's driver's license] is confidential. Thus, there is no constitutional right to privacy in motor vehicle record information which the [statute at issue] enforces." *Id.*

We are similarly bound by the prior panel precedent rule, and our prior precedents foreclose Plaintiffs' informational privacy claim. *See Morrison v. Amway Corp.*, 323 F.3d 920, 929 (11th Cir. 2003) ("A prior panel decision of this Court is binding on subsequent panels and can be overturned only by the Court sitting en banc."). Like the plaintiffs in *Collier* and *Pryor*, the information in which Plaintiffs seek to assert a constitutional privacy interest is the information displayed on their driver's licenses—specifically, their sex designation. Because "there is no constitutional right to privacy in motor vehicle record information" and Plaintiffs have no "reasonable expectation that . . . information [like one's sex designation] is confidential," Plaintiffs' due process claim based on a right to informational privacy fails. *Pryor*, 171 F.3d at 1288 n.10.

Second, we turn to Plaintiffs' claim that Policy Order 63 violates their right to refuse medical treatment. The Supreme Court has recognized that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990). And Plaintiffs argue that this right is heightened "when the treatment involves procreation or sterilization." Plaintiffs contend that Alabama violated their right to refuse medical treatment by "forc[ing them] to undergo surgery as a

condition of receiving a driver's license" and that Alabama is conditioning access to a government benefit on giving up their constitutional right to refuse unwanted medical treatment. But both of these arguments miss the mark.

As an initial matter, Policy Order 63 does not force or require Plaintiffs to undergo surgery as a condition of receiving a driver's license. Rather, the Policy merely sets forth documentation requirements for individuals who wish "to have the sex changed on their Alabama driver['s] license due to gender reassignment surgery." Access to an Alabama driver's license is not dependent on any surgical procedure. Indeed, all Plaintiffs currently have Alabama driver's licenses, and none of them were required to undergo any unwanted medical treatment to obtain them.

Nonetheless, Plaintiffs contend that Alabama is conditioning access to a government benefit on giving up their constitutional right to refuse unwanted medical treatment. Plaintiffs define the government benefit at issue not as a driver's license generally, but as a "license that lists their sex as female," arguing that "a license that lists their sex as female—that is, a license they can actually use without sacrificing being their 'true self'" or subjecting themselves to harassment, assault, or violence—is "undoubtedly a valuable government benefit." But Plaintiffs cite no authority for the proposition that an Alabama driver's license is meant to confer such a benefit. Thus, Plaintiffs fail to make any argument—and thus fail to carry their burden—to show that a license that conforms with

their preferred sex identifier is a government benefit—except for declaring that it "undoubtedly" is.  *See, e.g.*, *Barnes v. Zaccari*, 669 F.3d 1295, 1303 (11th Cir. 2012) (explaining that states can create substantive interests in government benefits by grounding an entitlement in a state law, a regulation, an express or implied contract, or a mutually explicit understanding).  Without a government benefit to point to, Plaintiffs' argument fails from the start.

Accordingly, because Policy Order 63 does not force Plaintiffs to undergo medical treatment, and because Plaintiffs have not shown that licenses that conform with their preferred sex identifier is a government benefit to begin with, Plaintiffs' constitutionally protected liberty interest in "refusing unwanted medical treatment" has not been infringed.  *See Cruzan*, 497 U.S. at 278.  Plaintiffs' due process claims fail.

### C.  First Amendment Claim

Finally, Plaintiffs argue that Policy Order 63 violates their free speech rights by compelling them to communicate the State's message about their biological sex and by forcing them to disclose their transgender status.  Alabama, on the other hand, argues that any speech at issue is government speech—not compelled speech—and to the extent it implicates Plaintiffs' First Amendment rights, such infringement is incidental to the broader regulation requiring drivers to carry licenses.  We agree with Alabama.

To start, any speech on an Alabama driver's license, including the sex designation, is government speech.  And Plaintiffs

agree. Driver's licenses are "often closely identified in the public mind with the [State]." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 212 (2015) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 472 (2009) (alteration in original)). Indeed, a driver's license is a form of government identification, and, here, Alabama is the issuer and "maintains direct control" over the requirements for and contents of a driver's license. *See id.* at 213; *see* Ala. Code § 32-6-6 (2009). "Consequently, persons who observe . . . [licenses] routinely—and reasonably—interpret them as conveying some message on the *issuer's* behalf," rather than conveying a message by the license holder. *Walker*, 576 U.S. at 212 (quotations omitted and alteration adopted) (emphasis added). Nothing about the sex designation on a driver's license suggests that it is Plaintiffs' speech or restricts what Plaintiffs may say about their sex or sex designation. *Cf. Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 65 (2006) (explaining that a statute that denied federal funding to institutions of higher education that did not permit military recruiters on campus did not impermissibly regulate speech where "[n]othing about recruiting suggests that [the schools] agree with any speech by recruiters, and nothing in the [statute] restrict[ed] what the [schools] may say about the military's policies"). And the fact that Plaintiffs may take part in providing some physical identification information for inclusion on their licenses does not extinguish the governmental nature of State-issued identification. *Walker*, 576 U.S. at 217 (explaining that a private party's provision of information "does not extinguish the governmental nature of the message").

Our conclusion that the content of an Alabama driver's license is government speech is crucial because "[t]he Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City*, 555 U.S. at 467–68; *see also Walker*, 576 U.S. at 207 ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."). And because "[a] government entity has the right to speak for itself[,] [i]t is entitled to say what it wishes" and is free "to select the views that it wants to express." *Pleasant Grove City*, 555 U.S. at 467–68 (quotations omitted); *cf. Gore*, 107 F.4th at 557 (A state "may decide how to use the word 'sex' in government documents, and it may decide . . . 'to say what it wishes' in its records" (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995)).

Next, we reject Plaintiffs' argument that the Policy "compels Plaintiffs to communicate the State's message that their sex is male . . . [and] forces them to disclose their transgender status." They contend that "[t]he express purpose of a driver's license is for the holder to convey information about the holder to someone else," meaning that "[a] reasonable person would think that someone who presented a driver's license was expressing that the license was theirs and the information it contained about them was accurate." It is true that the "government's ability to express itself is [not] without restriction." *Walker*, 576 U.S. at 208. The First Amendment may "constrain government speech if, for example, the government seeks to compel private persons to convey the

government's speech." *Id.* But we disagree that the Policy somehow amounts to compelled speech.

Contrary to Plaintiffs' arguments, Policy Order 63 simply does not compel Plaintiffs "to communicate the State's message that their sex is male" and does not "force them to disclose their transgender status." If anything, the Policy helps to do the opposite by providing an avenue for "individual[s] wishing to have the[ir] sex changed on their Alabama driver['s] license." Without the Policy, there would be no such avenue. Either way, Plaintiffs fail to show how *the Policy*—which simply spells out the way in which an individual may change the sex on his or her license— compels their speech in any way.

At bottom, Plaintiffs disagree with Alabama's method of determining how sex is listed on a driver's license—*i.e.*, Alabama's viewpoint. But, as we explained above, when it comes to the government's speech, Alabama "has the right to speak for itself," "is entitled to say what it wishes," and is free "to select the views that it wants to express." *Pleasant Grove City*, 555 U.S. at 467–68 (quotations omitted). "That freedom in part reflects the fact that it is the democratic electoral process that first and foremost provides a check on government speech." *Walker*, 576 U.S. at 207; *see also id.* at 208 ("It is not easy to imagine how government could function if it lacked the freedom to select the messages it wishes to convey." (quotation omitted and alterations adopted)). Moreover, Plaintiffs correctly concede "private parties may not" "compel the government to convey their own message"—meaning that

Plaintiffs cannot force Alabama to convey their message about sex either. *See id.* at 218; *see also id.* at 212 ("[I]ssuers of IDs typically do not permit the placement on their IDs of message[s] with which they do not wish to be associated." (quotations omitted)). Accordingly, considering that the sex designation on Alabama driver's licenses is government speech and that Policy Order 63 does not compel Plaintiffs' speech, Plaintiffs' First Amendment claim fails.

## IV.    Conclusion

Plaintiffs seek to change the Policy by which Alabama permits an individual to change the sex on his or her driver's license. But neither the Equal Protection Clause, nor the Due Process Clause, nor the First Amendment gives us any right to order Alabama to do so. Thus, because Policy Order 63 withstands Plaintiffs' constitutional challenges, we reverse the district court's order declaring Policy Order 63 unconstitutional and enjoining its enforcement.

**REVERSED.**

JILL PRYOR, Circuit Judge, concurring in judgment:

Plaintiffs Darcy Corbitt, Destiny Clark, and Jane Doe are transgender women living in Alabama. Each woman sought an Alabama driver's license with a sex designation identifying her as female. The Alabama Law Enforcement Agency's Policy Order 63 establishes the procedure for changing the sex designation on an Alabama driver's license. To change the sex on a driver's license, Policy Order 63 requires the driver to submit one of two documents: a birth certificate bearing an amended sex designation or a letter from a physician showing that the driver underwent gender reassignment surgery. None of the three women had a modified birth certificate—because the policy for changing the sex on a birth certificate is similar—so the women were required to submit a physician's letter. When Alabama refused to change the sex designations on their licenses based on the documentation they presented, they sued, challenging as unconstitutional the State's application of Policy Order 63. The district court agreed with the plaintiffs that the policy order's application violated the Equal Protection Clause of the Constitution's Fourteenth Amendment and enjoined Alabama from enforcing it against them.

The majority opinion reverses the district court. It holds that the district court erred in concluding that Policy Order 63 discriminates based on sex and thus the court must apply an intermediate level of scrutiny when reviewing its constitutionality. Because the policy order does not discriminate based on sex, the majority opinion holds, the district court was limited to making

sure the policy order had a rational basis. Under rational basis review, if federal judges reviewing the policy can come up with a reason, any reason, why the State's adoption of the policy might not be completely irrational, the policy order must be upheld. Not surprisingly, then, Policy Order 63 survives rational basis review.

I do not blame the majority for this result. As I discuss below, this Court's binding precedent requires it. I merely observe that this case is the latest in a series of cases from this Court rejecting equal protection claims by transgender individuals challenging government policies that prohibit them from living their lives consistently with their gender identity. *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 802–11 (11th Cir. 2022); *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1227 (11th Cir. 2023), *reh'g denied*, 2024 WL 3964753 (11th Cir. Aug. 28, 2024); *see also Doe v. Surgeon Gen.*, No. 24-11996 (11th Cir. Aug. 26, 2024) (allowing a law to take effect that prohibits the prescription of puberty blockers and hormones to transgender minors and restricts the prescription of puberty blockers and hormones to transgender adults after a district court had enjoined enforcement of the law). Some of my colleagues and I have expressed grave concerns with these decisions. *See Adams*, 57 F.4th at 821 (Wilson, J., dissenting); *id.* at 824 (Jordan, J., dissenting); *id.* at 830 (Rosenbaum, J., dissenting); *id.* at 832 (Jill Pryor, J., dissenting); *Eknes-Tucker*, 2024 WL 3964753, at *29 (Wilson, J., dissenting from denial of rehearing en banc); *Eknes-Tucker*, 2024 WL 3964753, at *42 (Rosenbaum, J., dissenting from denial of rehearing en banc); *Doe*, slip op. at 1 (Wilson, J., dissenting).

I am sympathetic to the plaintiffs' plight and concerned about this Court's equal protection decisions involving transgender individuals. But the decision in *Eknes-Tucker*, which we declined to rehear en banc, compels me to agree with the majority that we must apply rational basis review to the plaintiffs' challenge to the policy order. Because the policy order survives rational basis review, I concur in the judgment of the majority.

## I.

Corbitt, Clark, and Doe,[1] transgender Alabamians, have consistently and persistently identified as a gender different from the sex they were assigned at birth. They spent their childhoods and adolescences feeling a persistent distressing disconnect between the sex they were assigned at birth (male) and the gender with which they identified (female).

In adulthood, each was diagnosed with gender dysphoria. Gender dysphoria is an accepted medical diagnosis with defined criteria. See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (DSM-5 TR) (5th ed. text rev. 2022) (setting forth diagnostic criteria). Left untreated, gender dysphoria is associated with self-harm, anxiety, depression, and rates of suicidality ranging from 30 to 80 percent. Id. at 518. But appropriate treatment markedly improves these outcomes. Some forms of

---

[1] Consistent with our case law recognizing that transgender parties may face severe "social stigma," the district court permitted Doe to proceed under a pseudonym. *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992).

treatment include social transitioning, hormone replacement therapy, and gender-affirming surgery.

As part of the treatment for her gender dysphoria, each plaintiff undertook social transitioning to match her outward presentation of gender with her gender identity. Each began to interact with society as a woman by choosing a new name; using the pronouns "she," "her," and "hers"; and wearing different clothing. The plaintiffs found the transition empowering. As Corbitt explained, transitioning allowed her to "feel somewhat normal for the first time in [her] life." Doc. 52-29 at 16.[2]

As part of their transitions, the plaintiffs sought to change the sex designations on their official documents. They successfully changed the sex designations on their passports or social security records to female to reflect their identity as women.

The trouble started when each woman went to a local driver's license office to obtain an Alabama driver's license with a female sex designation. Each plaintiff felt it was important to change the sex designation on her driver's license to affirm who she was and live authentically.[3]

---

[2] "Doc." numbers refer to the district court's docket entries.

[3] Evidence in the record confirms the benefits of having identification documents that are consistent with a person's gender identity. According to a recent study, having an identification document with a sex designation corresponding to a transgender person's gender identity "was associated with a large reduction in suicidal ideation and attempts." Doc. 52-45 at ¶ 27. For

21-10486        Jill Pryor, J., concurring in judgment        5

The plaintiffs also understood that carrying a driver's license with a sex designation that matched their gender identity was important for their safety. Carrying a driver's license with a male sex designation meant that whenever they showed their licenses, they were effectively disclosing that they were transgender and putting themselves at risk of abuse and violence. Both Corbitt and Clark received death threats in the past for being transgender. And while working as a firefighter, Doe was targeted for abuse and violence by her coworkers because of her gender identity. During a training activity, they barricaded her in a burning room so hot that it melted her protective gear and burned her body, leaving second- and third-degree burns. As she burned, her colleagues called her a "freak" and told her she was not welcome in the fire department. Doc. 56-12 at ¶ 11.

The plaintiffs also knew that disclosing their transgender status by showing a driver's license that did not match their gender identity could put them at risk of other types of harm or ridicule. Doe lost a job after showing her driver's license with a male sex designation to a person who then informed her employer that she was transgender. Another time, she showed her license with a male sex designation at a bank. Upon realizing that Doe was transgender, the teller became visibly upset, told her that she was going to hell, and refused to serve her.

_____

every 100 transgender people who succeeded in changing an identification document, two suicide attempts were averted, the study found.

6                  Jill Pryor, J., concurring in judgment          21-10486

Corbitt actually experienced ridicule and fear for her physical safety at the driver's license office where she went to obtain a license with a female sex designation. The examiner who assisted her was initially friendly and chatty—until she saw that Corbitt previously had an Alabama driver's license with a male sex designation and realized that Corbitt was transgender. The examiner then began loudly referring to Corbitt as a "man" and "it," treating her like "an object." Doc. 52-29 at 25–26. Corbitt witnessed other people present looking at her "with disgust." Id. at 26. She fled the office, fearing that she would be beaten up.

All three plaintiffs were unsuccessful in changing the sex designation on their Alabama driver's licenses. In reviewing the women's requests, Alabama Law Enforcement Agency ("ALEA") officials applied Policy Order 63, which permits a change to the sex designation on a driver's license only if a person submits either an "amended state certified birth certificate" or a letter from a physician who performed "gender reassignment surgery" on the person. Doc. 1-1 at 2. Although the policy order does not define "gender reassignment surgery," ALEA officials require the person to undergo both "top" and "bottom" surgery.[4] Doc. 48-4 at 16, 19–

---

[4] Worth noting is the fact that there are "dozens of possible [surgical] procedures that transgender people can undergo, and no single patient undergoes all of the ones possible for their gender." Doc. 52-45 at ¶ 36. To name only some, as part of their medical treatment for gender dysphoria transgender people may undergo the following procedures: zero-depth vaginoplasty, phalloplasty, metoidioplasty, mastectomy, chest reconstruction, hysterectomy, testosterone subcutaneous implants, and contra laryngoplasty.

20. In effect, ALEA ties a transgender person's ability to obtain a driver's license that matches her gender identity to the person's ability to afford costly gender-affirming surgery, which may not be covered by insurance,[5] and willingness to undergo this type of invasive surgery that often results in infertility.

Applying Policy Order 63, ALEA officials refused to change the sex designations on the plaintiffs' driver's licenses. None of the women had undergone the required surgery. Corbitt had not had gender-affirming surgery because she did not believe that it was right for her. Although Clark had breast augmentation surgery, ALEA officials refused to change her license, telling her that she needed to have "the full surgery." Doc. 52-36 at 31. And Doe had not undergone gender-affirming surgery because she could not afford it.

After being refused licenses with female sex designations, the three plaintiffs sued various Alabama officials responsible for implementing Policy Order 63. See 42 U.S.C. § 1983. Among other claims, they alleged that the policy order violated the Equal Protection Clause of the Fourteenth Amendment because it discriminated based on sex and transgender status and served no legitimate government interest.

---

Despite the myriad types of available surgeries, ALEA does not maintain a list of procedures that satisfy the policy order.

[5] *See Lange v. Hous. Cnty.*, 101 F.4th 793 (11th Cir.), *vacated en banc*, 110 F.4th 1245 (11th Cir. 2024). It also appears that Alabama's Medicaid program does not cover any gender-affirming health services for transgender individuals.

The district court concluded that Policy Order 63 violated the Equal Protection Clause. The court reasoned that the policy "classifie[d] by sex" by "making the content of . . . [Alabama] driver licenses depend on . . . genitalia." Doc. 101 at 3. The district court then applied the legal test used to review sex-based classifications—known as intermediate scrutiny. To survive intermediate scrutiny, the court correctly explained, Alabama had to "show that its decision to classify based on sex serves important governmental objectives and that the particular policy it employs is substantially related to the achievement of those objectives." Id. at 15 (internal quotation marks omitted).

In applying intermediate scrutiny, the district court considered the one interest that ALEA advanced when it adopted the policy order: the need for "uniformity between birth certificate and driver license amendment standards." Id. at 18. The court determined that this interest did not qualify as important under the intermediate-scrutiny standard because the only drawback Alabama could identify in a situation where an Alabama driver's license bore a different sex from an Alabama birth certificate was "the need to gather some additional documentation" when issuing a new license. *Id.* at 21. Then, based on factual findings about the lack of standards for sex-designation changes on Alabama birth certificates and driver's licenses, as well as the inconsistency with which state officials implemented Policy Order 63's change-of-sex requirement, the district court found that the policy did not substantially advance the interest in uniformity.

21-10486        Jill Pryor, J., concurring in judgment        9

The district court declared Policy Order 63's surgical requirement unconstitutional as applied to Corbitt, Clark, and Doe, and it enjoined the defendant officials from "failing to issue" the three women "driver licenses with female sex designations, upon application for such licenses." Doc. 102 at 2. Alabama appealed.

## II.

The Equal Protection Clause of the Fourteenth Amendment provides that "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Under modern equal protection jurisprudence, we subject laws to different degrees (or tiers) of scrutiny, depending on their operation. We reserve strict scrutiny—"the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997)[6]—for laws that classify based on race, national origin, or (sometimes) alienage.[7] And we apply intermediate scrutiny to laws that classify based on sex. *See United States v. Virginia*, 518 U.S. 515, 531–33 (1996). But most laws are subject only to rational basis review, the least probing form of equal protection review. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439–40 (1985).

_____

[6] *City of Boerne* was superseded by statute on other grounds. *See Ramirez v. Collier*, 595 U.S. 411, 424 (2022).

[7] *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 235 (1995) (race); *Graham v. Richardson*, 403 U.S. 365, 371–72 (1971) (alienage); *Oyama v. California*, 332 U.S. 633, 644–47 (1948) (national origin). *But see Plyler v. Doe*, 457 U.S. 202, 223–24 (1982) (alienage).

The majority opinion holds that the district court erred in applying intermediate scrutiny to the plaintiffs' equal protection claim because Policy Order 63 is subject to rational basis review only. I agree that precedent compels this conclusion.

As the majority opinion explains, this Court recently held that an Alabama law criminalizing gender-affirming care for transgender minors did not "amount[] to a sex-based classification subject to intermediate scrutiny." *Eknes-Tucker*, 80 F.4th at 1227. *Eknes-Tucker* held that the law did "not establish an unequal regime for males and females" because it established "a rule that applie[d] equally to both sexes"—minors of neither sex may undergo treatment for gender dysphoria. *Id.* at 1228. Although Alabama's law classified minors according to the state's definition of sex to determine whether providing a particular treatment is a crime, *Eknes-Tucker* concluded that neither the fact that the statute's application logically depends on sex nor the fact that sex is its subject matter made it a sex-based classification. *Id.* at 1227–28. And it held that the statute did not, by burdening exclusively transgender individuals, unlawfully classify based on transgender status. *Id.* at 1229–30. Thus, *Eknes-Tucker* reviewed Alabama's law under rational basis review. *Id.* at 1230.

I agree with the majority opinion that *Eknes-Tucker* bars us from applying intermediate scrutiny to Policy Order 63. Like the law challenged in *Eknes-Tucker*, the policy order prescribes a rule that is equally applicable to both transgender men and transgender women: no individual can amend the sex designation on an existing

21-10486          Jill Pryor, J., concurring in judgment          11

Alabama driver's license without undergoing genital-altering surgery. *See id.* at 1228. And although the subject matter of the policy order is sex (as the majority opinion concedes), *Eknes-Tucker* also rejected the argument that the fact that a law's subject matter is sex makes it a sex-based classification. *See id.* The argument that the policy order is subject to intermediate scrutiny because it touches on a critical aspect of gender-affirming care undertaken solely by transgender people meets the same fate. *See id.* at 1229–30 ("[R]egulation of a course of treatment that only gender nonconforming individuals can undergo would not trigger heightened scrutiny unless the regulation were a pretext for invidious discrimination.").

To be clear, I disagree with *Eknes-Tucker*. If I were writing on a blank slate, I would conclude that Policy Order 63 must be reviewed under intermediate scrutiny because it classifies based on sex and because transgender status is itself a quasi-suspect classification for purposes of equal protection analysis. I would reach these conclusions for the reasons Judge Rosenbaum explained in her thorough and thoughtful opinion dissenting from the denial of rehearing in *Eknes-Tucker*. *See* 2024 WL 3964753, at *60–67 (Rosenbaum, J., dissenting from denial of rehearing en banc).

But we are not writing on a blank slate. *Eknes-Tucker* is binding precedent that forecloses the application of intermediate scrutiny. *See Smith v. GTE Corp.,* 236 F.3d 1292, 1300 n.8 (11th Cir. 2001) ("Under the well-established prior panel precedent rule of

this Circuit, the holding of the first panel to address an issue is the law of this Circuit, thereby binding all subsequent panels unless and until the first panel's holding is overruled by the Court sitting en banc or by the Supreme Court.").

Under *Eknes-Tucker*, we must apply rational basis review to the plaintiffs' equal protection challenge to Policy Order 63. Under rational basis review, we ask "whether the challenged legislation is rationally related to a legitimate state interest." *Eknes-Tucker*, 80 F.4th at 1224–25. We must presume Policy Order 63's classification is valid, and the plaintiffs "have the burden 'to negative every conceivable basis which might support it.'" *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). Put another way, a classification "is constitutional under rational basis scrutiny so long as 'there is any reasonably conceivable state of facts that could provide a rational basis'" for the policy. *Williams v. Morgan*, 478 F.3d 1316, 1320 (11th Cir. 2007) (quoting *Beach Commc'ns*, 508 U.S. at 313). A challenged policy fails under rational basis review only when the "varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Vance v. Bradley*, 440 U.S. 93, 97 (1979).

Despite my serious concerns about the wisdom of Alabama's policy judgment, I am compelled by precedent to agree with the majority opinion that Policy Order 63 survives rational

basis review. *See Williams*, 478 F.3d at 1324 (recognizing that even a "bad" or "foolish" policy may survive rational basis review).

### III.

In closing, I understand the profound impact that today's decision will have on the lives of Corbitt, Clark, Doe, and other transgender people in Alabama. The decision means that Alabama can deny transgender people access to driver's licenses with sex designations that match their gender identity if they have not undergone the expensive and invasive gender reassignment surgeries that Policy Order 63 requires. I understand that without the ability to change the sex designations on their licenses, transgender Alabamians will likely suffer abuse and even violence when their licenses reveal, in everyday transactions, that they are transgender. Because our precedent compels the conclusion that classifications targeting transgender individuals are subject to rational basis review, not intermediate scrutiny, however, I reluctantly and with grave misgivings concur in the majority opinion's judgment.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

September 20, 2024

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  21-10486-GG
Case Style:  Darcy Corbitt, et al v. Secretary of the Alabama Law Enforcement Agency, et al
District Court Docket No:  2:18-cv-00091-MHT-SMD

Opinion Issued
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP 41(b).

Petitions for Rehearing
The time for filing a petition for panel rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing is timely only if received in the clerk's office within the time specified in the rules. **A petition for rehearing must include a Certificate of Interested Persons and a copy of the opinion sought to be reheard.** See 11th Cir. R. 35-5(k) and 40-1.

Costs
Costs are taxed against Appellee(s) / Respondent(s).

Bill of Costs
If costs are taxed, please use the most recent version of the Bill of Costs form available on the Court's website at www.ca11.uscourts.gov. For more information regarding costs, see FRAP 39 and 11th Cir. R. 39-1.

Attorney's Fees
The time to file and required documentation for an application for attorney's fees and any objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation via the eVoucher system no later than 45 days after issuance of the mandate or the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or

cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Clerk's Office Phone Numbers

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1 Ntc of Issuance of Opinion